

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**97-1264**
**CIV-LENARD**

CASE NUMBER:

MAGISTRATE:

**MAGISTRATE**
**JOHNSON**

| | |
|---|---|
| EXOTIC BOTANICALS, INC., a Florida corporation; HODGE GREENHOUSES, INC., a Florida corporation; JOAN D. CONE, INC. d/b/a TREEHOUSE PLANTS, a sole proprietorship; DONALD WAYNE SIMPSON d/b/a ORNAMENTAL HORTICULTURE, a sole proprietorship; and GATOR GROWERS NURSERY, INC., a Florida corporation; on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| E.I. DU PONT DE NEMOURS & COMPANY, INC., a Delaware corporation; CRAWFORD & COMPANY, a Georgia corporation; THOMAS M. BURKE, ESQ., individually; TIMOTHY T. OBRIGAWITCH, individually; EDGAR S. WOOLARD, JR., individually; and CABANISS & BURKE, P.A., a Florida partnership, f/k/a CABANISS BURKE & WAGNER, P.A., | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**DEFENDANTS' NOTICE OF REMOVAL**

**TO THE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA:**

Defendants, E.I. DuPONT DE NEMOURS & COMPANY ("DuPont"), CRAWFORD & COMPANY, INC. ("Crawford"), EDGAR S. WOOLARD, JR., and TIMOTHY T. OBRIGAWITCH, by and through undersigned counsel and pursuant to 28 U.S.C. §§ 1331, 1332, 1337, 1441, and 1446, hereby file this Notice of Removal. In support of this Notice of

Removal and this Court's jurisdiction, Defendants state:

1.    On March 27, 1997, DuPont and Crawford were served with and first received a summons and a complaint styled Exotic Botanicals, Inc., et al. v. E.I. DuPont De Nemours & Co., et al., Case No. 97-6611 CA 08 (later transferred to CA 23).  This complaint had been filed in the Circuit Court of the Eleventh Judicial Circuit, in and for Dade County, Florida, on March 25, 1997.  Copies of the Summons and Complaint are attached to this notice pursuant to 28 U.S.C. § 1446(a). (Ex. A)  The complaint is the initial pleading upon which the action is based. All other Defendants named in this action were served with and/or first received the summons and complaint in this action after March 27, 1997, the date on which DuPont and Crawford were served.

2.    The United States District Court for the Southern District of Florida is the district in which the state court action was filed.  Pursuant to 28 U.S.C. § 1446(b), this Notice is filed within thirty days of the receipt by Defendants of the initial pleading setting forth the alleged claim for relief upon which the action is based. Removal to this Court is proper under 28 U.S.C. §§ 1331, 1332, 1337, 1367, 1441 and 1446 because, as shown below, this Court has "federal question" jurisdiction, "diversity" jurisdiction, and "supplemental" jurisdiction over the claims for relief.

3.    The undersigned has conferred with counsel for Defendants Cabaniss & Burke, P.A., and Thomas M. Burke,[1] and is authorized to represent that they have received notice of this cause and consent to and join in this removal.  Evidence thereof is attached hereto.  (Ex. B)

---

[1]Thomas M. Burke was originally misnamed as "Thomas J. Burke" in the complaint, but Plaintiffs subsequently  filed a notice correcting this error.

4.     In removing this action, Defendants do not intend to waive any rights or defenses to which they are otherwise entitled, including but not limited to those set forth in Fed.R.Civ.P. 12(b) and 13.

5.     The removing Defendants are filing a copy of this notice with the Circuit Court of the Eleventh Judicial Circuit, in and for Dade County, Florida as required by 28 U.S.C. § 1446(d).  A copy of the notice to be filed is attached hereto.  (Ex. C)

6.     The removing Defendants have filed with this Notice of Removal, a true and legible copy of all process, pleadings and orders on file in the state court, as well as other papers served but not yet included in the state court file, which are attached hereto.  (Ex. A)

### Federal Question Jurisdiction

7.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.  Moreover, pursuant to 28 U.S.C. § 1337, this Court has original jurisdiction of all civil actions or proceedings arising under any Act of Congress regulating commerce.

8.     By their complaint, the named Plaintiffs purport to bring a claim on behalf of themselves and others similarly situated pursuant to a class action, with the putative class defined in material part as:  "All Florida growers of ornamental plants who purchased and applied Benlate 50 DF in Florida and who were damaged thereby."  (Compl. ¶ 15)  Although Plaintiffs have attempted to artfully plead their complaint to avoid federal court jurisdiction, the gravamen of the complaint is the claim of violation of the Florida RICO statutes (e.g., Fla. Stat. § 772.103), which claim necessarily and expressly relies on violations of federal statutes as essential elements of the claim.  Specifically, as essential elements to recovery, Plaintiffs expressly allege Defendants are guilty of "thousands of acts of racketeering" by their

- 3 -

"thousands" of violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1622 (subordination of perjury), which combined to form a "pattern" of racketeering and proximately resulted in Plaintiffs' claimed damages. (Compl. Count I) In essence, Plaintiffs allege that Defendants conspired to commit fraud and the other federal statutory violations by denying that Benlate, a fungicide manufactured by DuPont, was defective and caused damages, and by otherwise defending against such claims brought in lawsuits filed throughout the country. (Compl.) Defendants vehemently deny these allegations of fraud and federal statutory violations and, thus, substantial, disputed questions of federal law will need to be determined in this action. In addition to the RICO claim, Plaintiffs assert product liability claims against DuPont only, under theories of strict liability, negligence, fraud and breach of express warranty. (Compl. Counts II-V)

9. A case arises under federal law, and thus comes within this Court's original "federal question" jurisdiction, not only when federal law creates the cause of action sued upon, but also "where the vindication of a right under state law necessarily turn[s] on some construction of federal law." Franchise Tax Board v. Construction Laborers Vacation Trust, 463 U.S. 1, 9 (1983)(citing Smith v. Kansas City Title & Trust Co., 255 U.S. 180 (1921), and Hopkins v. Walker, 244 U.S. 486 (1917)). Thus, even where the law that creates the cause of action sued upon is state law, original federal court jurisdiction is available where it appears from plaintiff's "well-pleaded complaint" that some substantial, disputed question of federal law is a necessary element of one of the pleaded state claims. Id. at 13, 27-28. As discussed above, that is the case here and, therefore, removal is proper under 18 U.S.C. § 1441(a) and (b) as this Court has original "federal question" jurisdiction under 18 U.S.C. §§ 1331 and 1337.

10. Federal question jurisdiction is also inherent in Plaintiffs' claim under the Florida

RICO statute since, not only is the state statute patterned after and construed in accordance with the federal RICO statute, but the Florida statute expressly incorporates federal statutes and law into the substantive provisions and essential elements of a claim thereunder, which federal statutes and law Plaintiffs expressly allege in their complaint as the essential elements and predicate acts upon which their claim is premised.  See Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians, 63 F.3d 1030, 1047 (11th Cir. 1995).  Accordingly, removal is proper under 28 U.S.C. § 1441(a) and (b).

11.   In addition, when the law that creates the cause of action alleged is state law, original federal court jurisdiction is nevertheless available where one or more of the claims asserted is "'really' one of federal law."  Franchise Tax Board, 463 U.S. at 13.  In the present case, notwithstanding Plaintiffs' attempted artful pleading to avoid federal court jurisdiction, Plaintiffs' allegations under its Florida RICO count "really" are a claim for federal RICO (18 U.S.C. § 1962) in that, not only do Plaintiffs expressly allege thousands of violations of federal statutes as predicate acts and essential elements of their claim, but also it is apparent from the face of the complaint that the alleged violations of the statutes would have substantially affected interstate commerce.  See California Int'l Chemical Co. v. Neptune Pool Service, Inc., 770 F. Supp. 1530, 1536 (M.D.Fla. 1991).  Accordingly, this Court has original "federal question" jurisdiction under 18 U.S.C. §§ 1331 and 1337 and removal is proper under 28 U.S.C. § 1441(a) and (b).

12.   Moreover, since Plaintiffs' RICO claim against any or each of the removing Defendants is a separate and independent claim within the jurisdiction conferred by 28 U.S.C. § 1331, the entire case, including any otherwise non-removable claims, may be removed and this Court has jurisdiction to determine all issues.  28 U.S.C. § 1441(c).

## Diversity Jurisdiction

13.    Pursuant to 28 U.S.C. § 1332, this Court has original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

14.    Each of the Plaintiffs is a citizen of the state of Florida, each being a Florida corporation with its principal place of business in Florida or otherwise a citizen of the state of Florida.  (Compl. ¶¶ 1-5)

15.    Defendant DuPont is a citizen of Delaware, being a Delaware corporation with its principal place of business in Delaware.  (Compl. ¶ 6)

16.    Defendants, Edgar S. Woolard, Jr., and Timothy T. Obrigawitch, have been sued as "DuPont's agents" acting within the scope of their employment and therefore would be deemed citizens of the state of Delaware along with DuPont.  (Compl. ¶¶ 9-10)  See McCabe v. General Foods Corp., 811 F.2d 1336, 1339 (9th Cir. 1987).  In any event, to the extent individual liability is alleged,  Defendants Woolard and Obrigawitch are citizens of Delaware.

17.    Defendant Crawford is a citizen of Georgia, being a Georgia corporation with its principal place of business in Georgia.  (Compl. ¶ 11)

18.    Defendants Cabaniss & Burke, P.A. and Thomas J. Burke would be deemed citizens of Florida.  However, Plaintiffs' naming these Defendants in the complaint in an attempt to avoid federal court jurisdiction is unavailing.

a.    There are no allegations in the complaint to assert liability against Cabaniss & Burke, P.A., the only allegations concerning it being that it was the law firm of which Defendant Burke was a member.  (Compl. ¶¶ 12, 228(e))  Accordingly, Cabaniss & Burke, P.A., is, at best a mere nominal party that should not be considered in the

diversity analysis.  See Navarro Savings Ass'n v. Lee, 446 U.S. 458, 461 (1980).

     b.    The allegations of the complaint also clearly state that the activities of Defendant Burke complained about were undertaken in Burke's capacity as the legal representative of DuPont.  Accordingly, since all Burke's actions were taken as the legal representative of Defendant DuPont, only DuPont's citizenship (DuPont is a citizen of Delaware) should be considered in the diversity analysis.  Cf. 28 U.S.C. § 1332(c)(2)(legal representative of estate, infant or incompetent to be deemed a citizen only of the same state as the party represented).  See also McCabe, 811 F.2d at 1339 (fraudulent joinder exists where allegations state non-diverse defendant employee's actions were within scope of employment with diverse defendant employer).

     c.    Moreover, Plaintiffs' joinder of Burke and Cabaniss & Burke amounts to a fraudulent joinder of parties in that Plaintiffs have no viable claim and have failed to state a claim for which relief can be granted against these named Defendants; these Defendants have been joined only for the intended purpose of avoiding federal court jurisdiction. Accordingly, the citizenship of Burke and Cabaniss & Burke should not be considered in the diversity analysis.  See Levett v. Independent Life & Accident Ins. Co., 814 F.Supp. 1053 (M.D.Ala. 1993).  See generally Tapscott v. MS Dealer Service Corp., 77 F.3d 1353, 1360 (11th Cir. 1996).  To the extent the Court deems it necessary in order to determine that a fraudulent joinder exists, Defendants request the opportunity to conduct limited discovery and, thereafter, present affidavits and depositions to definitively establish the fact.  See Cavallini v. State Farm Mut. Auto Ins. Co., 44 F.2d 256, 263 (5th Cir. 1995).

     d.    In any event, even if these Defendants' citizenship were considered,

- 7 -

jurisdiction would be appropriate. An exception to the traditional complete diversity requirement exists where the plaintiff joins a non-diverse defendant with a diverse defendant and federal question jurisdiction exists over the claim against the non-diverse defendant. See Palmer v. Hospital Authority, 22 F.3d 1559, 1564 (11th Cir. 1994); Hiram Walker & Sons, Inc. v. Kirk Line, 877 F.2d 1508, 1511-12 (11th Cir. 1989). Such is the case here. As discussed above, the only claim asserted against Defendants Burke and Cabaniss & Burke is the RICO claim over which this Court has original federal question jurisdiction.

e. Moreover, even absent complete diversity, this Court can exercise diversity jurisdiction over the claims between the diverse parties, and, as discussed below, supplemental jurisdiction over claims between the non-diverse parties. 28 U.S.C. §1367. See Palmer, 22 F.3d at 1563-69; Hiram Walker, 877 F.2d at 1512.

19. Accordingly, under 28 U.S.C. § 1332(a)(1), this civil action is between "citizens of different states."

20. Additionally, under 28 U.S.C. § 1332(a), the amount in controversy in this civil action exceeds the sum or value of $75,000, exclusive of interest and costs, as to each Plaintiff and putative class member. Indeed, Plaintiffs expressly allege that this is an action for damages "well in excess of $1,000,000.00, exclusive of interest, costs and attorneys' fees." (Compl. ¶ 13)

21. Moreover, based upon a fair reading of the complaint and based upon the experience of the undersigned counsel and his law firm in cases nearly identical to this case, the undersigned reasonably concludes that the amount in controversy in this case exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, as to each Plaintiff and

each member of the putative class. See Richman v. Zimmer, Inc., 644 F. Supp. 540 (S.D. Fla. 1986); Lee v. Altamil Corp., 457 F. Supp. 979 (M.D. Fla. 1978). This is especially true given that recovery of statutory attorneys fees (under the RICO claim), treble damages (under the RICO claim), and punitive damages (expressly sought under the RICO claim and undoubtedly to be added by amendment to the other claims), must all be considered in assessing the amount in controversy.     See Tapscott v. MS Dealer Service Corp., 77 F.3d 1353 (11th Cir. 1996)(punitive damages sought in putative class action should be aggregated and attributed to each of the class representatives in determining the amount in controversy for diversity jurisdiction); In re Abbott Laboratories, 51 F.3d 524 (5th Cir. 1995)(statutory attorneys fees recoverable by the class must be attributed to the class representatives in determining the amount in controversy for diversity jurisdiction).    Moreover, this Court is requested, pursuant to Fed.R.Evid. 201, to take judicial notice of the claims and verdicts of record in similar cases by individual plaintiffs who have been successful in convincing juries that Benlate® caused damage to plants. E.g. Claire J. Sidran and Phillip Sidran, as partners in Sidran Orchids v. E.I. Du Pont de Nemours & Co., Case No. 92-18377 Ca 25 (Fla. 11th Jud. Cir. Dade County)(verdict returned for plaintiff for $3.5 million)(subsequently vacated and new trial granted); Fred Henry and Donna Henry d/b/a Fred Henry's Paradise of Orchids v. E.I. Du Pont D Nemours & Co., Case No. 92-26633-12 (Fla. 17th Jud. Cir. Broward County)(verdict returned for plaintiff for nearly $3.8 million); KHD, Ltd. v. E.I. Du Pont de Nemours & Co., Case No. 92-20476 (Fla. 17th Jud Cir. Broward County)(verdict returned for plaintiff for more than $1.3 million); Finks Farms, Inc. v. Vigoro Industries, et al., including E.I. Du Pont de Nemours & Co., Case No.

92-378 (Fla. 20th Jud. Cir. Hendry County)(verdict returned for plaintiff for $1 million).[2]

22.    Because, as stated above, this civil action is between "citizens of different states" and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, as to each Plaintiff (as well as each member of the putative class), this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332.  Accordingly, removal to this Court is proper under 28 U.S.C. §§ 1441(a) and (b).

<div align="center">

### Supplemental Jurisdiction

</div>

23.    To the extent this Court determines it does not otherwise have jurisdiction over a particular claim against a particular party either because of lack of diversity or lack of federal question, this Court can nevertheless exercise supplemental jurisdiction over the claim pursuant 28 U.S.C. § 1367.  See Palmer, 22 F.3d at 1563-69; Abbott Labs, 51 F.3d at 528.

Dated in Miami, Dade County, Florida this 25 day of April, 1997.

Respectfully submitted,

CARLTON, FIELDS, WARD,
EMMANUEL, SMITH & CUTLER, P.A.
100 S.E. Second Street, Suite 4000
Miami, FL  33131
Counsel for E.I. du Pont de Nemours
& Co., Crawford & Co., Edgar S. Woolard, Jr.
and Timothy T. Obrigawitch
Phone: (305) 530-0050
Fax: (305) 530-0055

By: _____
BENJAMINE REID
FLORIDA BAR NO. 183522
PAUL L. NETTLETON
FLORIDA BAR NO. 396583

---

[2]In those cases where DuPont has proved to the jury's satisfaction that Benlate® was not defective and did not cause the plaintiffs' claimed damages, the plaintiffs have nevertheless routinely sought recovery of damages of more than $1 million, thus further evidencing the amount in controversy exceeds $75,000, exclusive of interest and cost, as to each claimant. See, e.g., Native Hammock Nursery, Inc. v. E.I. Du Pont De Nemours & Co., Case No. 92-20061 (Fla. 11th Jud. Cir. Dade County).

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via U.S. Mail this $\underline{25}$th day of April, 1997 to  HARLEY S. TROPIN, ESQUIRE, KOZYAK TROPIN & THROCKMORTON, P.A., Attorneys for Plaintiffs, 2800 First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida  33131;  MARK COOPER, ESQUIRE, COOPER & WOLFE, P.A., Co-counsel for Plaintiffs, 700 Courthouse Tower, 44 West Flager Street, Miami, Florida   33130;   and DOUGLAS L. O'KEEFE, ESQUIRE, RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A., Attorneys for Defendants, Thomas M. Burke, Esq. and Cabaniss & Burke, P.A., 701 Brickell Avenue, Suite 1900, Miami, Florida 33131.

> CARLTON, FIELDS, WARD,
> EMMANUEL, SMITH & CUTLER, P.A.
> 100 S.E. Second Street, Suite 4000
> Miami, FL  33131
> Counsel for E.I. du Pont de Nemours
> & Co., Crawford & Co., Edgar S. Woolard, Jr.
> and Timothy T. Obrigawitch
> Phone: (305) 530-0050
> Fax: (305) 530-0055
>
> By: _____
>    BENJAMINE REID
>    FLORIDA BAR NO. 183522
>    PAUL L. NETTLETON
>    FLORIDA BAR NO. 396583

1136289.1

- 11 -

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN
AND FOR DADE COUNTY, FLORIDA

CASE NO.  **97- 6611 CA**

EXOTIC BOTANICALS, INC., a
Florida corporation; HODGE
GREENHOUSES, INC., a Florida
Corporation; JOAN D. CONE, INC.
d/b/a TREEHOUSE PLANTS, a Florida
corporation; DONALD WAYNE SIMPSON
d/b/a ORNAMENTAL HORTICULTURE,
a sole proprietorship; and
GATOR GROWERS NURSERY, INC., a
Florida corporation; on behalf of
themselves and all others similarly
situated,

     Plaintiffs,

v.

E.I. DU PONT DE NEMOURS & COMPANY,
Inc., a Delaware corporation;
CRAWFORD & COMPANY, a Georgia
corporation; THOMAS J. BURKE, ESQ.,
individually; TIMOTHY T. OBRIGAWITCH,
individually; EDGAR S. WOOLARD, JR.,
individually; and CABANISS & BURKE, P.A.,
a Florida partnership, f/k/a CABANISS
BURKE & WAGNER, P.A.,

     Defendants.

_____/

**CLASS REPRESENTATION**

## CLASS ACTION COMPLAINT

Plaintiffs, Exotic Botanicals, Inc.; Hodge Greenhouses, Inc.;

Joan D. Cone, Inc. d/b/a Treehouse Plants; Gator Growers Nursery,

Inc., and Donald Wayne Simpson d/b/a Ornamental Horticulture, on

their own behalf and on behalf of all class members similarly

situated sues defendants E. I. du Pont de Nemours & Company, Inc.;

Crawford & Company; Thomas J. Burke; Timothy T. Obrigawitch; Edgar

S. Woolard, Jr.; and Cabaniss & Burke, P.A., f/k/a Cabaniss Burke

& Wagner, P.A.; and demand trial by jury of all issues so triable

and state:

**EXHIBIT**

**"A"**

## INDEX

I.   The Parties . . . . . . . . . . . . . . . . . . . . . 3

  1.  The Plaintiffs . . . . . . . . . . . . . . . . . . 3
  2.  The Defendants . . . . . . . . . . . . . . . . . . 5

      a.  DuPont . . . . . . . . . . . . . . . . . . . 5
      b.  The DuPont Agents . . . . . . . . . . . . . . 6
      c.  Crawford & Company . . . . . . . . . . . . . 6
      d.  Cabaniss & Burke . . . . . . . . . . . . . . 6

  3.  Venue . . . . . . . . . . . . . . . . . . . . . . 7

II.  Class Representation Allegations . . . . . . . . . . . 7

III. Background and Brief Overview of DuPont's Fraud . . . . 10

      a.  DuPont's Agricultural Products Division . . . 10
      b.  Benlate's Inherent Problems for Ornamental
          Plants . . . . . . . . . . . . . . . . . . . 11
      c.  The Rush of Benlate 50 DF to the Market . . . 13
      d.  The Making of Benlate 50 DF:
          Reckless and Intentional Contamination . . . . 16
      e.  The Damage to Ornamental Plants . . . . . . . 20
      f.  The Atrazine Myth:
          Planting the Seeds for the Fraudulent Scheme . 21
      g.  DuPont's "Benlate is Back" Campaign:
          Perpetuating the Fraud . . . . . . . . . . 23
      h.  DuPont's Handling of Benlate Claimants . . . . 25
      i.  DuPont's Legal Team Takes Control . . . . . . 31
      j.  Burke and the Litigation of the Benlate Cases:
          Fraud and Obstruction of Justice . . . . . . . 38

          a.  Bush Ranch Case . . . . . . . . . . . . . 39
          b.  Hawaii Benlate Trials . . . . . . . . . . 43
          c.  Lambert Case . . . . . . . . . . . . . . . 45
          d.  Ritter-Whitworth Case . . . . . . . . . . 46
          e.  Native Hammock Nursery Case . . . . . . . 47
          f.  Davis Tree Farms Case . . . . . . . . . . 47

Count I    - Florida RICO . . . . . . . . . . . . . . . . 53

             The DuPont Enterprise . . . . . . . . . . . 53
             The Predicate Acts of Racketeering . . . . . 55
             Violations of § 772.103(4), Fla. Stat. . . . 64
             Violations of § 772.103(3), Fla. Stat. . . . 65

Count II   - Strict Liability . . . . . . . . . . . . . . 65
Count III  - Negligence . . . . . . . . . . . . . . . . . 67
Count IV   - Fraud . . . . . . . . . . . . . . . . . . . . 69
Count V    - Breach of Express Warranty . . . . . . . . . 71

Jury Demand . . . . . . . . . . . . . . . . . . . . . . . 72

2

## I. **GENERAL ALLEGATIONS**

### PARTIES

### 1. **The Plaintiffs**

1.    Named class representative Exotic Botanicals, Inc. ("Exotic") is a Florida corporation with its principal place of business in Homestead, Florida.  The owner and principal of Exotic is Mr. James Cannata.  At all material times, Mr. Cannata operated Exotic, which grew and sold high quality ornamental nursery products.  Mr. Cannata received his degree in horticulture (with high honors) from Rutgers University.  Exotic purchased Benlate 50 DF and applied the product on its ornamental plants and as a direct result, suffered extensive plant damage.

2.    Named class representative Hodge Greenhouses, Inc. ("Hodge Greenhouses") is a Florida corporation with its principal place of business in Winter Garden, Florida.   The owner and principal of Hodge Greenhouses is Mr. Mark Hodge.  As well as being a grower of ornamental foliage in Florida since 1976, Mr. Hodge is a certified teacher of science.  Mr. Hodge at all material times, operated Hodge Greenhouses, which grew and sold high quality ornamental products.  Hodge Greenhouses purchased Benlate 50 DF and applied the product on its ornamental plants and as a direct result, suffered extensive plant damage.

3.    Named class representative Joan D. Cone, Inc. d/b/a Treehouse Plants ("Treehouse") is a Florida corporation with its principal place of business in Apopka, Florida.  At all material times, Mr. Alan Cone operated Treehouse, which grew and sold high

3

quality ornamental nursery products.   Mr. Cone was the first president of the Florida Foliage Association.   Prior to applying Benlate 50 DF to its plants, Treehouse received the "Sears Roebuck Award of Excellence" based upon the quality of its ornamental products.   Treehouse was the only nursery in Florida to win the award for three consecutive years.   Treehouse purchased Benlate 50 DF and applied the product on its ornamental plants and as a direct result, suffered extensive plant damage.

4.   Named class representative Gator Growers Nursery, Inc. ("Gator Growers") is a Florida corporation with its principal place of business in Plymouth, Florida.  The owner and principal of Gator Growers is Mr. Kenneth Sumner.   During all material times, Mr. Sumner operated Gator Growers, which grew and sold high quality ornamental products.  Mr. Sumner received a degree in entomology (with a minor in horticulture) from the University of Florida and is certified to teach pesticide application.  Mr. Sumner's family started Gator Growers in 1952.  Gator Growers purchased Benlate 50 DF and applied the product on its ornamental plants and as a direct result, suffered extensive plant damage.

5.   Named class representative Donald Wayne Simpson d/b/a Ornamental Horticulture ("Ornamental Horticulture") is a sole proprietorship with its principal place of business in Plymouth Sorrento, Florida.   The owner and principal of Ornamental Horticulture is Mr. Donald Wayne Simpson.   During all material times, Mr. Simpson operated Ornamental Horticulture, which grew and sold high quality ornamental products.   Mr. Simpson received a

4

degree in agriculture (with a specialty in ornamental horticulture) from the University of Florida.  Ornamental Horticulture purchased Benlate 50 DF and applied the product on its ornamental plants and as a direct result, suffered extensive plant damage.

## 2. The Defendants

### a. DUPONT

6.    Defendant E.I. Du Pont De Nemours and Company, Inc. ("DuPont") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Wilmington, Delaware.  DuPont manufactured, sold and delivered the Benlate 50 DF that was purchased by Plaintiffs.

7.    DuPont does business and sells products in Dade County, Florida within the meaning of Fla. Stat. §48.181.  DuPont is qualified to do business in Florida, has a registered agent in Florida, and maintains an export distribution Center in Dade County, Florida.

8.    DuPont's Latin American headquarters of its Agricultural Products division is located in Dade County, Florida.  At all relevant times, DuPont was engaged in selling and delivering into the State of Florida various fungicides, including Benlate 50 DF. This Court has personal jurisdiction over DuPont pursuant to Fla. Stat. §48.193.

5

b.   **THE DUPONT AGENTS**

9.   Defendant Edgar S. Woolard, Jr. has been, during relevant times, DuPont's Chairman of the Board and Chief Executive Officer.

10.   Defendant Timothy T. Obrigawitch has been, during relevant times, responsible for supervising DuPont's field research activities pertaining to Benlate 50 DF.

c.   **CRAWFORD & COMPANY**

11.   Defendant Crawford & Company, Inc. ("Crawford") is a Georgia company which is qualified to do business in Florida and which has its principal place of business at 6095 Barfield Road, Atlanta, Georgia.   Crawford is an authorized representative for DuPont.   During relevant times, Crawford was continuously engaged in representing DuPont with regard to the investigation of claims made by purchasers and users of Benlate 50 DF in Dade County and throughout the State of Florida.   This Court has personal jurisdiction over Crawford pursuant to Fla. Stat. §48.193.

d.   **CABANISS & BURKE AND THOMAS J. BURKE, ESQ.**

12.   Defendant Cabaniss & Burke, P.A. is a partnership of attorneys with its principal place of business in Orlando, Florida. Cabaniss & Burke, P.A. was, during relevant times, retained to provide professional legal services to DuPont in the handling of Benlate 50 DF claims.   Defendant Thomas J. Burke, Esq. was, during relevant times, a partner in the firm of Cabaniss & Burke and delegated and authorized by DuPont to serve as the National Coordinator for all Benlate litigation.   This Court has personal jurisdiction over Cabaniss & Burke pursuant to Fla. Stat. §48.193.

6

13. This is an action for damages well in excess of $1,000,000.00, exclusive of interest, costs and attorneys' fees.

14. Venue is proper in this Eleventh Circuit Court for Dade County because: (a) DuPont maintains offices for the transaction of its customary business in Dade County, Florida; (b) many of the acts and conduct charged herein occurred in Dade County, Florida and specifically before this Court; (c) much of the ornamental plant damage charged herein occurred in Dade County, Florida; and (d) much of the tangible evidence is presently located in Dade County, Florida.

## II. **CLASS REPRESENTATION ALLEGATIONS**

15. All Plaintiffs bring this action as a class action against all Defendants pursuant to Rule 1.220(b)(3) of the Florida Rules of Civil Procedure on behalf of the class (the "Class") consisting of:

> All Florida growers of ornamental plants who purchased and applied Benlate 50 DF in Florida and who were damaged thereby. Excluded from the Class are DuPont, the Defendants, their subsidiaries and affiliates, other officers of DuPont, members of the immediate families of each Defendant, and the legal representatives, heirs, successors or assigns of any of the Defendants.

16. The representative parties and Class Members are all Florida growers that purchased Benlate 50 DF and applied the product on ornamental plants and have all suffered injuries. Upon information and belief, there has never been a prior lawsuit certified on behalf of victims of Benlate 50 DF. All Florida ornamental growers are similarly subjected to the phytotoxic (injurious or poisonous to plants) effects of Benlate 50 DF.

7

17.   Members of the Class are so numerous that joinder of all Class Members is impractical.   Upon information and belief, there are approximately 800 class members.

18.   Plaintiffs will fairly and adequately protect the interests of all Class Members and have retained counsel competent and experienced in class litigation.

19.   Plaintiffs' claims are typical of the claims of the Class Members and all Class Members sustained damages arising out of Defendants' wrongful conduct in violation of state laws complained of herein.

20.   The prosecution of separate claims by each individual Class Member would create a risk of inconsistent or varying adjudications.

21.   The questions of law or fact common to the claims or defenses of the representative parties and the claims or defenses of each Class Member predominate over any questions of law or fact affecting individual Class Members.

22.   This action is properly maintained as a class action inasmuch as the questions of law and fact common to Class Members predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

23.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class Members is impracticable.   Furthermore, the expense and burden of individual litigation make it impossible for

8

the Class Members to individually redress the wrongs done to them.

24. There are questions of law and/or fact common to the Class which predominate over any questions solely affecting individual Class Members. Among the questions of law and fact common to all Class Members, are, *inter alia*:

a. Whether Benlate 50 DF, when used in accordance with its label instructions, was phytotoxic to ornamental plants in Florida;

b. Whether and when DuPont knew that applications of Benlate 50 DF to ornamental plants in Florida caused injury;

c. Whether studies conducted by DuPont provided DuPont with information about the dangers from applications of Benlate 50 DF to ornamental plants in Florida;

d. Whether DuPont misrepresented data on the risk of Benlate 50 DF applications to ornamental plants in Florida and conspired to distort such information;

e. Whether the Defendants utilized a litigation strategy to falsify and misrepresent evidence on the risk of applying Benlate 50 DF to ornamental plants in Florida;

f. Whether the attorney/client privilege was fraudulently utilized by DuPont to conceal scientific evidence linking ornamental plant injury to applications of Benlate 50 DF; and

g. Whether the state RICO laws were violated by Defendants' acts as alleged herein.

25. The defenses asserted by the Defendants will be very similar if not identical as to all named representatives and Class Members; it would be impractical to assert the claims and defenses

9

in separate litigation.

26.   The proof on the issue of causation, including numerous studies and documents linking ornamental plant phytotoxicity to applications Benlate 50 DF in Florida, will be the same for the named representatives and Class Members.

## II. BACKGROUND AND BRIEF OVERVIEW OF DUPONT'S FRAUD

### a.   DuPont's Agricultural Products Division

27.   DuPont is one of the oldest and largest companies in the world.   DuPont's revenues in 1995 were forty-two billion dollars ($42,000,000,000.00)   with   twenty-five   billion   dollars ($25,000,000,000.00) generated specifically from its "Chemical and Specialty" operations.

28.   One of the departments within the Chemical and Specialty operations is called Agricultural Products ("Ag Products").   Ag Products is the largest maker of plant protection products for agriculture in the United States.   In 1987, Ag Products had total sales of one billion, one hundred and eighty-six million dollars ($1,186,000,000.00).

29.   In 1970, Ag Products first began to sell a fungicide called "Benlate" in a wettable-powder form ("Benlate 50 WP").   The wettable powder formulation has a texture similar to that of baker's flour.   The "50" in "Benlate 50 WP" indicates that 50% of the Benlate is comprised of benomyl, the product's active ingredient.   Benomyl was first introduced as an experimental fungicide in 1967.

30.   Benlate was formulated and sold to growers in Florida to promote healthier plants by eliminating a broad spectrum of fungi and disease injurious to plants.   Through advertising, customer support and otherwise, DuPont intensively promoted and advertised the beneficial effects of Benlate -- i.e., that it would eliminate a broad range of organisms that are injurious to ornamental plants without harming the plants themselves.

31.   The Benlate family of products was very successful and lucrative for DuPont.

b.   **Benlate's Inherent Problems for Ornamental Plants**

32.   When Benlate is mixed with water, the benomyl decomposes and produces the following two molecules: (1) methyl benzimidazole carbamate ("MBC") and (2) butylisocyanate ("BIC").

33.   When water or moisture is added to BIC, butylamine is formed.   Butylamine, plus one BIC molecule, forms dibutylurea ("DBU").   DuPont has always been well aware of this naturally occurring breakdown process.

34.   DBU is a known phytotoxin.

35.   DuPont was well aware that the level of DBU increases: (a) with the age of the Benlate, and (b) when Benlate is exposed to hot and humid climates such as in Florida.

36.   During the 1980's, DuPont was well aware that when Benlate was mixed with high temperatures and humidity, DBU would form at levels that were phytotoxic.   For example, on August 6, 1985, Benlate's "product guardian" Warren Yap was asked to prepare a response to an interrogatory concerning Benlate damages to a

11

grower's crops.  Yap responded as follows:

> Moisture and high temperatures causes Benlate to deteriorate
> in both physical and chemical properties.  The reason [the
> plaintiff] complained about the Benlate he used was because
> the Benlate has picked up some moisture during packaging into
> water soluble bags.  In addition to moisture pick-up, the
> storage of this material in hot Florida warehouses had caused
> deterioration to the point where <u>the product had failed most
> of our product specifications</u>.  This data was shown in Table
> II of the letter from L.M. Gardner to L.F. Taylor on 12/20/80.
> (e.s.)

37.  In the early 1980's, DuPont started to receive reports
from greenhouse growers in Belgium that, upon applications of
Benlate 50 WP to their ornamental plants, plant injury and death
routinely occurred.  These growers filed legal actions against
DuPont in Belgium.

38.  In Belgium, the government assigns the scientific experts
for each case.  The experts in the Belgium Benlate cases concluded
that vapors emitted from the Benlate 50 WP caused the damage to the
ornamental plants.

39.  To assess the validity of these findings, DuPont
forwarded these Belgium reports to DuPont expert Dr. Charles Delp.
Delp confirmed that the research indicated that Benlate 50 WP, when
used under certain conditions, will cause damage to ornamental
plants.  Delp concluded that the Belgium experts confirmation of
the volatile component of Benlate 50 WP appeared to be logically
and carefully performed.

40.  Based upon the conclusions from Belgium, various DuPont
employees recommended changes in the Benlate instructions for
ornamental growers and urged DuPont to report such harmful findings
to the EPA.  DuPont never reported such findings to the EPA or to

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.

2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 · TEL. (305) 372 1800

any ornamental grower in Florida.

### c. **The Rush of Benlate 50 DF to the Market**

41. By 1985, DuPont was facing two significant problems with Benlate 50 WP: (a) numerous state and federal agencies were concerned with the human health hazards from the product's dust-like composition; and (b) DuPont realized that numerous strains of plant fungi were already resistant to the wettable powder formulation. See a copy of DuPont's early memorandum listing various Benlate resistant strains (with DuPont's notation on the cover "do not release") attached hereto as Exhibit "A".

42. Moreover, one of DuPont's main competitors was already selling a dry-flowable ("DF") fungicide for ornamental plants and, thus, DuPont determined that it stood to lose a large market share if it could not market a dry-flowable formulation.

43. One major problem for DuPont was that its previous attempts to manufacture a dry flowable Benlate had failed.

44. In 1981, DuPont manufactured 50,000 pounds of Benlate 75 DF (75% benomyl).

45. In 1983, DuPont abandoned the Benlate 75 DF project.

46. Therefore in 1985, DuPont embarked upon a plan to: (a) develop a DF formulation and produce sufficient test quantities by March 1986; (b) adequately complete the necessary greenhouse and field tests on the new DF version by October 1986; and (c) register and manufacture the new DF version so that sale would commence in January 1987.

13

47.  Prior to marketing Benlate 50 DF to the public, however, DuPont knew that chemical contamination could occur during the process of manufacturing Benlate and also knew that certain types of chemical contamination, particularly involving herbicides and other phytotoxic chemicals, would have a very significant adverse effect on ornamental plants.

48.  DuPont knew that because Benlate 50 DF represented a new formulation involving a different manufacturing process, the dry flowable formulation would have to be carefully studied in order to determine whether it would have any unpredictable properties.

49.  This was especially true because DuPont knew that the active ingredient in Benlate -- benomyl -- was extremely sensitive to any small changes in the formulation and because it naturally decomposed into BIC and DBU.

50.  DuPont was well aware of these potential Benlate risks all the way back to the early 1980's.

51.  In early 1980, DuPont was planning to change one of the inert ingredients in Benlate 50 WP.  The DuPont scientist in charge of the Benlate formulation warned DuPont's biochemical department and DuPont's Senior Research Supervisor Claude Corty not to make the change.  The DuPont scientist warned his superiors as follows:

> Benomyl is an extremely sensitive chemical and many inert ingredients cause it to decompose.  The "Benlate" formulation was developed only after years of patiently screening hundreds of ingredients by research.  We wouldn't change the "Benlate" formulation without a thorough review by research including aging tests. ... In spite of my discouraging response, I appreciate your question.  Let's look for better ways. (e.s.)

14

52.  Moreover, even Claude Corty (DuPont's Benlate Senior Research Supervisor) stated in a sworn affidavit in 1982 that "... benomyl formulations were observed to be particularly sensitive to minor variations ..." and "the formulation's stability was adversely affected by the presence of any impurities...."

53.  DuPont scientist Warren Yap, stated that it would be the "sin of all sins" not to engage in these extensive field and greenhouse testing prior to marketing any new version of Benlate. In explaining his reasoning, Yap stated: "[l]ike you produce medicine without having tested it and just sell it in the market. You just don't do that.  It is just not done.  It is just not done."

54.  However, by the end of the first year of the DF production schedule, DuPont realized it could not meet its original production goals because its "staff was overworked" and due to physical and chemical stability problems with the new Benlate formulation.

55.  In 1986, the DuPont scientist working on the new formulation told the director of Benlate development as follows:

> ... we do not have a clear vision of a solution for the benomyl problem.
>
> Our fungicide effort has grown to the point where I have more work than my existing staff can handle in the time frames requested. ... In particular, Yap is overloaded.
>
> Dry compacted Benlate is two months past goal due to physical and chemical stability problems and an easy solution is not in sight.
>
> The problem is that benomyl fails to disperse after the compacted formulation is aged for three weeks in a 45C oven.

15

Problem seems to be related to benomyl particle growth ... and small particle size ... and moisture sensitivity of benomyl.

I think Earl needs to follow his ideas ... until July. If we have no truly promising leads by then, <u>I would recommend suspending work on Benlate</u>. (e.s.)

56. Although DuPont knew that pre-market testing of the new DF formulation was necessary (and, in fact, began such testing) when its efforts to develop a sample batch of DF fell behind schedule, DuPont did not suspend its work but instead committed the "sin of all sins" by deciding to forgo the required testing and simply distribute Benlate 50 DF to the unsuspecting public, including ornamental growers in Florida, who DuPont knew would be susceptible to the foreseeable extreme dangers.

57. Benlate 50 DF was mass produced and marketed to all Florida growers for use on ornamental plants.

58. By the end of 1987, Benlate 50 DF had become DuPont's best selling fungicide. DuPont produced and delivered over fifteen million pounds of Benlate 50 DF to the public.

### d. The Making of Benlate 50 DF: Reckless and Intentional Contamination

59. Standard manufacturing protocols from the United States Environmental Protection Agency ("EPA") and the Department of Commerce ("DOC") require all pesticide manufacturers to report critical information to the EPA and DOC on an ongoing basis. As explained below, DuPont never reported any of the critical information regarding the contamination of Benlate 50 DF to the EPA or to the DOC.

16

60. Benlate 50 DF was not formulated at DuPont-owned facilities, but at facilities operated by three formulation contractors: Platte Chemical Company ("Platte"), Terra International Corporation ("Terra") and Bold Chemical Corporation ("Bold").

61. Although DuPont did not own these facilities, it essentially controlled and supervised the formulation process, and Benlate was made to order for DuPont.

62. DuPont manufactured and supplied the active, or technical ingredient (benomyl) to the formulators. Benomyl was manufactured by DuPont at its own Belle, West Virginia facility.

63. From the very beginning of the Benlate 50 DF production, DuPont was aware that cross contamination routinely occurred at the Belle facility and at the contract formulators. Nevertheless, most of this information was never provided to the EPA or to the public.

64. As Belle plant employee Rod Conrad explained in a 1992 internal DuPont memorandum:

> I ran this data back through the people who supplied it and ... they agreed it was an accurate document. I also had Tom Carpenito and Dick Knowles and Bob Schacht read it for "political feedback". They discouraged me from using this accurate information in this form because they thought it was too negative in presentation. However, if we are not willing to talk about the real problems we have, we are sure to continue having them.
>
> So I basically decided the Belle management team was unwilling to face our real selves in this area, and never published this collection of facts to a wider audience due to slightly negative management reaction. ... Neither Tom Carpenito or Dick Knowles would approve of any off plant publication of how many incidents of this type we are having to off plant groups. ... If I collected this much data in a half a day of casual conversation about the subject, can you imagine what a complete collection

17

of Belle incidents of the last few years would look like?

65.   At all material times, DuPont also manufactured at Belle a class of extremely powerful herbicides called sulfonylureas, which became one of DuPont's most profitable and widely sold products.

66.   As early as 1982, DuPont knew that sulfonylurea contamination with fungicides at the Belle facility would cause tremendous damage to the Florida ornamental industry.

67.   In a 1982 DuPont internal memorandum, a member of DuPont's biochemicals department concluded that "[i]nadvertent cross-contamination of sulfonylurea herbicides could result in incalculable losses to DuPont in the form of (1) immediate crop damage (and resulting law-suits) ...."

68.   In an effort to justify the existence of contaminates in Benlate 50 DF, including sulfonylurea, DuPont arbitrarily established numerous trace component action limits ("TCAL"). DuPont admittedly set these TCALs arbitrarily, because little testing was ever conducted to establish the safety of the TCALs.

69.   During the manufacturing of both benomyl by DuPont and Benlate 50 DF by the contract formulators, DuPont knew and authorized the inclusion of certain contaminants into Benlate 50 DF and was recklessly indifferent to the introduction of others.

70.   To increase profits by avoiding the costs of disposing material as toxic waste, DuPont generally followed a policy of diluting rather than eliminating or removing any known contaminants; this policy labelled substantially all contaminated

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.

2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 · TEL. (305) 372-1800

raw material and product as "rework", and required that the "rework" be added to subsequent lots, in effect, spreading the contamination to many more lots.

71. DuPont knew that this "rework" policy might risk injury for ornamental growers in Florida. In a 1989 DuPont internal memorandum entitled "Save the Benlate DF", Ken Krupa explained to Ted Kirchner that certain crops (such as wheat) may be strong enough to resist the contaminated product, but he warned that this policy could only be considered if DuPont could control Benlate's final distribution:

> ... in general agree that blending the material off and selling into the entire benlate market is risky. ... Only if we could control the distribution of the finished product, reworking might be an option. ... What is our loss potential if we do not rework.

72. Although DuPont <u>did not</u> control the distribution of the finished Benlate 50 DF product, it still, in fact, practiced a policy to rework the contaminated materials.

73. Moreover, as a result of the rework policy, many lots of Benlate 50 DF contained more benomyl than had been regulated and thus higher levels of DBU were formed.

74. Senior DuPont scientist Michael Duffy admitted in an internal DuPont memorandum that "extensive rework resulted in some Benlate DF with well above the label amount of active ingredient (ie benomyl + carbendazim) and higher than 'normal' levels of DBU. Such product could produce injury from the DBU alone."

19

75.  This resulting damage was confirmed by Benlate scientist A. Jay Julius, who concluded in a 1991 DuPont internal memorandum as follows:

> Over formulated Benlate DF – to [sic] much ingredient either in the form of benomyl of MBC... .  That means that even if the grower was in label specifications, he would be in trouble following the label.  ... <u>so an excessively over formulated or reformulated Benlate DF material means plant damage</u>. (e.s.)

76.  Yet another source of Benlate contamination arose from the cost cutting practice of producing Benlate with equipment that had last been used to produce herbicides or other harmful products, in some cases "flushed" with inert material that was subsequently utilized in Benlate production.

77.  In other instances, DuPont deliberately contaminated the Benlate DF with floor sweepings and other known products.  The sugar used to clean the manufacturing equipment which had been utilized to formulate Nustar, which contains flusilazole (a product which the EPA had prevented DuPont from selling in the United States due to numerous hazardous health studies) was subsequently added to numerous batches of Benlate 50 DF.

### e.  The Damage to Ornamental Plants

78.  Soon after it began widespread distribution of Benlate 50 DF, DuPont became aware of a pattern of ornamental grower complaints in Florida indicating that contaminated and/or defective Benlate 50 DF had caused extensive damage.

79.  While benomyl in the original Benlate WP version had many problems in hot and humid climates, the DF formulation only exacerbated and raised these problems to unknown heights.

20

80.   Because of the pernicious and gradual nature of Benlate 50 DF injury, most growers and plant pathologists were not able to immediately trace the damage to Benlate 50 DF.   In many cases, the ornamental plants were either slowly killed in the field, or were weakened to the point that they were unable to withstand the ordinary stress of inclement weather and/or transplanting.

81.   Holding a virtual monopoly on the empirical evidence of Benlate 50 DF's phytotoxicity, DuPont at first chose not to inform the public, including all Class Members, because of its desire to continue to generate huge profits without slowing down Benlate 50 DF production.

82.   On August 7, 1989, when it became aware that the EPA was investigating the problems with Benlate 50 DF, DuPont realized that it was no longer possible to remain silent about the defective nature of Benlate 50 DF.

### f. The Atrazine Myth:
### Planting the Seeds for the Fraudulent Scheme

83.   On or about August 1989, DuPont developed a plan and scheme to fraudulently misrepresent the cause of the extensive ornamental plant damage in Florida.   The plan was for DuPont to hide from the victims of Benlate 50 DF by deflecting all liability upon its third-party contractor Terra.

84.   Therefore, on or about August 11, 1989, T.R. Vaux, the Benlate sales manager, informed all growers that DuPont was recalling a very small number (27 in total) of Benlate 50 DF lots because DuPont had detected low levels of atrazine contamination in only those lots.

21

85.  Vaux made this statement with full knowledge of the other phytotoxic problems of Benlate 50 DF.  Vaux intended his information to reach all ornamental growers in Florida.

86.  DuPont used low levels of atrazine as the solitary, convenient scapegoat, which DuPont contradictorily pressured its formulator Terra to pay compensation for, but which it insisted to the EPA and for its own liability purposes was harmless.

87.  Despite much evidence establishing that the problem with Benlate 50 DF ran deeper than simply atrazine contamination, DuPont insisted upon Terra's settlements as part of a strategy to deflect attention from more serious contamination and product instability issues, and to permit resumption of Benlate 50 DF sales as soon as possible.

88.  One explanation for DuPont's "denial and concealment" strategy was because prior Benlate formulations were well known to Florida ornamental growers as safe and reliable.  In the words of one DuPont executive in an internal memorandum dated May 10, 1989:

> AS SOON AS WORD GETS AROUND IN THE GREENHOUSE INDUSTRY, WE MAY HEAR FROM MORE.  SINCE THE PEOPLE INVOLVED HAVE NEARLY ALL USED BENLATE FOR YEARS, **IT IS THE LAST THING THEY WILL THINK TO BLAME** ... (e.s)

89.  Not satisfied with simply defrauding those Florida ornamental growers that had already experienced extensive Benlate damage, DuPont initiated a massive "Benlate is Back" campaign, encouraging Florida ornamental growers to buy the new "quality assured" Benlate 50 DF.

22

### g. DuPont's "Benlate is Back" Campaign:
### Perpetuating the Fraud

90. On December 27, 1989, John A. Krol, Ag Product's vice-president (and currently DuPont's CEO), sent a letter to all ornamental growers in Florida representing that DuPont had been successful in recalling the few inadvertently atrazine contaminated Benlate lots. Krol stated that DuPont intended "to work closely with growers and nurserymen to retain their confidence in DuPont products" and that Benlate 50 DF was safe again to purchase.

91. DuPont intended that the information in Krol's letter reach all ornamental growers in Florida.

92. Krol's "confidence rebuilding" letter was sent with full knowledge that the problems with Benlate 50 DF ran deeper than simply atrazine contamination.

93. At the time of Krol's statement, DuPont was already aware that atrazine in Benlate 50 DF could not possibly account for all the reported ornamental plant damage.

94. This fact was previously confirmed by Kent Reasons, the original team leader of DuPont's Benlate Resolution Team, in his memorandum to all members of the Benlate Core Team. Reasons told his group that "we must communicate that the problem is more than atrazine, and communicate to field".

23

95.  At or about this same time, Kent Reasons traveled from Delaware to Florida to witness first-hand the extent of Benlate's extensive damage to ornamental plants.  Reasons' concluded, *inter alia*, as follows:

   *   Magnitude of the problem is much greater than the Wilmington team has perceived!

   *   There is a <u>real</u> <u>technical</u> problem

   *   It's huge & to date evasive

   *   Many ornamental growers may be put out of business

   *   Lives are being shattered

   *   Atrazine not the cause

   *   Growing belief that its inherent in D.F.

<u>See</u> Reasons' memorandum attached hereto as Exhibit "B".

96.  Many DuPont scientists acknowledged that DuPont's conduct was in reckless disregard for the welfare of the ornamental growers in Florida.

97.  DuPont scientist Ronald A. Hamlen declared in an internal DuPont memorandum dated August 28, 1990 as follows:

> ... there seems to be no improvement, no resolution to our inability to produce a <u>quality product</u> in sight!  We jump from atrazine to flusilazole to "what is next?"....  We do not test the magnitude of crops or ornamentals to allow a reasonable level of confidence that no problems will occur from trace impurities.  However, we will still establish permissible level limits and, I feel, it is a little like playing Russian roulette.

<u>See</u> a copy of Hamlen's memorandum attached hereto as Exhibit "C".

24

98.   The   evidence   of   Benlate   50   DF's   phytotoxicity   to ornamental   plants   in   Florida   was   so   overwhelming   that   DuPont initially   did   not   contest   much   of   the   damage,   but   instead   set   up   a claims   procedure   that   utilized   liability   insurance   proceeds   and monetary   contributions   from   a   Benlate   contract   formulator.   DuPont paid   over   five-hundred   million   dollars   ($500,000,000.00)   to   growers for   Benlate   50   DF   damage.

### h.   DuPont's Handling of Benlate Claimants

99.   To   release   funds   to   pay   for   the   Benlate   50   DF   damage, authorizations   from   numerous   DuPont   individuals   were   required.   For example,   Morris   Bailey   could   authorize   payment   at   the   damage   level up   to   and   including   one   million   dollars   ($1,000,000).   Above   that level,   DuPont   required   the   authorization   signatures   of   William Kirk,   John   Krol   and/or   Edgar   Woolard.

100. As   an   addition   to   the   investigation   process,   DuPont directed   three   of   its   most   experienced   scientists,   Drs.   Conrad Kmetz,   William   Reische   and   Gerald   Stephenson,   to   assist   in   the investigation   of   Benlate   claims.   The   three   scientists   were referred   to   as   the   "Benlate   Tech   Team",   which   conducted   technical causation   evaluations   on   the   individual   reported   Benlate   damage. As   part   of   its   function,   the   Benlate   Tech   Team   was   required   to provide   scientific   evidence   for   DuPont's   insurance   carriers   that the   symptomology   reported   in the   field   was   caused   by   Benlate.

101. To   help   manage   the   damage   assessments   of   the   Benlate claims,   DuPont   hired   Andersen   Consulting,   an   international consulting   firm   based   in   Chicago,   Illinois.

25

102. To help manage the Benlate claims process, DuPont hired Crawford & Company, an international casualty adjusting firm based in Atlanta, Georgia.  DuPont's instructions to Crawford were very clear: Go inspect the plant damage and if you are not able to determine any other obvious causes for the damage (except for Benlate), DuPont will pay the claims.

103. Unfortunately for DuPont, many Crawford inspectors were concluding that there was no other cause (except Benlate 50 DF) for the extensive ornamental plant damage.  Moreover, the Crawford inspectors were noticing extremely distinctive plant damage symptoms that became widely documented as the "Benlate Symptoms".

104. In some instances, upon information and belief, Crawford inspectors created fictitious reasons to reject and/or reduce a grower's Benlate claim.  To explain why this occurred, one DuPont representative observed in an October 1991 DuPont internal memorandum as follows: "Crawford is playing games and drawing out the claims settlement as long as possible.  Quite possibly to maximize the payment per claim to Crawford....  Crawford 'bonus' increases with each 'claim' dollar reduction."

105. In some instances, where the Crawford inspection reports were not favorable for DuPont, Morris Bailey, the new leader of the Benlate Resolution Team, instructed inspectors to either change the "negative" report or he hired additional inspectors who would conclude that Benlate could not have caused the plant damage.

106. In most cases, DuPont quietly settled growers Benlate claims, requiring strict confidentiality agreements in an effort to

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 · TEL. (305) 372-1800

avoid public and/or regulatory scrutiny. As a requirement of settlement, growers were prohibited by DuPont from discussing any aspects of their Benlate claim -- under threat of prosecution, while at the same time, DuPont was free to speak openly and publicly about each case.

107. As discussed below, DuPont routinely trumpeted these Benlate settlements (while growers were required to remain silent) to scare future Benlate victims from bringing claims. In some instances, when DuPont did not want unfavorable information disclosed, DuPont would simply state that it was also under the same confidentiality order (although in most cases, DuPont was not restricted by such agreements).

108. By manipulating the Benlate case results as well as the information which flowed from the Benlate claims, DuPont was able to injure many more Benlate victims who directly relied upon this information in determining any and all possible remedies.

109. As further trouble for DuPont, the EPA, which has filed two administrative complaints against DuPont relating to Benlate 50 DF (one based upon hazardous levels of DBU), was increasing its pressure on DuPont to cease the sale of all Benlate 50 DF.

110. As a result of its concerns with the inherent phytotoxicity of Benlate 50 DF, as well as the numerous confirmed reports of herbicide contamination, on March 22, 1991, DuPont recalled all Benlate 50 DF in the United States (although it was still exporting contaminated Benlate 50 DF abroad). In Costa Rica, for example, DuPont stuck new "WP" labels over the original "DF"

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.

2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 · TEL (305) 372 1800

labels, so that it could continue to sell the contaminated Benlate 50 DF product.

111. DuPont's explanation for the second recall was purportedly because of a finding, again, of very low levels of atrazine in its "quality assured" Benlate. As with the first recall, DuPont made this statement knowing that the problems with Benlate 50 DF were much more serious.

112. DuPont had already confirmed that Benlate 50 DF was <u>inherently</u> phytotoxic, even if used exactly as directed, in hot and humid climates like in Florida. For example, DuPont's internal testing confirmed that Benlate 50 DF absorbed more moisture than Benlate 50 WP and significantly more DBU was formed in the Benlate 50 DF.

113. In a July 25, 1991 "Interoffice Memorandum", Larry B. Gillham, a member of DuPont's Benlate Resolution Team, reiterated these confirmations as follows:

> QUESTION 1:   Do we believe that Benlate is the primary causal agent for the symptomology that we have seen in ornamentals and strawberry to date.
> **Yes, particularly in ornamentals.**
> . . .
> QUESTION 2:   Do we believe that there is an Exterior factor such as Weather, virus, nematodes, etc. other than Benlate causing the symptomology.
> **--NO--**
> . . .
> QUESTION 3:   Do you believe that the symptomology is due to miss use or off label use.
> **No, particularly not on a large scale.**
> . . . (e.s.)

<u>See</u> a copy of Gillham's memorandum attached hereto as Exhibit "D".

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 · TEL. (305) 372-1800

114. Moreover, Michael Duffy, a senior DuPont researcher, concluded in a September 10, 1991 internal memorandum as follows:

> The potential for crop injury exists from use of Benlate DF when used in accordance to the label - especially when added stress factors are present - since we now know that some allowed treatments are very near the injury threshold inherent in benomyl applied in this formulation. (e.s.)

115. As a result of the ornamental complaints in Hawaii, the College of Tropical Agriculture and Human Resources at the University of Hawaii at Manoa formed its own Benlate Task Force (the "Task Force"). In April of 1992, the Task Force met with DuPont representatives Bruce Hadley and Morris Bailey. Hadley and Bailey represented to the Task Force that DuPont did not have any information that could link Benlate 50 DF to the reported ornamental damage.

116. In December of 1992, Hadley and Timothy Obrigawitch returned to Hawaii and represented to the Task Force again that, based upon DuPont's 1992 Benlate testing, Benlate could not have caused any of the ornamental plant damage. Hadley and Obrigawitch made these statements knowing that they were false.

117. One explanation for DuPont's false statements to the Task Force can be found in DuPont's March 17, 1992 internal memorandum, generated just one month prior to Hadley and Obrigawitch's meeting in Hawaii, which instructed members of DuPont research team (including Hadley and Obrigawitch) to "get intelligence on the experts so we're not blind sided; know your enemies"; "cut them off publicly-don't share info with them." (e.s.)

29

118. Nevertheless, the Task Force conducted their own ornamental plant research with Benlate 50 DF. Drs. Aragaki, Uchida and Tang, all members of the Task Force, performed hundreds of plant tests to determine the effects of DBU and BIC with variables of temperature and humidity. The results of the experiments clearly proved that Benlate 50 DF was phytotoxic to ornamental plants when applied in high temperatures and humidity, such as in Florida.

119. On March 27, 1992, DuPont finally announced that it would no longer sell any of its Benlate products for use on ornamental plants. DuPont stated that this departure was based solely upon "business reasons".

120. DuPont made this statement knowing that it was false. The departure from the ornamental plant market was a direct result of the mounting evidence directly implicating Benlate with the extensive ornamental plant damage.

121. As the amount of reported plant damage increased, the problems for DuPont only got worse. DuPont's insurance company was contesting any obligation to pay for additional Benlate claims; Terra filed a lawsuit against DuPont claiming that atrazine could not have been responsible for all the reported plant damage; and many growers which had originally settled Benlate claims were now experiencing new and additional plant damage.

122. These new and additional Benlate claims are known as "recropping" or "residual" claims and pose an enormous liability for DuPont. Many ornamental growers that originally applied

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.

2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 · TEL (305) 372 1800

Benlate 50 DF, but had since stopped, began to notice damage to subsequently planted crops, but which were themselves never directly treated with Benlate 50 DF.

123. DuPont was well aware of the possibility for residual damage and even claimed in an early internal memorandum entitled "RECROPPING" that "[g]rowers will be reporting symptoms associated with Benlate DF for the next four years."

### i.   DuPont's Legal Team Takes Control

124. DuPont soon realized that it could no longer successfully utilize its atrazine myth.   Therefore, on or about September 26, 1991, Defendant Burke outlined a plan for DuPont whereby it could avoid the mounting and enormous liability.  Under the plan, DuPont would scale back its scientific efforts to identify the cause for the extensive plant damage, while at the same time it would provide false information as to the harmful effects of Benlate 50 DF. Burke stated that this plan would be successful because no Benlate plaintiff would have the money or resources to challenge DuPont's claims.  Burke outlined his strategy, *inter alia*, as follows:

> Given the public arena in which the Benlate issue is being addressed, there are many reasons to continue a broad, basic science search for the element/compound in Benlate DF that has apparently produced similar symptoms in multiple plant species in various states.  Du Pont's stature and credibility would be enhanced by its ability to identify and isolate the mechanism of injury.

> At the same time, **Du Pont would, in the absence of the ability to protect the scientific information under the work product privilege, have established one element of a complaining [Benlate] plaintiff's case, i.e., the identification of a "defect."**   ... a successful scientific effort would go beyond that which a plaintiff must prove in order to prevail.  The question of the discoverability of the results of the scientific effort

31

is complex and beyond the scope of this letter. **The prudent approach is to assume that some judge in some jurisdiction would order Du Pont to produce the records/results of its scientific efforts.**

As it now stands, Du Pont can prove that it was not herbicide contamination [apparently, referring only to atrazine] of Benlate DF that caused the observed plant damage event [sic] though the exact mechanism that did cause or contribute to the observed damage has not been isolated. **It is a safe assumption that no [Benlate] plaintiff's expert has the ability/resources to accomplish what Du Pont could not. The next step in the sequence is to assert that despite extensive and diligent efforts, Du Pont has not found anything in Benlate that could cause the observed damage.** The typical result of this scenario [at trial] is to create a question for jury resolution, with the odds of a favorable resolution in Du Pont's favor increasing with the identification of other causative/contributing factors. (e.s).

See a copy of Burke's letter attached hereto as Exhibit "E".

125. On or about September 30, 1991, DuPont held a meeting with its science leaders to discuss the procedures for implementing Burke's strategy.

126. DuPont claims that it decided not to follow Burke's advice. As explained in great detail below, the evidence reflects that DuPont not only adopted Burke's strategy, but carried out his proposed fraud to levels unparalleled in American jurisprudence.

127. One piece of evidence that clearly reflects that DuPont adopted Burke's strategy is an action memorandum generated by Gil Meyer, DuPont's public relations manager. Meyer foreshadowed the execution of the Burke plan by noting in his memorandum dated March 17, 1992 (just a short time after DuPont's field tests were initiated, but six months prior to the test's completion) that "11/1 presentation; we know what it is not, not what it is." (e.s.)

32

128. As planned by Burke and Meyer, in or about November 1992, William Kirk, the head of Ag Products, announced that after extensive testing, DuPont still did not know what had caused the extensive ornamental plant damage, but that DuPont had concluded that Benlate was not the cause. Kirk announced that all future Benlate victims would have to bring claims against DuPont in a court of law.

129. One week earlier, on or about November 3, 1992, DuPont generated an internal "Communications Plan" outlining the various communication channels that DuPont would utilize to assure that Kirk's message would reach all Benlate users.

130. A simple way to determine if DuPont, in fact, adopted Burke's fraudulent strategy is to ascertain whether DuPont's 1991 and 1992 Benlate testing was directed by: (a) DuPont's legal team, or (b) DuPont's scientists.

131. Mr. Woolard, as well as many other DuPont employees and directors, have denied that any of DuPont's Benlate scientific testing was organized and/or influenced by DuPont's legal team.

132. Mr. Woolard specifically testified under oath, including in this Court, that DuPont's 1991 and 1992 scientific tests were performed at his instruction and under his direct supervision, in an attempt to understand the problems with Benlate 50 DF.

133. Woolard has specifically testified that lawyers did not play any role in DuPont's 1991 and 1992 Benlate testing and more importantly, that DuPont scientists were not placed under the direct supervision of Thomas J. Burke. Mr. Woolard made these

33

statements knowing that they were false.

134. Numerous DuPont internal memorandums reflect that all of DuPont's 1991 and 1992 Benlate 50 DF testing was performed under the direct control and supervision of DuPont lawyers.

135. Shortly after Burke delivered his September 1991 strategy letter to DuPont, on November 25, 1991, several of DuPont's outside and corporate counsel met.   After the meeting, DuPont attorney Peter Wellington noted the following: "At this point all our outside counsel are recommending further research under Tom Burke's direction as to causation and now also as to atrazine impact at various levels.  Glenn [Baldwin] and I will talk to Morris [Bailey] and the Steering committee early this coming week."

136. About  one  month  later,  on  January  6,  1992,  DuPont announced the "retirement" of the large team of DuPont scientists which had been investigating the problem with Benlate, and the formation of a "Benlate Resolution Core Team" which would continue the "science" investigations.

137. In fact, the Benlate Resolution Core Team had been formed in September 1991 (immediately after the Burke letter was provided to DuPont), and consisted of public affairs representatives, DuPont legal counsel and claims specialists.

138. DuPont's  own  internal  documents  clearly  reflect  that DuPont's 1991 and 1992 Benlate testing was directed by DuPont's lawyers, as illustrated:

(a) On January 9, 1992, Bill Kirk informed Elmo Beyer that Thomas J. Burke had requested assistance from DuPont in

<div align="center">34</div>

selecting and working with a team of outside researchers;

(b)   On February 7, 1992, Bruce Hadley informed members of the Benlate Resolution Team that they have been designated by William Kirk to provide support for Thomas J. Burke and that they are "essentially working for Thomas Burke, not DuPont";

(c)   The next day on February 8, 1993, Elmo Beyer sent a letter to all persons who had been sent Burke's strategy letter, explaining that Beyer was concerned that the scientists did not realize the extreme care that they must take with their work; and

(d)   The next day on February 9, 1992, Joel Wommack reminded the scientists that they were doing their work at the request of Thomas Burke and thus needed to be "circumspect".

139. The most important aspect of DuPont's "scientific" defense of Benlate is the Florida Field Trials ("FFT").   The FFT served as DuPont's only remaining defense on the merits of the issue as to whether Benlate 50 DF was defective.   Confronting billions of dollars of liability, DuPont could not risk any negative results from the tests.

140. The results of these field tests have been displayed during every Benlate trial.   Woolard has testified that the FFT were originated "at his request" and carried out "under his supervision" with no lawyer involvement.

141. Bruce Hadley was the director of the FFT and Timothy Obrigawitch was its lead scientist.

35

142.   In early April 1992, Hadley informed Obrigawitch that while he appreciated his efforts in designing the protocols for the FFT, Hadley had to at least present the protocols to DuPont's Central Research and Development ("CR&D") department so that the CR&D could not later claim that they were not consulted.

143. The CR&D department of DuPont is a group of DuPont's top scientists.

144. On or about April 6, 1992, the CR&D scientists met with Hadley and other Ag Products members responsible for the FFT.  As a result of the meeting, the CR&D issued a memorandum outlining certain changes that needed to be made to the proposed FFT protocols so that the tests would be quality assured, including the following: (1) that a non-DuPont statistician review the field test protocols; (2) that non-DuPont personnel make the applications or at least have blind treatments; and (3) that unbiased persons review the test treatments.

145. Hadley rejected all the CR&D proposals.  Hadley stated in an internal DuPont memorandum dated April 7, 1992 that no outside scientists would assist DuPont in the 1992 tests because "<u>this work is being done to support pending and existing litigation.</u>" (e.s.).

146. This was not the first time that members of Ag Products rejected assistance from other DuPont scientists.

147. In or around June of 1992, Marie Chubb, after discussing the Benlate issue with DuPont's corporate leaders outside of Ag Products, suggested to the leaders of Ag Products that they should confer with other scientists at DuPont, including the CR&D

36

department, in an attempt to solve the Benlate problems.

148. The leaders of Ag Products rejected Chubb's suggestion based upon the "legal ramifications of using these [other] people."

149. The hypocrisy of this position (between Woolard's public statements and Hadley's private remarks) was noted in an April 8, 1992 internal memorandum by DuPont scientist Michael Duffy:

> If there is a hidden agenda or an unwillingness to be completely candid with ALL of the thinking going on, then I have reason to be a lot more pessimistic than I already am that the organization is ever going to be able to learn form this debacle, or even survive it.
>
> Even if the ideas are as poor as he evidently sees them, where is the attitude that says "these are good upgrades, but ones that we might not be able to incorporate for <u>NONSCIENCE reasons</u>. Let me share the legal guidance and then let's review the proposal to see if we can adopt some parts of them or <u>maybe (God forbid!!) we should go back to legal and challenge their thinking !!!</u>   (e.s.)

<u>See</u> a copy of Duffy's memorandum attached hereto as Exhibit "F".

150. No one challenged Burke's authority to direct DuPont's Benlate testing efforts.

151. Burke instructed DuPont scientists working on the Benlate issue not to discuss any of the testing with fellow DuPont scientists and to mark on every writing "privileged and confidential", "attorney-client communication" and "attorney work-product."

152. Similarly George Frank, DuPont's corporate counsel who worked with Burke on formulating the Benlate litigation strategy, informed DuPont's scientists that nothing should be put in writing, and that if something needed to be documented, that they should send all such communications to DuPont legal so as to prevent

37

Benlate plaintiffs and other growers from obtaining such information.

153. Frank also instructed DuPont scientists that in the event a writing was necessary, the document should be given a disguised title to divert attention from the document. Frank suggested that documents titled "Benlate Causation" and "Benlate Science Meetings" should be changed to "Luncheon Update Meetings".

154. On or about June of 1993, DuPont hired the law firm of Crowell & Moring in Washington, D.C. to serve as additional Benlate national coordinating counsel.

### j. Burke and the Litigation of the Benlate Cases: Fraud and Obstruction of Justice

155. DuPont's strategy to hide evidence of Benlate's defectiveness has been utilized during the litigation of many Benlate cases.

156. DuPont has taken numerous measures to prevent incriminating evidence from being revealed to Plaintiffs, including: (1) committing perjury; (2) destroying evidence; and (3) intimidating and tampering with witnesses.

157. In many instances, DuPont has attempted to disqualify Benlate judges as well as plaintiffs' lawyers prior to the issuance of negative orders and/or rulings. In other Benlate cases, where DuPont was not able to disqualify and/or prevent the entry of the negative rulings, DuPont simply had the decisions vacated as part of the Benlate case settlement.

38

158. Numerous courts have recognized that these actions by DuPont are not simply isolated incidents of misconduct, but are part of a systematic pattern of concealment and false representations designed to thwart the entire judicial process.

### a. __Bush Ranch Case__

159. In 1992, the first major Benlate trial was conducted in federal court in Georgia (referred to as the Bush Ranch case). The plaintiffs alleged that Benlate 50 DF caused extensive damage to their ornamental plants. During trial, Judge Elliott sanctioned DuPont $1 million dollars for withholding numerous internal DuPont documents evidencing the contamination of Benlate 50 DF.

160. During the Bush Ranch litigation, Judge Elliott made the following conclusions concerning DuPont's conduct:

> The Court finds that the Defendant, DuPont continues to take every means possible to obstruct discovery to which the Plaintiffs are entitled ... It is simply an abuse of the discovery process. An [sic] during the recent weeks, since this is the worst case of this nature that I have ever had anything to do with, I have been interested in searching in the books to see, to compare it with other cases that have dealt with abuse of the discovery process and I haven't found a case that approaches this. In other words, I haven't found a case where the deliberate actions on the part of a defendant to obstruct the discovery process approach what has happened here.
>
> In other words, my impression is that defendant [DUPONT] continues to take every course possible to obstruct discovery which the Plaintiff is entitled to. They take every course available. And things have happened here today during the course of this trial that they continue to do the same thing. Instead of abiding by the Court and producing things that they're supposed to produce, they just don't do it.

39

161. In May of 1993, Judge Elliott also concluded as follows:

> In other words, my impression is that Defendant continues to take every course possible to obstruct discovery which the plaintiff is entitled to.  They take every course available.  And things that have happened here today during the course of this trial that have indicated they continue to do the same thing.  Instead of abiding by the court and producing things they are supposed to produce, they just don't do it.

162. The <u>Bush Ranch</u> case settled prior to a verdict being rendered.

163. As with other manipulated and predetermined results, DuPont showcased the <u>Bush Ranch</u> settlement as a warning to other potential Benlate victims not to file suit or even challenge DuPont's findings.

164. On or about June 16, 1993, Woolard held a national press conference to denounce any allegations that DuPont had "covered up evidence" and stated that such accusations "impugn [DuPont's] motives and disgrace the character of DuPont and its people." Woolard promised that DuPont "will not tolerate this in silence any longer, and beginning today our response to all such accusations in this and any other case will be swift and sure."

165. William Kirk reiterated Woolard's warnings and stated to the press that "[t]he decision of this plaintiff to settle his case should be noted by all other potential plaintiffs that we have the scientific evidence to show that Benlate cannot cause damage and we will use this data in court."

166. Both Woolard and Kirk intended their statements to be heard by all ornamental growers in Florida.

40

167. Almost two years after <u>Bush Ranch</u> settled, Judge Elliott discovered that DuPont had, in fact, utilized numerous fraudulent tactics during litigation to successfully hide important documents incriminating Benlate 50 DF.

168. Specifically, DuPont had consciously and deliberately withheld specific documents from the <u>Bush Ranch</u> plaintiffs which evidenced that sulfonylures had been detected in the samples of plaintiffs' soil that had been tested by DuPont's agent Alta Labs ("Alta") and that DuPont intentionally provided false testimony concerning these confirmed tests.

169. DuPont's counsel admitted during opening and closing statements that the sulfonylurea contamination was the "critical issue in the case."

170. DuPont's scientists admitted that these documents (which indicated a positive finding of sulfonylurea contamination) would be devastating against DuPont.

171. Among other documents which DuPont steadfastly refused to produce during the <u>Bush Ranch</u> case were laboratory test results which evidenced the findings of numerous contaminates within hundreds of lots of Benlate 50 DF. Most of these tests were conducted by A & L Labs Midwest and were completed prior to 1992.

172. In addition to DuPont's failure to produce these crucial testing documents to the <u>Bush Ranch</u> plaintiffs, the documents (with DuPont's bates stamp prefixes BAM, BAL and BPM) were also not placed into the DuPont Benlate warehouse of documents until three years later.

41

173. After conducting a hearing on DuPont's conduct, Judge
Elliott concluded as follows:

> [p]ut in layperson's terms, DuPont cheated.  And it
> cheated consciously, deliberately and with purpose.
>
> It has shown a lack of respect for the civil justice
> system in general ...
>
> DuPont has committed a fraud on this Court ...
>
> ...    essentially  identical  conduct  of  DuPont  in
> concealing and misrepresenting Alta [Laboratories] tests
> and documents in other courts immediately after the Bush
> Ranch trial is ... strong evidence of DuPont's intent and
> motive, and establishes a pattern of concealment and
> false representations.

174. The Eleventh Circuit Court of Appeals recently reversed
and remanded Judge Elliott's order, finding that DuPont was not
afforded the procedural protections required for the imposition of
criminal contempt sanctions.  As a result of DuPont's conduct,
Judge Elliott had sanctioned DuPont $115 million dollars.

175. As to the merits of the case, the Eleventh Circuit
concluded as follows:

> ... we conclude that a reasonable finder of fact could
> conclude beyond a reasonable doubt that the plaintiffs'
> first request for production of documents covered the
> Alta data.  In addition, a reasonable finder of fact
> could conclude beyond a reasonable doubt that the
> district court overruled DuPont's objections to that
> request and ordered DuPont to produce the Alta data.
>
> In sum, we hold that a reasonable fact finder could
> conclude beyond a reasonable doubt that the district
> court entered a lawful order of sufficient specificity
> commanding DuPont to provide the Alta data and that it
> willfully failed to obey the order.

176. The Eleventh Circuit also stated that "[i]n light of the
serious nature of the allegations against DuPont and its counsel,
we assume that the appropriate United States Attorney will shortly

42

begin an investigation of this matter (if he or she has not already done so)."

### b. **Hawaii Benlate Trials**

177. One of the longest Benlate trials took place in Hawaii in 1995 and was called <u>Kawamata Farms</u>. During trial, DuPont was again severely sanctioned for various litigation misconduct. Because DuPont had refused to identify and/or produce many important documents which evidenced the contamination of Benlate, the Hawaii court concluded that there had been "a pattern of withholding these documents by defendant DuPont beginning with the appointment of the master."

178. After only recently discovering the extent of DuPont's fraudulent tactics, the Hawaii court on April 26, 1996 entered an order directing the plaintiffs to have the case remanded so that the trial judge could enter his proposed order which states, *inter alia*, that "[t]his court would have entered a default judgment on liability against DuPont had the Court been aware of DuPont's fraudulent scheme and misconduct now revealed pursuant to this motion." The Hawaii court also ruled that had it known of the fraudulent conduct, it would have permitted much evidence to be admitted during trial (which was not admitted) "as evidence of a common scheme or plan by DuPont."

179. The Hawaii court specifically ruled that: (a) "DuPont committed fraud" with Dr. Frank's inaccurate testimony that DuPont had produced to the plaintiffs all the Alta testing documents; and (b) that DuPont's failure to disclose certain information on

43

DuPont's privilege log, prepared by DuPont's National Coordinating Counsel Crowell & Moring, "was intentional, false and misleading."

180. The Hawaii court held that the "DuPont National Coordinating Counsel necessarily knew it was giving a false impression" because the Crowell & Moring lawyer that prepared the privilege log had actually spoken to DuPont Bush Ranch lawyer Liz Gilley prior to preparing the log.

181. The Hawaii court concluded as follows:

> This court finds that DuPont's conduct as set forth herein constitutes abusive litigation practices and specifically finds that such practices were done in bad faith ....

> This court concludes that DuPont's conduct set forth in the Findings of Fact herein demonstrates that DuPont engaged in fraud and intentional misconduct which abused the judicial process. DuPont acted in bad faith, wantonly and for oppressive reasons ....

182. DuPont's recent trouble in the Hawaii litigation was due, in large part, upon its own inconsistent positions taken in the Bush Ranch and Hawaii litigation. In Bush Ranch, DuPont claimed that all of the raw Alta data was available for plaintiffs, but that those plaintiffs simply never asked for the data. In Hawaii, DuPont claimed that the same Alta data was always privileged and never made available to any plaintiff.

183. In 1995, a second Benlate trial was conducted in Hawaii called Petals of Paradise. In ruling in favor of plaintiffs and concluding that Benlate 50 DF was the legal cause of the extensive ornamental damage, The Honorable Kevin Chang ruled that "... DuPont withheld relevant and material information concerning the presence of contaminated Benlate ...." Judge Chang also found that DuPont's

44

in-house and outside counsel were "deeply involved with and clearly monitored DuPont's Benlate research" and that "very clearly, the extent of the contamination of Benlate product in the early 1987-1989 time period was far greater than the 27 lots of 1989 Benlate DF originally reported by DuPont to the EPA."

184. As part of the settlement of the Petals of Paradise case, DuPont required the entry of an order vacating Judge Chang's 166 page order.

### c. Lambert Case

185. The first major Benlate trial to be conducted in the State of Florida, following Bush Ranch, was called Billy Lambert v. DuPont. DuPont was represented by its new National Coordinating Counsel, Crowell & Moring.

186. Crowell & Moring, based in Washington, D.C., is currently DuPont's Benlate National Coordinating Counsel.

187. Prior to the commencement of trial, DuPont tested the plaintiff's soil for the presence of sulfonylureas. Similar to Bush Ranch, and upon information and belief, DuPont's agent Alta detected a DuPont sulfonylurea in the plaintiff's soil.

188. DuPont's lawyer from Crowell & Moring pronounced in opening statement that Alta's soil tests proved conclusively that there were no sulfonylureas in the plaintiff's soil.

189. During trial, DuPont again tested the plaintiff's soil for sulfonylureas and again, upon information and belief, the tests confirmed the initial positive findings of a sulfonylurea. Alta reported these positive findings to DuPont.

45

190. DuPont never informed the Lambert plaintiff about Alta's positive findings.

### d.  Ritter-Whitworth Case

191. The next Benlate case to proceed to trial in Florida was styled Ritter-Whitworth v. DuPont.

192. Upon information and belief, in January of 1994, numerous wipe samples obtained from DuPont's Belle facility were sent to Alta to test for the presence of sulfonylureas.  The samples were obtained from areas in the Belle facility where no sulfonylureas should have been detected.  Both benomyl and sulfonylureas were manufactured at Belle, and as discussed above, DuPont was well aware of the risks of possible cross-contamination.

193. The plaintiff's theory in Ritter-Whitworth included allegations that the Benlate 50 DF it had applied had been contaminated with sulfonylureas at the Belle facility.

194. Upon information and belief, in January of 1994, Alta informed DuPont that sulfonylureas had been detected in the wipe samples.

195. Upon information and belief, in February of 1994, DuPont instructed its employee to testify during the Ritter-Whitworth trial that it was not possible for sulfonylureas to contaminate the benomyl at the Belle facility.

196. Upon information and belief, DuPont presented its employee's testimony with full knowledge that it was false and with knowledge of the positive findings of Alta's tests.

46

### e. **Native Hammock Nursery Case**

197. One of the first Benlate trials in Dade County was called Native Hammock Nursery. After the jury found in favor of DuPont, Judge Colby of this Court quashed the verdict and granted the plaintiff a new trial. Judge Colby found that soil tests, not admitted during trial and conducted by DuPont, "established that the soil of the growers contains sulfonylurea herbicides" and that such evidence "will probably change the result if the new trial is granted."

198. Judge Colby found that the plaintiff "would have been able to link-up evidence presented by their paid expert", "who found sulfonylurea herbicides in the plaintiff's soil."

199. Moreover, Judge Colby independently found "that the personal threats made by DuPont scientist and expert witness, Dr. Timothy Obrigawitch, to plaintiff's expert witness, Dr. Raymond Schneider, made during a brief trial recess, require that a new trial be granted. A description of Dr. Obrigawitch's gesture of 'as if he was going to slice Dr. Schneider's throat' is fully contained in the trial and appellate record ...."

### f. **Davis Tree Farms Case**

200. In response to various discovery requests, DuPont has repeatedly stated in numerous courts, including this Court, that DuPont did not conduct any tests in Costa Rica in 1992 with Benlate 50 DF.

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 · TEL. (305) 372-1800

201. In the Texas Benlate case called <u>Lone Star Growers</u>, plaintiffs counsel asked DuPont to produce all documents relating to any tests conducted by DuPont in Costa Rica with Benlate 50 DF. In explaining why DuPont did not produce any responsive documents, DuPont's counsel stated as follows:

> And I will hasten to point out that [plaintiff's lawyer] knows full well from the deposition in which Mr. Abrigowitch [sic] explained to him very clearly that there were no Costa Rico [sic] field tests.

202. With DuPont counsel's assurances, the Texas court ruled that "DuPont is saying it has no responsive documents and therefore nothing to produce."

203. During the recent case styled <u>Davis v. DuPont</u> before this Court, numerous witnesses testified and many of DuPont's own documents revealed that in September of 1992, four of DuPont's top scientists (with the assistance of its top claims adjuster), in fact, conducted a secret test in Costa Rica to determine the effects of Benlate 50 DF on ornamental plants.

204. Included among DuPont's own documents, which DuPont's counsel previously stated "did not exist", were: (a) DuPont expense reports stating: "Reasons for travel: Benlate field tests"; "Reasons for travel: Research/field investigation in Costa Rica"; (b) confidentiality agreements stating that the services to be performed include "tests" and "experiments"; (c) bills from DuPont's hired Costa Rican expert for the tests state: "fees for consultation regarding effect of Benlate in ornamental plants: 1. Setting up experiment in Montevista"; and (d) DuPont services agreements which state that "DuPont is desirous to engage in

48

research activities concerning the use and application of Benlate 50 DF" and for "assistance in Costa Rica in setting up the Research Project."

205. The ornamental plants treated with Benlate 50 DF in Costa Rica turned black and died. Instead of reporting the test results, DuPont destroyed the damaged plants and required all participants to sign confidentiality agreements never to discuss the matter.

206. This Court concluded that "DuPont has made claims in defending other litigation and before this court that the results of the field tests exonerate Benlate 50 DF as the cause of the crop damage. Plaintiffs will have no opportunity to rebut or question the results of the Florida field trials by examining and utilizing the results from Monte Vista. It is clear that DuPont has destroyed the evidence from the 'Monte Vista research project'. Plaintiffs will never have an opportunity to examine the plants, the medium, or the protocol."

207. DuPont's 1992 secret test in Costa Rica proved conclusively that Benlate 50 DF is phytotoxic to ornamental plants in hot and humid conditions, such as in Florida.

208. Thomas Burke played a key role in DuPont's secret Costa Rica tests. For example, all participants were required to sign Services Agreements with DuPont. These agreements were generated by Thomas Burke's firm and in fact, Burke himself, in paragraph 5 of the agreements, was the party named to receive all notices on behalf of DuPont.

49

209. All persons involved in the tests were also required to sign Confidentiality Agreements. Again, Thomas Burke was named as the party to receive all notices on behalf of DuPont.

210. Burke had intimate knowledge of the secret Costa Rican field tests and, despite, such knowledge, stood idly by as DuPont's counsel of record and officer of the court in a number of DuPont cases, while DuPont's witnesses gave testimony denying the existence of the Costa Rican tests, both in deposition and through responses to written discovery.

211. As the Benlate National Coordinating Counsel during those relevant times, Burke was given significant authority and control over a large number of DuPont employees that were directly responsible for the Benlate research and testing efforts.

212. As the national counsel, Burke was informed as to what research was being conducted in the various Benlate matters, and the positions that were taken by DuPont in response to the numerous discovery requests and which documents were being produced.

213. With such responsibility, numerous courts have already noted Burke's involvement, as cited above, by concluding that DuPont has fraudulently concealed and/or refused to produce negative test results, pursuant to a strategy controlled by its in-house counsel and/or "its national coordinating counsel."

214. In striking DuPont's pleading, this Court concluded as follows:

> ... the court is in the unique position of sanctioning a litigant which has been severely sanctioned in other court, seemingly to no avail....

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.

2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 · TEL. (305) 372 1800

> This Court finds that DuPont's conduct constitutes
> abusive litigation practices and specifically finds that
> such practices were done in bad faith .... DuPont engaged
> in intentional misconduct which abused the judicial
> process.
>
> ... DuPont has engaged in a systematic design to thwart
> discovery.... DuPont's conduct in this regard is so
> atrocious that it shocks the conscience of this Court.
> DuPont has destroyed evidence; it has delayed discovery;
> mislabeled documents at its document depository to thwart
> discovery; and it has produced totally illegible
> discovery.
>
> DuPont has purposefully set upon a course of conduct that
> has served as a complete denial of Plaintiffs' right to
> have its day in court.

215. The _Davis_ case settled prior to a trial on damages and an agreed order was entered, similar to the order in the _Petals of Paradise_ case, vacating the above quoted order.  Prior to entry of the order vacating all file copies of the sanction order, a local business publication obtained a copy of the sanction order and quoted it in great detail.   The sanction order was also subsequently transcribed in a public legal database available on the Internet.

216. DuPont's attempts to vacate all negative rulings have not always been successful.  In _John Harrod v. DuPont_, Judge Jimm Larry Hendren of the United States District Court for the Western District of Arkansas, refused to grant DuPont's "Joint Motion to Vacate Judgment".

217. In _Harrod_, twenty-three growers filed claims against DuPont for damage caused by Benlate 50 DF.  After a four-week trial, the jury returned verdicts against DuPont for compensatory and punitive damages.

51

218. After the verdict was rendered, DuPont filed with the court a "Joint Motion", stating that the parties had settled the matter and requested that the court vacate the judgment.

219. In denying the "Joint Motion", Judge Hendren first distinguished the legal authorities cited by DuPont, noting that most of the cases involved controversies "that expired by [their] own terms" and not "reasonably be expected to be repeated", and that the case at bar (damage to crops by Benlate 50 DF) "certainly has not gone away".

220. Judge Hendren's ruling is insightful as to DuPont's past and future conduct in Benlate litigation and sings loudly of reason as follows:

> The inception and continuing evolution of these three concepts [stare decisis, res judicata, and collateral estoppel] ... suggests to the Court that society in general and the judicial system in particular both have strong interests in holding litigating parties to the final results achieved through use of the courts. The Court believes there is a discernable public policy to the effect that once parties resort to the court system to settle their differences, those parties must live with that which is deliberately and solemnly decided by that system and the system itself, after being so used, should be entitled to incorporate that deliberate and solemn decision into its body of law for use by future litigants.
> ...
> **Further, if a defendant could be permitted to litigate a case to finality ... and then come forward with a checkbook and settle with the opponent it had worn out in court, then such defendants would be free to re-litigate those same issues in different courts with different plaintiffs over and over again, unfettered by the constraints afforded by the first decision. That is no way to promote judicial economy. (e.s.)**
>
> ... This Court does not believe the dignity and majesty of the court system should be lent to a burlesque of justice. ... [C]ourts do not conduct "moot trials" so that parties may evaluate their respective cases, at taxpayer expenses, and then be free to settle their cases after having so used the court system.

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.

2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 · TEL (305) 372 1800

In the case at bar, it is reasonably clear the defendant seeks to have the judgment in question vacated so as to not have a precedent on record which could be used against it in other similar cases that may be tried in other jurisdictions. ... Defendant apparently doesn't want to appeal because it ... also sees a further chance to keep the precedent against it off the record and out of the law reports. (e.s.)
...

221. It is with this background that the Class Members file this action.

<div align="center">COUNT I</div>

### VIOLATIONS OF 772.103 OF THE FLORIDA CIVIL RICO ACT AGAINST DUPONT, THE DUPONT AGENTS, CRAWFORD & COMPANY, CABANISS & BURKE, AND THOMAS BURKE

222. Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 221 above.

223. Plaintiffs assert claims against DuPont, the DuPont Agents, Crawford & Company, Cabaniss & Burke and Thomas Burke (the "Count I Defendants"), for violations of the Civil Remedies for Criminal Practices Act, Chapter 772, Florida Statutes (Florida's civil RICO statute).

224. Plaintiffs are "persons" within the meaning of Fla. Stat. § § 1.01(3) and 772.104.

225. The Count I Defendants are all "persons" within the meaning of Fla. Stat. § § 1.01(3) and 772.103(3) and (4).

### THE DUPONT ENTERPRISE

226. From approximately 1987 and continuously thereafter until today, the Count I Defendants, as well as others, both known and unknown, constituted an association of fact and an enterprise within the meaning of § 772.102, Fla. Stat. (the "DuPont Enterprise").

<div align="center">53</div>

227. The object of the DuPont Enterprises was: (a) to get Benlate 50 DF to the market and to keep the product on the market; and (b) to avoid liability and limit financial exposure from Benlate 50 DF damage by manipulating (1) the information and scientific research concerning Benlate, (2) the Benlate claims procedure, and (3) the legal process.

228. The DuPont Enterprise was structured in the following manner and the members and other persons or entities associated and employed by the DuPont Enterprise or in conspiracy with it or its members, function in the following roles:

(a)   Edgar S. Woolard, Jr. served as both organizer and front-man for the DuPont Enterprise. Woolard personally approved, directed and managed DuPont's fraudulent scientific efforts. Although Woolard was aware of the defective nature of Benlate 50 DF, he made numerous false representations under oath concerning the quality of the product both to the public and in sworn testimony in legal proceedings.

(b)   John A. Krol and William F. Kirk were second and third in command of the Benlate resolution effort and organized, managed and supervised the DuPont Enterprise.

(c)   Morris Bailey, Krol and Kirk's lieutenant, was DuPont's product manager for Benlate 50 DF and responsible for organizing the Benlate settlement claims process.

(d)   Timothy T. Obrigawitch, Bruce A. Hadley and Gerald A. Stephenson provided DuPont with disingenuous scientific evidence to serve as the basis for the fraudulent misrepresentations.

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.

2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 · TEL (305) 372 1800

(e)   Thomas J. Burke, Esq. and his firm Cabaniss & Burke, P.A., served as DuPont's national coordinator for all Benlate litigation.  Burke directed the DuPont Enterprise, as well as all of DuPont's agents and employees, in support of the Benlate litigation.

(f) The success of the DuPont Enterprise would not have been achieved but for the active and willing participation of many other DuPont employees, some who assisted in the disingenuous science efforts and others that assisted in the litigation misconduct.  As discovery in this matter proceeds, Plaintiffs reserve the right to include additional defendants.

229. The Count I Defendants participated in a pattern of racketeering activity in violation of §§ 772.103(3) and 772.103(4), Fla. Stat.  Each committing at least two acts of racketeering activity.

## THE PREDICATE ACTS OF RACKETEERING

230. In order to effectuate the objectives of the DuPont Enterprise, the Count I Defendants and other employees and agents both known and unknown, committed thousands of acts of racketeering, below are merely some examples:

(A)   Violations of 18 U.S.C. § 1341, which prohibits the use of the mail in interstate and foreign commerce in furtherance of schemes and artifices to defraud including, but not limited to:

(1)   Thousands of copies of a letter were forwarded through the mails on August 11, 1989 from T.R. Vaux, DuPont's Benlate Sales Manager, to all purchasers of Benlate 50 DF.  In his

55

letter, Vaux informed all purchasers that the only problem with Benlate 50 DF was that a small portion of Benlate 50 DF was contaminated with low levels of atrazine.

(2)  On August 24, 1989 Ron Hamlen, DuPont's registration specialist, forwarded a letter through the mails to the Environmental Protection Agency.  In his letter, Hamlen informed the EPA that the only problem with Benlate 50 DF was that a small portion of Benlate 50 DF was contaminated with low levels of atrazine.

(3)  Thousands of copies of a letter were forwarded through the mails on December 27, 1989 from John A. Krol, DuPont's vice president of Ag Products, to all purchasers of Benlate 50 DF. In the letter, Krol stated that the only problems with Benlate 50 DF was that trace levels of atrazine had been detected in a few lots of Benlate 50 DF.  Krol stated that all contaminated Benlate 50 DF had been recalled from the market and that the Benlate currently available was safe to purchase.

(4)  Thousands of copies of a letter were forwarded through the mails on March 22, 1991 from T.R. Vaux to all Benlate customers.  In the letter, Vaux stated that the only problem with Benlate 50 DF was that a very small portion of Benlate 50 DF had been contained with low levels of atrazine.

(5)  Thousands of copies of a letter were forwarded through the mails on June 21, 1991 from DuPont to all Benlate 50 DF users.  In the letter, a DuPont agent stated that the only reason for the first and second recall of Benlate recall, was that DuPont

56

had detected trace levels of atrazine in a few lots of Benlate 50 DF.

(6) Thousands of copies of a letter were forwarded through the mails on November 6, 1992 from Thomas C. Humphrey, to all DuPont customers. In the letter, Humphrey stated that based upon extensive scientific testing, DuPont was not able to cause any crop damage from applications of Benlate 50 DF.

(7) A letter dated September 26, 1991 was forwarded through the mails by Thomas A. Burke to Glen Baldwin, DuPont's in-house counsel. In the letter, Burke outlined the strategy for the DuPont Enterprise.

(8) DuPont forwarded a verified interrogatory response in numerous Benlate cases, stating that DuPont had not conducted any tests with Benlate 50 DF in Costa Rica in 1992, through the mails.

(9) Other known and unknown documents were also forwarded through the mails to promote the DuPont Enterprise and its disingenuous science campaign.

(10) Each such use of the mails described above in connection with the aforementioned scheme and artifice by means of false misrepresentations constitutes a separate and distinct violation of 18 U.S.C. §1341.

(B) Violations of various sections of §914, Fla. Stat., which prohibit the tampering and retaliating with a witness, victim or informant including, but not limited to:

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.

2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 · TEL. (305) 372 1800

(1)   During   the   <u>Native Hammock Nursery</u>   case   in   Dade County,   Florida,   Timothy   Obrigawitch   made   personal   threats   to plaintiff's expert witness Dr. Raymond Schneider, during a brief trial recess.  Among his threats, Obrigawitch made a gesture as if he was going to slice Schneider's throat.   On May 9, 1995, Judge Colby of the Eleventh Judicial Circuit in Dade County entered an order granting a new trial for Plaintiff, based in part, upon the actions   taken   by   Obrigawitch   towards   Dr.   Schneider.     This intimidation and threat constitutes a violation of §914.22, Fla. Stat.

(2)   On January 8, 1992 DuPont employee Frank Aulour sent an internal memorandum to Janice Sharp confirming that she was told by Morris Bailey to destroy all E-Mail files regarding "Benlate and the events in 91".

(3)   In 1992, DuPont conducted tests in Costa Rica with Benlate 50 DF.   After the test plants turned black and died, Obrigawitch instructed that the plants be discarded and destroyed.

(C)   Thousands   of   violations   of   18   U.S.C.   §1343,   which prohibits the use of wire communications in interstate and foreign commerce   in   furtherance   of   schemes   and   artifices   to   defraud including, but not limited to:.

(1)   On November 5, 1992, William Kirk, held a nationally covered press conference and stated that DuPont could find no correlation between Benlate and any of the reported crop damage.

(2)   On November 5, 1992, Bruce Hadley, DuPont's research manager for Ag Products, held a nationally covered press conference

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.

2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 · TEL. (305) 372 1800

and stated that DuPont could not reproduce any of the reported plant damage.

(3)   On November 5, 1992, Edgar S. Woolard, DuPont's Chairman and CEO, held a nationally covered press conference and stated that DuPont, in its testing, could not cause any of the reported Benlate symptoms.

(4)   On June 16, 1993, Edgar S. Woolard, held a nationally covered press conference and stated that DuPont's 1992 testing did not have any results indicating that Benlate 50 DF was defective.

(5)   From as early as July 1991 until December 1991, Jack Cain, a spokesperson for DuPont and the coordinator of DuPont's 1-800 Benlate hotline, informed hundreds of Benlate victims that the only problems with Benlate 50 DF was that small trace levels of atrazine were detected in a few Benlate 50 DF lots.

(6)   A telephone conversation took place on June 19, 1993 between DuPont lawyers Elizabeth Gilley, Todd David and Cannard Neal (of the Alston & Bird law firm) and Robert Bethem and Robert Peterson (from Alta Labs).  The Alta scientists informed the DuPont lawyers that they detected sulfonylureas in numerous samples of plaintiffs' soil.  The DuPont lawyers told the Alta scientists to re-test the samples at a weaker level of analysis so that no detections would appear on the evidence that was eventually provided to plaintiffs.

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.

2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 · TEL (305) 372 1800

(7)   Other   known   and   unknown   documents   were   also forwarded through the wires to promote the DuPont Enterprise and its disingenuous science campaign.

(8)   Each   such   use   of   the   wires   described   above   in connection with the aforementioned scheme and artifice by means of false   misrepresentations   constitutes   a   separate   and   distinct violation of 18 U.S.C. §1343.

(D)   Violations of §817.42, Fla. Stat., which prohibits false and  misleading  advertisements  including,  but  not  limited  to:;

(1)   In 1990, DuPont caused to be published in many national magazines an advertisement which was entitled "DuPont Continues   Commitment   to   Quality   Assurance   Program."   Said advertisement was disseminated throughout the State of Florida, and falsely stated, _inter alia_, that DuPont had recalled some lots of Benlate 50 DF only because it was inadvertently contaminated with atrazine.   Said advertisement was disseminated in furtherance of the goal of concealing the defective nature of Benlate 50 DF and to prevent those with Benlate 50 DF caused injury from bringing claims,   and   constituted   untrue,   deceptive,   or   misleading advertising as proscribed by §817.42, Fla. Stat.

(2)   In 1995, DuPont caused to be published a full page advertisement in the Wall Street Journal an advertisement which was entitled "A Statement by DuPont on Balanced Reporting".   Said advertisement was disseminated throughout the State of Florida, and falsely stated, _inter alia_, that DuPont had never withheld information,   either   in   the   courtroom   or   elsewhere.   Said

60

advertisement was disseminated in furtherance of the goal of concealing the defective nature of Benlate 50 DF and to prevent those with Benlate 50 DF caused injury from bringing claims, and constituted untrue, deceptive, or misleading advertising as proscribed by §817.42, Fla. Stat.

(3) Each incident of false and misleading advertising described above, in connection with the aforementioned scheme, to wit convincing growers that Benlate could not have caused any plant damage and that they could not possibly have a claim against DuPont, and artifice by means of false pretenses, misrepresentations and failure to disclose material facts constitutes a separate and distinct violation of §817.42, Fla. Stat.

(E) Violations of various sections of §837, Fla. Stat., and §18 U.S.C. §1622, which prohibits the subordination of perjury including, but not limited to:

(1) On or about February 2, 1994, Edgar Woolard testified under oath in the <u>Native Hammock v. DuPont</u> case conducted in this Court in Dade County, that after reviewing all the results from DuPont's 1991 and 1992 Benlate testing, there was no evidence linking Benlate DF to the reported plant damage. Woolard made this statement believing that it was not true.

(2) On or about May 11, 1995, Edgar Woolard testified under oath in the <u>Bush Ranch Sanction Hearing</u> that DuPont did have any scientific evidence that Benlate could cause plant damage. Woolard made this statement believing that it was not true.

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.

2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 · TEL (305) 372 1800

(3)  On  or  about  December  22,  1994,  Edgar  Woolard testified under oath in the <u>Roberts v. DuPont</u> case that DuPont's Benlate 1992 testing did not produce any results to indicate that Benlate DF could have caused extensive plant damage.  Woolard made this statement believing that it was not true.

(4)  On  or  about  March  4,  1993,  Timothy  Obrigawitch testified under oath in the <u>Lambert v. DuPont</u> case that except for the Florida and Hawaii field tests of 1991-1992, DuPont had not conducted   any   other   Benlate   studies   after   January   1991. Obrigawitch made this statement believing it was not true.

(5)  On  or  about  April  3,  1993,  Timothy  Obrigawitch testified under oath in the <u>Faulkner v. DuPont</u> case that he had never seen any injury from Benlate applications in any of the experiments that DuPont had conducted.  Obrigawitch testified that DuPont has never thrown away any incriminating Benlate tests and/or evidence.  Obrigawitch made this statement believing it was not true.

(6)  On  or  about  March  4,  1996,  Timothy  Obrigawitch testified under oath in the <u>Davis v. DuPont</u> case that he never informed anyone to throw out plants in Costa Rica in 1992; he did not buy, bring and/or use any Benlate on his trip to Costa Rica in 1992; and that he did not see anyone buy, bring and/or use Benlate during his trip to Costa Rica in 1992.  Obrigawitch made this statement believing it was not true.

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.

2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TEL (305) 372 1800

(7)  On or about May 15, 1992, Bruce Hadley testified under oath in the Bush Ranch v. DuPont case that DuPont could not find a way to make Benlate DF cause plant damage in any testing in 1991 or 1992.  Hadley made this statement believing it was not true.

(8)  During the Bush Ranch v. DuPont trial, DuPont expert Nicholas Albergo misrepresented his role during the testing of the plaintiffs' soil samples.  Albergo made these misrepresentations believing they were not true.

(9)  During the Bush Ranch v. DuPont trial, DuPont lawyer Elizabeth Gilley misrepresented DuPont expert Nicolas Albergo's role during the testing of plaintiff's soil samples.  Gilley made these misrepresentations believing they were not true.

(10) In the Davis v. DuPont litigation, DuPont served sworn interrogatory responses stating that DuPont did not conduct any experiments in Costa Rica in 1992 using Benlate 50 DF.  DuPont made this statement believing it was not true.

(11) In the Griffin v. DuPont litigation, DuPont served sworn interrogatory responses stating that DuPont did not conduct any experiments in Costa Rica in 1992 using Benlate 50 DF.  DuPont made this statement believing it was not true.

231. The DuPont Enterprise's repeated violations as described above extended over a period of years and involved distinct and independent unlawful acts as described herein.  Said acts were neither isolated nor sporadic events, but involved the regular and repeated violation of law to accomplish the defendants' desired

63

ends in the course of continuing business of the enterprise.   The
acts have similar intents, results, accomplices, victims or methods
of commission, or are otherwise interrelated and not isolated
incidents, so as to constitute a "pattern of racketeering
activity".   But for the said RICO conspiracy, Benlate 50 DF would
not have been marketed to the Class Members.

232. Defendant DuPont is vicariously liable for the overt
racketeering acts committed by its employees, officers and
directors.

### Violations of § 772.103(4), Fla. Stat.

233. From as early as 1987, continuously through to today, the
Count I Defendants knowingly, willfully and unlawfully conspired
within the meaning of §772.103(4), Fla. Stat. to participate in an
enterprise through a pattern of racketeering activity in violation
of §772.103(3), Fla. Stat.

234. Plaintiffs' injuries flow directly from the use of the
wire communications, the mail and false advertisements by the
DuPont Enterprise: (1) to convince Class Members not to assert
Benlate claims against the Defendants; (2) to fraudulently transmit
false information to Class Members and various regulatory agencies
as to the true defective nature of Benlate 50 DF applied to
ornamental plants in Florida; which directly induced Plaintiffs to
value their Benlate claims for a fraction of the legitimate value
and prevented regulatory agencies from detecting the true defective
nature of Benlate 50 DF; and (3) promote a pattern of fabricating
and concealing evidence in order to create an unfair advantage for

64

Class Members during Benlate litigation process.

235. Plaintiffs' injuries also flowed directly from the DuPont Enterprises conduct in various litigation, including but not limited to, the incidents of perjury and tampering of witnesses and information, which prevented numerous regularity agencies and courts of law from uncovering the Defendant's massive fraud.

### Violations of § 772.103(3), Fla. Stat.

236. The Count I Defendants were associated in fact to constitute the DuPont Enterprise but are all separate and distinct from the DuPont Enterprise.   They were all active perpetrators of the racketeering activity and thus, individually liable for all the damages caused to Plaintiffs and others by the racketeering activity.

237. Plaintiffs suffered damages as a direct result of the violations of §772.103(3), Fla. Stat.

238. Wherefore, Plaintiffs demand judgment for all damages, including attorneys' fees, treble damages, penalties, exemplary damages as provided by Florida statutory law and such further relief as is appropriate in the interest of justice.

### COUNT II

### STRICT LIABILITY IN TORT
### AGAINST DUPONT

239. Plaintiffs hereby reallege, as if set out fully herein, paragraphs 1 through 221 above.

240. DuPont sold Benlate in a defective condition which was unreasonably dangerous to the property of Plaintiffs, to wit, their ornamental plants, nursery facilities and land.    This

65

defective condition was due to the contamination and/or decomposition of Benlate, or a design defect in the Benlate, or some combination thereof.

241. DuPont as a seller at all material times was engaged in the business of selling Benlate, DuPont's fungicide product.

242. The Benlate sold by DuPont was expected to reach, and in fact reached, Plaintiffs without any substantial change in its condition after being sold by DuPont.

243. DuPont knew that the Benlate they sold would be used without inspection for defects.

244. As a direct and proximate result of the effects of the use of Benlate, the property of Plaintiffs, to wit, their ornamental plants, nursery facilities and land, have been physically harmed and damaged. Such physical harm and damage to this property has, in turn, directly caused foreseeable consequential losses to Plaintiffs in the form of loss of value, loss of production, loss of profits, loss of reputation, loss of business and costs of disposal and decontamination.

WHEREFORE, Plaintiffs demand judgment against Defendant DuPont for damages, including compensatory damages, pre-judgment interest, costs, and all other relief allowable under the laws of the State of Florida.

LAW OFFICES KOZYAK TROPIN & THROCKMORTON, P.A.
2800 FIRST UNION FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 · TEL (305) 372 1800

## COUNT III

### NEGLIGENCE AGAINST DUPONT

245. Plaintiffs hereby reallege, as if set out fully herein, paragraphs 1 through 221 above.

246. DuPont owed a duty to Plaintiffs to exercise reasonable care in the manufacture and sale of Benlate, both as to itself and with regard to others, so as to render it free from contamination, stable against decomposition into harmful by-products, and free from other defects, and to make it reasonably safe for its foreseeable uses and users.

247. DuPont was negligent in the manner in which they sold, or in which DuPont allowed the manufacture and sale of, Benlate in one or more of the following respects, among others:

a. By manufacturing and selling, or by allowing the manufacture and sale of, Benlate, in an unstable condition such that it was subject to deccmposition into harmful by-products, or contaminated with one or more harmful substances, or with a design defect, so that the Benlate was detrimental to Plaintiffs' ornamental plants;

b. By failing to properly inspect, examine, test and analyze the Benlate manufactured and sold to Plaintiffs for such defects;

c. By failing to take all reasonably necessary precautions to ensure that the Benlate manufactured and sold to Plaintiffs would not decompose, be contaminated or contain a design defect detrimental to Plaintiffs' ornamental plants;

67

d.   By failing to engage in adequate testing before placing Benlate on the market;

e.   By failing to engage in a program of adequate quality control; and

f.   By failing to remove Benlate from the market when DuPont knew, or reasonably should have known, of the likelihood of decomposition, contamination or one or more design defects, or some combination thereof.

248. As a direct and proximate result of its use of Benlate, the property of Plaintiffs, to wit, their ornamental plants, nursery facilities and land, have been physically harmed and damaged. Such physical harm and damage to this property has, in turn, directly caused foreseeable consequential losses to Plaintiffs in the form of loss of value, loss of production, loss of profits, loss of reputation, loss of business and costs of disposal and decontamination.

WHEREFORE, Plaintiffs demand judgment against Defendant DuPont for damages, including compensatory damages, pre-judgment interest, costs, and all other relief allowable under the laws of the State of Florida.

68

## COUNT IV

### FRAUD AGAINST DUPONT

249. Plaintiffs hereby reallege, as if fully set out herein, paragraphs 1 through 221, and 222 through 238 above.

250. At all relevant times, through advertising, customer support and otherwise, DuPont intensively promoted and advertised the salutary effects of Benlate -- i.e., that it would eliminate a broad spectrum of organisms that are injurious to plants without harming the ornamental plants themselves.

251. In particular, DuPont affirmatively represented to Plaintiffs that Benlate was beneficial, as described in great detail above, and was not phytotoxic.

252. At all relevant times, Benlate 50 DF was an inherently unstable, defective and destructive product, as explained in detail above, that has wreaked havoc on all Florida ornamental growers causing them to suffer hundreds of millions of dollars in damages.

253. Plaintiffs reasonably relied on these affirmative representations in purchasing and using Benlate 50 DF on ornamental plants.

254. At the time it made the foregoing affirmative representations, DuPont knew that benomyl, the active ingredient in Benlate, was an unstable compound that decomposed into BIC and DBU. DuPont also knew that when high temperatures and humidity were present, the DBU level resulting from Benlate 50 DF would greatly increase.

69

255. At all times material hereto, DuPont knew that DBU is highly phytotoxic.

256. DuPont's affirmative and continuous representations to the public in general, and to Plaintiffs in particular, that Benlate was beneficial to plants and was not phytotoxic, were false when made.

257. Rather than informing the public of what it knew and recalling the Benlate it knew was contaminated and phytotoxic, DuPont continued to intensively promote and advertise the salutary effects of Benlate and continued affirmatively representing to the public in general, and to Plaintiffs in particular, that Benlate was not phytotoxic.

258. Plaintiffs reasonably relied on DuPont's ongoing, continuous affirmative representations that Benlate was not phytotoxic and unknowingly purchased and used phytotoxic Benlate after DuPont had notice that its product was defective and/or contaminated and phytotoxic, and Plaintiffs were thereby injured.

259. The conduct of DuPont set forth above, is of a gross and flagrant character, demonstrating a conscious and intentional indifference to consequences, was wanton and reckless, and constituted an intentional and grossly careless disregard of, and indifference to, the safety, rights and welfare of others. Moreover, due to the extensive use of Benlate, known to DuPont, its egregious wrongdoing rose to the level of a public wrong.

WHEREFORE, Plaintiffs demand judgment against Defendant DuPont for compensatory damages, pre-judgment interest, court costs

70

and all other relief allowable under the laws of the State of Florida.

<center>COUNT V</center>

<center>BREACH OF EXPRESS WARRANTY AGAINST DUPONT</center>

260. Plaintiffs hereby reallege, as if set out fully herein, paragraphs 1 through 221 above.

261. DuPont was at all material times a merchant and seller with respect to Benlate.

262. DuPont has stated in magazine and newspaper advertisements that Benlate 50 DF is a safe systemic fungicide recommended for the control of many important plant diseases on ornamental plants.

263. DuPont breached its express warranty by selling Benlate 50 DF which was defective and not fit for its intended use and thus not consistent with the express warranty.

264. As a direct and proximate result of its use of Benlate 50 DF in reliance on DuPont's express warranty, the property of Plaintiffs, to wit, their ornamental plants, nursery facilities and land, have been physically harmed and damaged. Such physical harm and damage to this property has, in turn, directly caused foreseeable consequential losses to Plaintiffs, including, but not limited to, loss of value, loss of production, loss of profits, and loss of business.

265. Plaintiffs provided DuPont with notice of the breach of express warranty.

WHEREFORE, Plaintiffs demand judgment against Defendant

<center>71</center>

DuPont for damages, pre-judgment interest, court costs, and all other relief allowable under the law of the State of Florida.

### DEMAND FOR JURY TRIAL

Plaintiffs, pursuant to Rule 1.430, Fla. R. Civ. P., hereby demand trial by jury on all issues so triable as a matter of right.

Respectfully submitted this March 25, 1997 by:

**Attorneys for the Class Members**

KOZYAK TROPIN & THROCKMORTON, P.A.

_____
Harley S. Tropin, Esq.
Florida Bar Number 241253
William Xanttopoulos, Esq.
Florida Bar Number 623598
Adam M. Moskowitz, Esq.
Florida Bar Number 984280
Adam T. Rabin, Esq.
Florida Bar Number 985635
2800 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 372-1800
Telecopy: (305) 372-3508


COOPER & WOLFE, P.A.

_____
Marc Cooper, Esq.
Florida Bar Number 198358
700 Courthouse Tower
44 West Flagler Street
Miami, Florida 33130
Telephone: (305) 371-1597
Telecopy: (305) 374-2460

72

Do NOT Release
(esp. with dates)
without Mgmt
Approval

BWM 0401

CONFIDENTIAL PROPRIETARY

## KNOWN TOLERANT STRAINS - 1979

| FUNGUS | YEAR | CROP | LOCATION |
|---|---|---|---|
| Ascochyta | 1971 | Ornamentals | Holland |
| Aspergillus | 1973 | Laboratory | Europe |
| Botrytis | 1971 | Ornamentals | Worldwide |
| Botrytis | 1971 | Eggplant | Japan |
| Botrytis | 1971 | Strawberries | Europe, New Zealand, U.S. |
| Botrytis | 1971 | Beans | Pacific N.W. |
| Botrytis | 1971 | Grapes | Europe, New Zealand, U.S., Japan |
| Botrytis | 1971 | Caneberries | United Kingdom |
| Botrytis | 1971 | Lettuce | United Kingdom, U.S. |
| Botrytis | 1971 | Cucumber | United States |
| Botrytis | 1971 | Tomato | United Kingdom, New Zealand |
| Ceratocystis | 1976 | Elm | United States |
| Cercospora | 1973 | Peanuts | United States, Australia |
| Cercospora | 1973 | Sugar Beets | Greece, United States, Japan |
| Cercospora | 1973 | Celery | United States |
| Cercosporella | 1973 | Cereals | Europe |
| Cercosporidium | 1973 | Peanuts | United States |
| Cladosporium | 1973 | Laboratory | Europe |
| Colletotrichum | 1973 | Strawberry | United States |
| Colletotrichum | 1973 | Coffee | E. Africa |
| Colletotrichum | 1978 | Bananas | West Indies |
| Corynespora | 1979 | Eggplant | Japan |

BWM 04010

CONFIDENTIAL PROPRIETARY

-2-

| FUNGUS | YEAR | CROP | LOCATION |
|---|---|---|---|
| Diplocarpon | 1974 | Rose | United States |
| Fusarium | 1973 | Bulbs | United States, Holland |
| Fusarium | 1973 | Ornamentals | United States |
| Fusarium | 1973 | Bananas | Central America |
| Fusicladium | 1977 | Pecan | United States |
| Monilinia | 1976 | Stone Fruits | Australia, United States |
| Mycosphaerella | 1978 | Bananas | Central America, Philippines |
| Mycosphaerella | 1979 | Citrus | United States |
| Neurospora | 1973 | Laboratory | Europe |
| Penicillium | 1971 | Bulbs | Holland |
| Penicillium | 1971 | Ornamentals | Holland |
| Penicillium | 1971 | Citrus | United States, Australia, Japan |
| Penicillium | 1971 | Apple | United States |
| Phialophora | 1973 | Ornamentals | France |
| Powdery Mildew | 1969 | Apples | United States |
| Powdery Mildew | 1969 | Strawberries | Japan |
| Powdery Mildew | 1969 | Eggplant | Japan |
| Powdery Mildew | 1969 | Curcurbits | Worldwide |
| Powdery Mildew | 1969 | Ornamentals | Worldwide |
| Powdery Mildew | 1969 | Grapes | United States |
| Powdery Mildew | 1969 | Turf | United States |
| Rhizoctonia | 1973 | Laboratory | Europe |
| Sclerotinia | 1974 | Turf | United States, Australia |
| Septoria | 1974 | Celery | Australia, United States |
| Septoria | 1974 | Cereals | Europe |
| Septoria | 1974 | Ornamentals | United States, New Zealand |

BWH 04010

-3-

| FUNGUS | YEAR | CROP | LOCATION |
|---|---|---|---|
| Ustilago | 1973 | Laboratory | Europe |
| Verticillium | 1973 | Mushrooms | United States |
| Verticillium | 1973 | Strawberry | United Kingdom |
| Venturia (Apple Scab) | 1974 | Apples, Pears | Worldwide |

BWM 040101

CONFIDENTIAL/PROPRIETARY



**E. I. DU PONT DE NEMOURS & COMPANY**

WALKER'S MILL BARLEY MILL PLAZA
P.O. BOX 80036
WILMINGTON, DELAWARE 19880-0036

AGRICULTURAL PRODUCTS DEPARTMENT

Date  5/14

TO:   C. M. Beyer
      A G
      Steve

FROM: K. M. Reasons
      A G
      Barley Mill

COMMENTS:

TOTAL NO. OF PAGES ___ (Including Front Cover Sheet)

FACSIMILE NO.    (302) 992-6184
VOICE CONTACT:   Janet Singleton (302) 992-6197

BETTER THINGS FOR BETTER LIVING

BSH 0160961

CONFIDENTIAL/PROPRIETARY

## FLORIDA VISIT - 5/10/91

- Magnitude of problem is much greater than the Wilmington team has perceived!

    - Business/Ethical issues
        - Legal - liability
        - Technical - what's causing
        - Morale - impact on people (customers & Du Pont personnel)

- To date, we have focused primarily on legal-liability

- There is a <u>real technical</u> problem

    - It's huge and to date evasive!
    - Many ornamental growers may be put out of business
    - Lives are being shattered
    - Recall has likely generated some unfounded claims

- Benlate® appears to be the only common variable!

    - Common contributing factors (site-to-site)

        a) Temperature
        b) Day length/intensity
        c) Small plants injured most

    - Beliefs by field personnel:

        a) It is D.F. related
        b) Atrazine may not be the cause
        c) Majority of complaints with 1990 Terra D.F.
        d) Topsin M - doesn't appear to have a problem (but may be too soon)
        e) Some people still using D.F.

BSH 0160962

CONFIDENTIAL/PROPRIETARY

# FIELD ATTITUDE CONCERNS

- It's not atrazine.

- We are digging a hole sticking to atrazine as a cause.

- Growing belief that it's inherent in D.F.

- Greatest fear is that we have SU contamination.

- Legal has shut down communications! Stopped technical search.

- Wilmington management has not given adequate resource support.

- Delaying the inevitable - keeping growers in "limbo".

- We have the obligation to clean up the mess and allow people to get on with their lives and businesses. We must give them the technical direction.

- EPA and/or state regulatory agencies are communicating and the "AX" can drop soon!!

- Independent analysis of Benlate® have found:
    - propazine
    - simazine
    - bromacil
    - chlorothalomil
    - ??

- Du Pont is out of time to deal with this! We have been milling around for 6 weeks!!

BSH 0160963

CONFIDENTIAL/PROPRIETARY

# NEEDS/RECOMMENDATIONS

- Must put a dedicated task force in place soon to deal with the following issues.

  - Technical team
  - Business
  - Legal

- Must approach from 4 directions

  - Deal with affected people and lives ASAP
  - Science – determine cause
  - Legal/liability and Du Pont reputation
  - Regulatory

- Must open up and share information.

- Must make a decision (promptly) to clean up the damage and let people get on with business.

- Provide technical direction for disposal of waste generated - soil, pots, matting, etc.

- Must have a dedicated assistant to Clyde R. Details - KMR.

- Must continue to support. Field preceives Wilmington as thinking the worst has passed - i.e., Recall!!

- Must recognize that if it is determined that atrazine is not the cause we will have a massive amount of claims.

BSH 0160964

CONFIDENTIAL/PROPRIETARY

*Steve Wright*

FLORIDA

- MAGNITUDE OF PROBLEM IS MUCH GREATER THAN THE WILMINGTON TEAM HAS PRECIEVED

- ~~Basically it is~~ ~~THREE~~

- ~~ITS~~ PHASED

  - Legal - LIABILITY

  - TECHNICAL - what's CAUSING

  - MORAL - IMPACT ON PEOPLE (customer & Dupont personnel)

- To DATE WE HAVE FOCUSED ON LEGAL - LIABILITY

- THERE IS A REAL TECHNICAL PROBLEM

  - It's HUGE & TO DATE EXPENSIVE!

- Recall has likely generated SOME MARGINAL CLAIMS.

- ~~There~~ MANY ORNAMENTAL GROWERS MAY BE PUT OUT OF BUSINESS.

- LIVES ARE BEING SHATTERED

- BENLATE APPEARS TO BE THE ONLY COMMON VARIABLE!
  - Common Contributing factors (site to site)
    a) TEMPERATURE
    b) day length / Intensity
    c) SMALL PLANTS INFRARED MOST.
  - ~~Bull~~ =
    a) That it's POST D.F.
    b) ATRAZINE NOT THE CAUSE
    c) Majority of Complaints w/1991 TEEGA D.F.
    d) To join M. DOESN'T Appear To have A Problem
       (But MAY BE TOO SOON)
    - Some Dumb still USING D.F.

MAJORITY TOL CF. 'C' OF THE PROBLEM

BSH 0160955

CONFIDENTIAL/PROPRIETARY

*Brian Knight?*

## BHEAD ATTITUDE
### CONCERNS

1. IT'S NOT ATRAZINE

2. WE ARE DIGGING A HOLE STICKING TO
ATRAZINE AS A CAUSE.

3. GROWING BELIEF THAT IT'S INHERENT
IN D.F.

4. GREATEST FEAR IS THAT WE HAVE
S.U. CONTAMINATION.

5. LEGAL HAS SHUT DOWN COMMUNICATIONS!
- STOPPED TECHNICAL SEARCH

6. WE (NCHT) HAVE NOT GIVEN ADEQUATE RESOURCE

7. DELAYING THE INEVITABLE
- KEEPING GROWERS IN "LIMBO"

8. WE HAVE THE OBLIGATION TO CLEAN UP THE
MESS AND ALLOW PEOPLE TO GET ON WITH THEIR
THEIR LIVES & BUSINESSES. WE MUST
GIVE THEM THE TECHNICAL DIRECTION.

9. EPA and/OR STATE REGULATORY AGENCIES ARE
COMMUNICATING AND THE "AXE" CAN DROP SOON!!

10. Independent Analysis of BENLATE HAVE FOUND
- PROPAZINE
- SIMAZINE
- BROMACIL
- Chlorothalonil.
??? ?

11. DuPONT IS OUT OF TIME TO DEAL W/THIS!
WE HAVE BEEN MILLING AROUND for 6 WEEKS!!

BSH 0160956

CONFIDENTIAL/PROPRIETARY

( River Wright )

## NEEDS / RECOMMENDATIONS

- MUST PUT A DEDICATED TASK FORCE IN PLACE NOW to DEAL WITH THE TECHNICAL.
  - Wilm - Cross discipline (Technical)
  - Business
  - Field MUST BE Represented
  - Legal

- MUST APPROACH FROM 4 DIRECTIONS.
  - Deal with affected People & lives - ASAP
  - Science - Determine Cause
  - Legal / Liability ¿ Dupont Agitation.
  - REGULATORY

- MUST OPEN-up and Share Information

• MUST MAKE A DECISION (PROMPTLY) to Clean up the damage and let people get on with business.

◦ PROVIDE TECHNICAL DIRECTION FOR DISPOSAL OF. WASTE GENERATED - SOIL, POTS, MATTING etc.

- MUST HAVE A DEDICATED ASSISTANT FOR CLYDE P.
  - Field Details - RME.

- MUST Continue - SUPPORT - Field Practices Wilm, to Thinking the worst has passed - i.e. Recall !!

• MUST Recognize THAT IF IT IS DETERMINED THAT MATTING IS NOT THE CAUSE WE WILL HAVE A MASSIVE AMOUNT OF CLAIMS → IN SITUES on THE EAST COAST. (WE'VE CONVINCED Alot ¿ Growers THAT THEIR PROBLEMS could be Arsenic - Lt THEY BELIEVE IT'S Benlate)

• Clete Botkin WANTS TO Rejoin Dupont - Customers love her - She can help - HER COMING SAYS WE SHOULD HELP !

BSH 0160957

INTEROFFICE MEMORANDUM

```
Date:    28-Aug-1990  04:54pm
From:    Ronald A. Hamlen
         HAMLENRA
Dept:    AG-REGISTRATION
Tel No:  992-6027
```

TO: Distribution List

Subject: RE: Benlate:  North Carolina

Gang,

The following has the smell of my frustration around the whole benomyl contamination issue.  Knowing that, however, does not diminish what follows.

A whole lot of us, our time and energy has been and continues to be eaten up by this contamination issue, and we know it is not just limited to benomyl.  It hurts like hell to see so much talent being "spent" on this ongoing issue.  The thought of what we aren't doing while we are drowning in this issue scares the hell out of me!  And there seems to be no improvement, no resolution to our inability to produce a quality product in sight!  We jump from atrazine to flusilazol to "what is next?".

While we shout to ourselves and to our customers "DuPont means quality", we aren't walking out talk.  And our customers are seeing this and the Regulators are too.  And they will be very responsive to what the public wants.  Remember Alar?

The very fact that we are unable to control our products and effectively recall "bad" stuff will force the EPA to do our work for us, e.g. more stop sales, more legal action, more requirements to absolutely insure the quality of products and more bad press.

I hate to say this, but as I think over all the long and painful events around the benomyl atrazine contamination, I feel we are pushing and have pushed the EPA to take action that we don't want.  We should not scream foul to loudly for if we can't get our shop in order, their job in protecting the public, is to do it for us.; Please don't just get mad, but think about our individual and collective responsibility to turn this problem around.

I'm aware of the dedicated line for benomyl to be established at Belle, I fully support this and I know this is not the end-all answer for we can shoot ourselves in the foot too.  We have already done so!

I also see a disconnect between our biology and manufacturing.

We have very limited biological data to allow any meaningful interpretation as to the safety of our products and even less clear understanding of the safe levels before plant injury results. We do not test the magnitude of crops or ornamentals to allow a reasonable level of confidence that no problems will occur from trace impurities. However, we still establish permissible level limits and, I feel, it is a little like playing Russian roulette.

I would ask, have we decided to take this risk and are we willing to expand the amount of resources needed to handle the problems when they occur?   Are we willing to risk having the EPA develop our business strategy?  To risk having our customers look to our competitors?  I feel the answers are no.  But what are doing to resolve these issues?  Are we truly committed to QUALITY?

Thanks for listening, please comment and let's pull together on this, I feel the alternatives are to frightening for us to be apart on this issue.

Regards,

Ron Hamlen

CONFIDENTIAL/PROPRIETARY

INTEROFFICE MEMORANDUM

| | |
|---|---|
| Data: | 25-Jul-1991 09:57am |
| From: | Larry B. Gillham |
| | GILLHALB |
| Dept: | AG-FIELD/MKT |
| Tel No: | 404-396-8966 |

TO: Distribution List

Subject: Summaries for Friday Benlate Meeting

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
ATTORNEY CLIENT COMMUNICATION

Jane and Mike, the following is our ( RES and Myself) first attempt at summarizing our thoughts around the three questions that we discussed yesterday.

Gerry, I understand that you will be at this meeting in Wilmington on Friday also. I don't know if you will have time to review the following and make comments, additions or deletions, but if you do it would be most appreciative.

David, Erick and I wanted you to see this also for the same reason and if you have any upgrades, please feel free to make them.

Steve, realize that you are on vacation, but wanted you to know what we are thinking incase you have your computer and in case you get on the system prior to the meeting tomorrow morning at 9:00 a.m. in Wilmington.

The following are Erick's and my collective thoughts that we discussed yesterday and last evening. We are operating under the assumption that they are at least similar to what others in Florida are thinking, however with so many out on vacation this is impossible to say for sure on such short notice.

QUESTION 1: Do we believe that Benlate is the primary causual agent for the symptomology that we have seen in ornamentals and strawberry to date.

Yes, particularly in Ornamentals. In strawberry there is some doubt in that neither Erick or I have seen fields where Benlate was not used to use as a comparison during this season.

Why do we believe that Benlate is the primary casual agent?

· Benlate was the only common denominator with all of the complaints. Where there were multiple applications we have seen an increase in severety of symptomology with an increase in the number of applications.

There were also some semi-comparisons where Benlate was used and not used and a difference in growth and etc could be

CONFIDENTIAL PROPRIETARY

seen.

.Plant material treated to date buy RES have shown non-colclusive results. On one occasion planted cucumber's in soil removed from growers pots where had previous problems and did see a reaction in the form of reduced growth, unpward leaf cupping, yellowing and marginal necrosia.

Also. have a grower study which showed symptoms @ 9 months after treatment ( new growth starting).

. .Commonality of symptoms - some cases where Benlate was the only application made according to reports.

. Product Recall heightened awareness of producers, also second occurance in 2 years.

. Productions schedules from some growers show yield reduction over previous years with Benlate being the only common denominator.

. Quality problems of many products within Florida in recent years (Krovar, Hyvar, Vendex, Benlate, etc) has greatly eroded the confidence in quality of DuPont products, both internally and externally.

. Rod Roan reports that a grower has production records to show a steady decline in production of ornamentals since they started using Benlate DF when ii first came out as a product formulation.

.Benlae WP has a built in obsolescence, in that when the bag has been. left open to humidity and etc, the material virtualy becomes useless in a short period of time as it becomes unsprayable. Benlate DF bag inside the box is almost impossible to reseal but at the same time remains a usuable formulation over a much longer period of time when exposed to the same conditions - it continues. to flow from the box, and dieperses readily in water. The problem this could create is that if there is infact a breakdown product occuring within DF, an open box could lead to more of this.

. Lack of overall faith in Benlate DF both internally and externally:

## QUESTION 2

Do we believe that there is an Exterior factor such as Weather, virus, nematodes, etc. other than Benlate causing the symptomology.

                    --NO--

Why-
. We ar enow in our second year of similar problems/ symptomology.

. 2 years with dis-similar weather patterns:
    Year 90/91 slightly warmer (above average temperature).
        slightly above average long term rainfall,
        considerably above recent year avg rainfall.
    In general good growing conditions except for 2
        days in Feb. which were windy and cool.
    Generally felt that the weather patterns this
        summer are more typical of what used to be seen-

BFL 0720143

CONFIDENTIAL/PROPRIETARY

said to be the most typical spring/summer since 1986.

. Year 89/90 Very severe cold in late December.
. Dryer than normal
  Windier than normal

. Have seen nurseries in close proximity of each other where one used on a heavy schedule and had problems with growth and one that did not use or used very sparingly and had either no problems or at least lessor problems.

. If external, why were not similar problems seen in areas other than nurseries such as Parks, homes, schools and etc where Benlate is not typically used.

. If external, particularly a disease, nematodes or etc. should have heard of this from Plant inspectors who regularly check the ornamental growers.

. Virus's, don't know. The experts say that Virus's can infect all spp. of plant material, but procedures for testing most plant spp. for Virus are just now being developed.

. Nematodes - majority of Strawberry growers fumigate to reduce or eliminate as a problem. Also potting soil used in nurseries is generally considered sterial. Also would espect that this would have been picked up by plant inspectors.

. If this was a new disease or something else new, probability of being seen over a large scale would be small.

QUESTION 3:

   Do we believe that the symptomology is due to miss use or off label use.

   No, particularly not on a large scale. This is always possible in some instances but generally felt that this would be a rarety.

. In Strawberry, according to the label a grower can use 34 - 36 lbs of Benlate per acre beginning the applications in the plant bed in mid July and continuing until mid April with the Anthracnose label. Maximum number of applications recorded on any of the complaints ranged from 10 - 12 (10 - 12 lbs max). Generally the average range was 4 - 6 aplications at 1/2 #.

. In ornamentals as a drench can sue 1 #/100 gal H2O at 1-2 pints per ft square after transplanting into propagation beds or containers and repeat at 2 - 4 week intervals during periods favorable for disease. This allows for 109 lbs of Benlate per acre per application with a total maximum number of applications of 24 with a total of 2613 lbs of Benlate per acre per year.

   As a foliar treatment can begin application when disease first appears and repeat on a 10 - 14 day schedule at 1/2 - 1 # per 100 gal with no limit to volume applied or total number of applications.

. What the above means to us is that it is almost impossible to use off label.

. Another feeling is that we feel that we should limit

CONFIDENTIAL INFORMATION

in some way the amount of Benlate or volume used per application
as we have seen in our test work that a significant amount of the
material runs through the pot and is virtually wasted.
    . Along these same lines, we have seen symptomology with
few number of applications and etc, thus just limiting the amount
of product or volume will not correct the problem we have seen in
the past.

    Jane, Mike and etc; we hope that the above is what you
were looking for and makes sense to you-all. As said initially,
these are our thoughts. Let me knwo if you need something else.
    Others, if you have comments, please make them ASAP.
    Larry

BFL 072014S

CONFIDENTIAL/PROPRIETARY

CABANISS, BURKE & WAGNER, P. A.

SUITE 500
ONE SOUTH ORANGE AVENUE
POST OFFICE BOX 2513
ORLANDO, FLORIDA 32602-2513

TELEPHONE (407) 246-1800
FACSIMILE (407) 246-1895

**PRIVILEGED**

Rec'd 10/2/91 - faxed 9/26/91
September 26, 1991

Mr. Glen Baldwin
Legal Department
E. I. Du Pont De Nemours and Company
Barley Mill Plaza 36
Route 141 & 48
Wilmington, Delaware  19805

Dear Mr. Baldwin:

In follow up of our brief conversation on September 25, 1991, I wanted to explore in greater detail the rationale for my recommendation that other than the scientific effort concerning the recropping issue, Du Pont may have reached the point of diminishing returns in continuing high intensity efforts to isolate a discrete cause of the damage seen in crops where the growers used Benlate DF from the 1990-91 campaign.  As you know, I will not be able to attend the conference in Wilmington on September 30, 1991 because of other commitments. I understand that Jerry Oshinsky will attend; he has a separate set of concerns related to the "occurrence" clause in the XL insurance contract.

Given the public arena in which the Benlate issue is being addressed, there are many reasons to continue a broad, basic science search for the element/compound in Benlate DF that has apparently produced similar symptoms in multiple plant species in various states. Du Pont's stature and credibility would be enhanced by its ability to identify and isolate the mechanism of injury.

At the same time, Du Pont would, in the absence of the ability to protect the scientific information under the work product privilege, have established one element of a complaining plaintiff's case, i.e., the identification of a "defect." Although specific proof of a particular defect is not required in Florida (and presumably other states), a successful scientific effort would go beyond that which a plaintiff must prove in order to prevail. The question of the discoverability of the results of the scientific effort is complex and beyond the scope of this letter. The prudent approach is to assume that some judge in some jurisdiction would order Du Pont to produce the records/results of its scientific efforts.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
PRODUCED BY SM4K

BII 0005981

Mr. Glen Baldwin
September 26, 1991
Page 2

CONFIDENTIAL/PROPRIETARY

PRIVILEGED

As it now stands, Du Pont can prove that it was not herbicide contamination of Benlate DF that caused the observed plant damage even though the exact mechanism that did cause or contribute to the observed damage has not been isolated. It is a safe assumption that no plaintiff's expert has the ability/resources to accomplish what Du Pont could not. The next step in the sequence is to assert that despite extensive and diligent efforts, Du Pont has not found anything in Benlate that could cause the observed damage. The typical result of this scenario is to create a question for jury resolution, with the odds of a favorable resolution in Du Pont's favor increasing with the identification of other causative/contributing factors.

On balance, the continuation of the science effort at some level makes good scientific and litigation sense. Scientifically, Du Pont can maintain that it continues to search for a cause and that it will continue to do so as long as it appears necessary to address the issues raised by customers and regulators. At some point, I would expect that it will no longer be an issue, but am unable to predict when that may occur.

In the litigation mode, we will not be forced into admitting that we have found a cause and it is our fault. It is a much better litigation position to state that we have looked, are looking, and will continue to look but have had no success, leaving the issue unresolved than it is to have to admit that we have isolated the mechanism of injury.

The issue then becomes one of the allocation of resources and extent of effort. From our meeting in Orlando on the 24th, I got the impression that there was a limit to the available resources to put to the task, given the heightened interest in the recropping issue. Given that a shutdown of the effort to nominate a cause will result in it never being reactivated, I would urge a division of labor that places the bulk of the effort into the recropping issue, but that a discernible amount of effort remain on the basic scientific issue. Coordination of those efforts may shorten the learning curve on the recropping front.

In summary, I recommend that the basic science effort continue at some level, but given the current significance of the recropping issue, the greater amount of resources be devoted to that problem. I trust this input will be helpful to the discussion on the 30th. If you desire, I can participate by telephone hook-up; I simply

**CONFIDENTIAL**
SUBJECT TO PROTECTIVE ORDER
PRODUCED BY FMHK

BII 0005982

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN
AND FOR DADE COUNTY, FLORIDA
CASE NO.

97 - 6611 CA 08

EXOTIC BOTANICALS, INC., a
Florida corporation; HODGE
GREENHOUSES, INC., a Florida
Corporation; JOAN D. CONE, INC.
d/b/a TREEHOUSE PLANTS, a Florida
corporation; DONALD WAYNE SIMPSON
d/b/a ORNAMENTAL HORTICULTURE,
a sole proprietorship; and
GATOR GROWERS NURSERY, INC., a
Florida corporation; on behalf of
themselves and all others similarly
situated,

    Plaintiffs,

v.

E.I. DU PONT DE NEMOURS & COMPANY,
Inc., a Delaware corporation;
CRAWFORD & COMPANY, a Georgia
corporation; THOMAS J. BURKE, ESQ.,
individually; TIMOTHY T. OBRIGAWITCH,
individually; EDGAR S. WOOLARD, JR.,
individually; and CABANISS & BURKE, P.A.,
a Florida partnership, f/k/a CABANISS
BURKE & WAGNER, P.A.,

    Defendants.

_____/

**CLASS REPRESENTATION**

S Name _____ CORIA R/A
E Date _3 _7 _97_ Time _12 '45 _
R P.S. _MATHEW BALLAS Mill_
V     Print/Sign Name
E     Certified in The Circuit Court of
D _(7_ Judicial Circuit Cert # _2 _

## CIVIL ACTION SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of Said State:

**YOU ARE HEREBY COMMANDED** to serve this summons and a copy of the
Complaint in this action on defendant:
    By serving:
    E.I. DU PONT DE NEMOURS AND COMPANY c/o Registered Agent
    CT Corporation Systems
    1200 S. Pine Island Road
    Plantation, FL 33324

Each defendant is required to respond to the Complaint on
Plaintiff's attorney whose address is: **Harley S. Tropin, Esq.,
Kozyak, Tropin & Throckmorton, P.A., 200 S. Biscayne Blvd., Suite
2800, Miami, Florida 33131** as provided in the Complaint and to file
the original of the defenses with the Clerk of this Court either
before service on Plaintiff's attorney or immediately thereafter.
If a defendant fails to do so, a judgment may be entered against
the defendant for the relief demanded in the Complaint.

DATED ON _____ MAR 25 1997 _____, 1997.

    HARVEY RUVIN,
    As Clerk of said Court

    By: _____
        As Deputy Clerk

MAR 2 6 1997

421528

| DATE RECEIVED | March 25, 97 |

| CASE NO. | 97-6611 CA 08 |
| COURT | 11th Circuit, DADE |
| HRG. DATE | |

EXOTIC BOTANICALS, INC., ET, AL

 Plaintiffs,

vs.

E.I. DU PONT DE NEMOURS & CO.,
INC., ET, AL

 Defendants,

RETURN OF SERVICE
AFFIDAVIT

TYPE OF WRIT
SUMMONS AND COMPLAINT

TO_____ E.I. DU PONT DE NEMOURS AND COMPANY

____ 1200 S. PINE ISLAND ROAD, PLANTATION, FL 33324

RECEIVED THIS WRIT ON __March 26, 1997__
AND ON __March 27, 1997__ at ____12:45 P.____ M., I SERVED IT ON THE WITHIN
NAMED ____E.I. DU PONT DE NEMOURS AND COMPANY____ IN __BROWARD__
COUNTY, FLORIDA

_____ **INDIVIDUAL SERVICE:** By serving upon the within named (Defendant/Witness) a true copy of this writ with the date and hours of service endorsed thereon by me and a copy of the Plaintiff's complaint, petition or initial pleading.

_____ **SUBSTITUTE SERVICE:** By serving a true copy of this writ with the date and hour of service endorsed thereon by me and a copy of Plaintiff's Initial pleading as furnished by the Plaintiff, at the within named (Defendant's Witness) usual place of abode with any person residing the age of 15 years or older to wit: _____
_____, or to _____ spouse of defendant, at _____
_____, or to _____ manager of defendant business _____
_____ and informing such person of their contents pursuant to: ☐ F.S. 48.031._____
XX ☐ F.S. 48.031 (2)(a)  ☐ F.S. 48.031 (2)(b).

_____ **CORPORATE SERVICE:** By serving a true copy of this writ and a copy of Plaintiff's initial pleading to _____
_____ as _____
corporation in the absence of any superior officer as defined in F.S. 48.081, or by serving _____ _____ of said
_____ as an employee of defendant corporation in compliance with F.S. 48.081 (3) or by serving
__C.T. CORPORATION SYSTEM__ as a registered agent in compliance with F.S. 48.091.

_____ **PARTNERSHIP SERVICE:** By serving _____, partner, or to _____
_____ a designated employee or person in charge of partnership.

_____ **POSTED:** ___ COMMERCIAL, ___ RESIDENTIAL, 1st Attempt ____ AM PM 2nd Attempt ____ AM PM

_____ **NO SERVICE:** For the reason that after diligent search and inquiry failed to find said _____
_____ in _____ County, Florida

COMMENTS: _____
_____

ATTORNEY:
HARLEY S. TROPIN, ESQ.
KOZYAK TROPIN
200 S. BISCAYNE BLVD,, Ste. 2800
MIAMI, FL 33131

FEES FOR SERVICE $ _____

Witness Fee _____
The foregoing instrument was acknowledged before me this __28th__
day of __MARCH__, 19_97_ by __MATHEW BACOLAS__ who is
name and title
personally known to me or who has produced _____ (type
of ID) as identification and who _____ take an oath.
____ did or did not

| TOTAL | |
| PAID | |
| BALANCE | |

SHERIFF OF BROWARD COUNTY

BY: _____

Sheriff's Appointment No.: _____

NOTARY PUBLIC OR PUBLIC OFFICER

OFFICIAL NOTARY SEAL
LINDA GONZALEZ
NOTARY PUBLIC, STATE OF FLORIDA
COMMISSION NO. CC573688
MY COMMISSION EXP. MAY 19, 1998

BSO C # 17 (Revised 10/91)

ORIGINAL

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN
AND FOR DADE COUNTY, FLORIDA
CASE NO.

**97- 6611 CA₀₈**

**EXOTIC BOTANICALS, INC., a
Florida corporation; HODGE
GREENHOUSES, INC., a Florida
Corporation; JOAN D. CONE, INC.
d/b/a TREEHOUSE PLANTS, a Florida
corporation; DONALD WAYNE SIMPSON
d/b/a ORNAMENTAL HORTICULTURE,
a sole proprietorship; and
GATOR GROWERS NURSERY, INC., a**
Florida corporation; on behalf of
themselves and all others similarly
situated,
     Plaintiffs,
v.
E.I. DU PONT DE NEMOURS & COMPANY,
Inc., a Delaware corporation;
CRAWFORD & COMPANY, a Georgia
corporation; THOMAS J. BURKE, ESQ.,
individually; TIMOTHY T. OBRIGAWITCH,
individually; EDGAR S. WOOLARD, JR.,
individually; and CABANISS & BURKE, P.A.,
a Florida partnership, f/k/a CABANISS
BURKE & WAGNER, P.A.,
     Defendants.
_____/

**CLASS REPRESENTATION**

S  Name _C. McCarr R/h_
E  Date _3-25-97_  Time _12:45_
R  P.S. _Matthew Raccias  MBona_
V              Print/Sign Name
E       Certified in The Circuit Court of
D   _17_  Judicial Circuit Cert # _272_

**CIVIL ACTION SUMMONS**

THE STATE OF FLORIDA:
To Each Sheriff of Said State:

**YOU ARE HEREBY COMMANDED** to serve this summons and a copy of the
Complaint in this action on defendant:
     By serving:
     CRAWFORD & COMPANY c/o Registered Agent
     CT Corporation Systems
     1200 S. Pine Island Road
     Plantation, FL 33324

Each defendant is required to respond to the Complaint on
Plaintiff's attorney whose address is: **Harley S. Tropin, Esq.,
Kozyak, Tropin & Throckmorton, P.A., 200 S. Biscayne Blvd., Suite
2800, Miami, Florida 33131** as provided in the Complaint and to file
the original of the defenses with the Clerk of this Court either
before service on Plaintiff's attorney or immediately thereafter.
If a defendant fails to do so, a judgment may be entered against
the defendant for the relief demanded in the Complaint.

DATED ON _____, 1997:

HARVEY RUVIN
As Clerk of said Court

By: _____
        As Deputy Clerk

MAR 2 6 1997

421528

March 26, 97

EXOTIC BOTANICALS, INC., ET, AL

   Plaintiffs,

vs

E.I. DU PONT DE NEMOURS AND
COMPANY, INC., ET, AL

| CASE NO. | 97-6611 CA 08 |
| COURT | 11th Circuit, DADE |
| HRG. DATE | |

RETURN OF SERVICE
AFFIDAVIT

TYPE OF WRIT

SUMMONS AND COMPLAINT

TO     CRAWFORD & COMPANY

    1200 S. PINE ISLAND ROAD, PLANTATION, FL 33324

RECEIVED THIS WRIT ON   MARCH 36, 1997 at 1 P.M.
AND ON   MARCK 27, 1997    at     12:45 A.     M., I SERVED IT ON THE WITHIN
NAMED   CRAWFORD AND COMPANY      IN   BROWARD
COUNTY, FLORIDA

_____ **INDIVIDUAL SERVICE:** By serving upon the within named (Defendant/Witness) a true copy of this writ with the date and hours of service endorsed thereon by me and a copy of the Plaintiff's complaint, petition or initial pleading.

_____ **SUBSTITUTE SERVICE:** By serving a true copy of this writ with the date and hour of service endorsed thereon by me and a copy of Plaintiff's Initial pleading as furnished by the Plaintiff, at the within named (Defendant's Witness) usual place of abode with any person residing the age of 15 years or older to wit: _____
_____, or to _____ spouse of defendant, at _____
_____ or to _____ manager of defendant business _____
_____ and informing such person of their contents pursuant to: ☐ F.S. 48.031. _____
☐ F.S. 48.031 (2)(a)    ☐ F.S. 48.031 (2)(b).

   X    **CORPORATE SERVICE:** By serving a true copy of this writ and a copy of Plaintiff's initial pleading to _____
_____ as _____ of said
corporation in the absence of any superior officer as defined in F.S. 48.081, or by serving _____
_____ as an employee of defendant corporation in compliance with F.S. 48.081 (3) or by serving
CT. CORPORATION SYSTEMS as a registered agent in compliance with F.S. 48.091.

_____ **PARTNERSHIP SERVICE:** By serving _____ , partner, or to _____
_____ a designated employee or person in charge of partnership.

_____ **POSTED:** ____ **COMMERCIAL,** ____ **RESIDENTIAL, 1st Attempt** _____ ___ <sup>AM</sup>/<sub>PM</sub> **2nd Attempt** _____ ___ <sup>AM</sup>/<sub>PM</sub>

_____ **NO SERVICE:** For the reason that after diligent search and inquiry failed to find said _____
_____ in _____ County, Florida

COMMENTS: _____

ATTORNEY:
HARLEY S. TROPIN, ESQ.
KOZYAK, TROPIN & THROCKMORTON, P.A.
200 S. BISCAYNE BLVD., Suite 2800
MIAMI, FL 33131

FEES FOR SERVICE    $ _____

    Witness Fee _____
The foregoing instrument was acknowledged before me this   28th
day of   MARCH   , 19 97 by   MATHEW BACOLA who is
personally known to me or who has produced _____ (type
of ID) as identification and who _____ take an oath.
        did or did not

NOTARY PUBLIC OR PUBLIC OFFICER AND TITLE OR RANK/CCN

OFFICIAL NOTARY SEAL
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC373692
MY COMMISSION EXP. MAY 19, 1998

| TOTAL |
| PAID |
| BALANCE |

SHERIFF OF BROWARD COUNTY

BY: _Mathew Bacola_
Sheriff's Appointment No.: _280_

BSO C # 17 (Revised 10/91)        **ORIGINAL**

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN
AND FOR DADE COUNTY, FLORIDA
CASE NO.

EXOTIC BOTANICALS, INC., a
Florida corporation; HODGE
GREENHOUSES, INC., a Florida
Corporation; JOAN D. CONE, INC.
d/b/a TREEHOUSE PLANTS, a Florida
corporation; DONALD WAYNE SIMPSON
d/b/a ORNAMENTAL HORTICULTURE,
a sole proprietorship; and
GATOR GROWERS NURSERY, INC., a
Florida corporation; on behalf of
themselves and all others similarly
situated,

    Plaintiffs,

v.

E.I. DU PONT DE NEMOURS & COMPANY,
Inc., a Delaware corporation;
CRAWFORD & COMPANY, a Georgia
corporation; THOMAS J. BURKE, ESQ.,
individually; TIMOTHY T. OBRIGAWITCH,
individually; EDGAR S. WOOLARD, JR.,
individually; and CABANISS & BURKE, P.A.,
a Florida partnership, f/k/a CABANISS
BURKE & WAGNER, P.A.,

    Defendants.

_____/

**97 - 6611 CA**

**CLASS REPRESENTATION**

S E R V E D

Name _Ronald Cabaniss_
Date _4/2/97_   Time _4:40_
P.S. _Paul Andrews   #976_

Pr__/Sign Name

Certified in The Circuit Court of
_____ Judicial Circuit Cert # _____

## CIVIL ACTION SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of Said State:

**YOU ARE HEREBY COMMANDED** to serve this summons and a copy of the
Complaint in this action on defendant:

    By serving:
    RONALD E. CABANNIS
    Cabaniss & Burke, P.A.
    800 N. Magnolia Avenue
    Orlando, FL 32802

Each defendant is required to respond to the Complaint on
Plaintiff's attorney whose address is: **Harley S. Tropin, Esq.,
Kozyak, Tropin & Throckmorton, P.A., 200 S. Biscayne Blvd., Suite
2800, Miami, Florida 33131** as provided in the Complaint and to file
the original of the defenses with the Clerk of this Court either
before service on Plaintiff's attorney or immediately thereafter.
If a defendant fails to do so, a judgment may be entered against
the defendant for the relief demanded in the Complaint.

DATED ON _____, 1997.

MAR 25 1997

HARVEY RUVIN
As Clerk of Said Court

_____ Deputy Clerk

MAR 26 1997

97 03546

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN
AND FOR DADE COUNTY, FLORIDA

CASE NO. 97-6611-CA 08

EXOTIC BOTANICALS, INC., a
Florida corporation; HODGE
GREENHOUSES, INC., a Florida
Corporation; JOAN D. CONE, INC.
d/b/a TREEHOUSE PLANTS, a Florida
corporation; DONALD WAYNE SIMPSON
d/b/a ORNAMENTAL HORTICULTURE,
a sole proprietorship; and
GATOR GROWERS NURSERY, INC., a
Florida corporation; on behalf of
themselves and all others similarly
situated,

     Plaintiffs,

v.

E.I. DU PONT DE NEMOURS & COMPANY,
Inc., a Delaware corporation;
CRAWFORD & COMPANY, a Georgia
corporation; THOMAS J. BURKE, ESQ.,
individually; TIMOTHY T. OBRIGAWITCH,
individually; EDGAR S. WOOLARD, JR.,
individually; and CABANISS & BURKE, P.A.,
a Florida partnership, f/k/a CABANISS
BURKE & WAGNER, P.A.,

     Defendants.

_____/

**REVENIA S. BLAND**

## PLAINTIFFS' NOTICE OF CLERICAL CORRECTION

Plaintiffs, through their undersigned counsel, hereby notify this Court and all parties of the following clerical corrections to Plaintiffs' Complaint in the above-styled action.  The clerical corrections are as follows:

1.  The case style and text of the Complaint states the name of Defendant as "Thomas J. Burke."  The case style and all textual references to such Defendant should hereafter state, as corrected, "Thomas M. Burke."

2.  The case style and text of the Complaint describe

Plaintiff as "Joan D. Cone, Inc. d/b/a Treehouse Plants, a Florida corporation."  The case style and all textual references shall hereafter state, as corrected, Plaintiff "Joan D. Cone d/b/a Treehouse Plants, a sole proprietorship."

Respectfully submitted this April 8th, 1997 by:

**Attorneys for the Class Members**

KOZYAK TROPIN & THROCKMORTON, P.A.

Harley S. Tropin, Esq.
Florida Bar Number 241253
William Xanttopoulos, Esq.
Florida Bar Number 623598
Adam M. Moskowitz, Esq.
Florida Bar Number 984280
Adam T. Rabin, Esq.
Florida Bar Number 985635
2800 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 372-1800
Telecopy: (305) 372-3508


COOPER & WOLFE, P.A.
Marc Cooper, Esq.
Florida Bar Number 198358
700 Courthouse Tower
44 West Flagler Street
Miami, Florida 33130
Telephone: (305) 371-1597
Telecopy: (305) 374-2460

Co-counsel for the Class Members

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing Plaintiffs'
Notice of Clerical Correction was served this 8th day of April,
1997 via facsimile transmission and U.S. Mail upon Benjamine Reid,
Esq., Popham, Haik, Schnobrich & Kaufman, Ltd., 4000 International
Place, 100 Southeast Second Street, Miami, FL 33131; and by U.S.
Mail upon Cabannis & Burke, P.A., c/o Ronald E. Cabaniss, 800 N.
Magnolia Avenue, Orlando, FL, 32802; and Crawford & Company, c/o
Registered Agent, CT Corporation Systems, 1200 S. Pine Island Road,
Plantation, FL 33324.

_____
Adam M. Moskowitz

2635/101/92997.1

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN
AND FOR DADE COUNTY, FLORIDA

CASE NO. 97-6611 CA 08

EXOTIC BOTANICALS, INC., a
Florida corporation; HODGE
GREENHOUSES, INC., a Florida
Corporation; JOAN D. CONE
d/b/a TREEHOUSE PLANTS, a sole
proprietorship; DONALD WAYNE SIMPSON
d/b/a ORNAMENTAL HORTICULTURE,
a sole proprietorship; and
GATOR GROWERS NURSERY, INC., a
Florida corporation; on behalf of
themselves and all others similarly
situated,

     Plaintiffs,

v.

E.I. DU PONT DE NEMOURS & COMPANY,
Inc., a Delaware corporation;
CRAWFORD & COMPANY, a Georgia
corporation; THOMAS M. BURKE, ESQ.,
individually; TIMOTHY T. OBRIGAWITCH,
individually; EDGAR S. WOOLARD, JR.,
individually; and CABANISS & BURKE, P.A.,
a Florida partnership, f/k/a CABANISS
BURKE & WAGNER, P.A.,

     Defendants.

_____/

REVENIA S. BLAND

### PLAINTIFFS' MOTION TO TRANSFER SECTIONS

    Plaintiffs, Exotic Botanicals, Inc.; Hodge Greenhouses, Inc.;

Joan D. Cone d/b/a Treehouse Plants; Gator Growers Nursery, Inc.,

and Donald Wayne Simpson d/b/a Ornamental Horticulture, on their

own behalf and on behalf of all class members similarly situated,

hereby request that this case be transferred from Section 08 to

Section 23 and state as follows:

    1.  On March 25, 1997 this Class Action complaint was filed

in the Circuit Court of the Eleventh Judicial Circuit in and for

Dade County and randomly assigned to Section 08.

2.    This  Class  Action  involves  allegations  regarding  a product manufactured by E.I. Du Pont De Nemours and Company, Inc. called Benlate.

3.    An Order was previously entered in this Circuit Court transferring all Benlate related litigation to Section 23.

**WHEREFORE**, Plaintiffs respectfully request that this action be transferred from Section 08 to Section 23 for all further proceedings.

Respectfully submitted this April 8th, 1997 by:

**Attorneys for the Class Members**

KOZYAK TROPIN & THROCKMORTON, P.A.

_____
Harley S. Tropin, Esq.
Florida Bar Number 241253
William Xanttopoulos, Esq.
Florida Bar Number 623598
Adam M. Moskowitz, Esq.
Florida Bar Number 984280
Adam T. Rabin, Esq.
Florida Bar Number 985635
2800 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 372-1800
Telecopy: (305) 372-3508


COOPER & WOLFE, P.A.
Marc Cooper, Esq.
Florida Bar Number 198358
700 Courthouse Tower
44 West Flagler Street
Miami, Florida 33130
Telephone: (305) 371-1597
Telecopy: (305) 374-2460

Co-counsel for the Class Members

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing Plaintiffs' Motion to Transfer Sections was served this 8th day of April, 1997 via facsimile transmission and U.S. Mail upon Benjamine Reid, Esq., Popham, Haik, Schnobrich & Kaufman, Ltd., 4000 International Place, 100 Southeast Second Street, Miami, FL 33131; and by U.S. Mail upon Cabannis & Burke, P.A., c/o Ronald E. Cabaniss, 800 N. Magnolia Avenue, Orlando, FL, 32802; and Crawford & Company, c/o Registered Agent, CT Corporation Systems, 1200 S. Pine Island Road, Plantation, FL 33324.

_____
Adam M. Moskowitz

2635/102/93026.1

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR DADE
COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION:

CASE NO.: *97 - 6611 CA 08*

*Exotic Botanicals, Inc.,*
*etc., et al.;*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Plaintiff(s)

vs.

*E. I. Du Pont De Nemours*
*+ Company, Inc., etc.,*
*et al.;*

Defendant(s).

**ORDER GRANTING MOTION
TO TRANSFER**

THIS CAUSE came on to be heard upon the (Plaintiff's)

(Defendant's) Motion to Transfer, and the Court being fully advised in the premises, it is

ORDERED AND ADJUDGED that this cause be and

the same is hereby transferred to Section No. ____*CA 23*____.

DONE AND ORDERED at Miami, Dade County,

Florida, this ____*9*____ day of ____*April*____, 19 *97*.

_____
ADMINISTRATIVE JUDGE

Copies furnished to:

CLK/CT226 10/89 METRO DADE/GSA MAT MGT

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN
AND FOR DADE COUNTY, FLORIDA
CASE NO. 97-6611 CA 08

EXOTIC BOTANICALS, INC., a
Florida corporation; HODGE
GREENHOUSES, INC., a Florida
Corporation; JOAN D. CONE
d/b/a TREEHOUSE PLANTS, a sole
proprietorship; DONALD WAYNE SIMPSON
d/b/a ORNAMENTAL HORTICULTURE,
a sole proprietorship; and
GATOR GROWERS NURSERY, INC., a
Florida corporation; on behalf of
themselves and all others similarly
situated,

    Plaintiffs,

v.

E.I. DU PONT DE NEMOURS & COMPANY,
Inc., a Delaware corporation;
CRAWFORD & COMPANY, a Georgia
corporation; THOMAS M. BURKE, ESQ.,
individually; TIMOTHY T. OBRIGAWITCH,
individually; EDGAR S. WOOLARD, JR.,
individually; and CABANISS & BURKE, P.A.,
a Florida partnership, f/k/a CABANISS
BURKE & WAGNER, P.A.,

    Defendants.

_____/

## CIVIL ACTION SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of Said State:

**YOU ARE HEREBY COMMANDED** to serve this summons and a copy of the
Complaint in this action on defendant:
Edgar S. Woolard, Jr.
c/o Benjamine Reid, Esq.
Popham, Haik, Schnobrich & Kaufman, Ltd.
4000 International Place
100 Southeast Second Street
Miami, FL 33131
Each defendant is required to respond to the Complaint on
Plaintiff's attorney whose address is: **Harley S. Tropin, Esq.,
Kozyak, Tropin & Throckmorton, P.A., 200 S. Biscayne Blvd., Suite
2800, Miami, Florida 33131** as provided in the Complaint and to file
the original of the defenses with the Clerk of this Court either
before service on Plaintiff's attorney or immediately thereafter.
If a defendant fails to do so, a judgment may be entered against
the defendant for the relief demanded in the Complaint.

DATED ON ___**APR 1 1 1997**___, 1997.

        HARVEY RUVIN
        As Clerk of Said Court

        By:_____
               As Deputy Clerk

2635/102/93476.1

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR DADE COUNTY, FLORIDA.

| DIVISION<br>☒ CIVIL<br>☐ OTHER | **SERVICE OF PROCESS RETURN** | CASE NUMBER<br>97-6611 CA 08 |
|---|---|---|

| PLAINTIFF(S)<br><br>EXOTIC BOTANICALS, INC.,<br>ET, AL | VS. DEFENDANT(S)<br><br>E.I. DU PONT DE NEMOURS &<br>CO., INC., ET, AL | CLOCK IN |
|---|---|---|

☒ ORIGINAL SUMMONS ☐ ALIAS SUMMONS ☐ OTHER

Pursuant to the request of ___HARLEY S. TROPIN, ESQ.___ , whose office is located at

__200 S. BISCAYNE BLVD., #2800, MIAMI__ and pursuant to the authority conferred on me by the blanket

order of appointment executed by the Judge having jurisdiction over the above action and the Chief Judge's Administrative

Order No. 93-50 dated October 1, 1993 , I, ___PETER KURSCHNER___ ____510____ , received this process on
(Name of Server)                              (I.D. No.)

__4-11-97 at 1 PM__ and served same on __EDGAR S. WOOLARD, JR.__
(Date)                                                      (Name of Defendant)

at __100 S.E. SECOND ST., #4000, MIAMI, FL__ on __4-14-97__ at __11:30 A__. M.
(Address)                                          (Date)           (Time)

☐ INDIVIDUAL SERVICE: By serving the within named person a copy of the writ, and a copy of the complaint, petition
or initial pleading.

☐ SUBSTITUTE SERVICE: By serving a copy of this writ, and a copy of the complaint, petition or initial pleading at

the defendants usual place of abode on a person permanently residing therein, to wit, _____
(Name)

_____ , who is 15 years of age or older and informing the person of the contents.

☐ CORPORATE SERVICE: By serving a copy of this writ and a copy of the plaintiff's initial pleading to

_____ as _____ or any employee of defendant corporation in the
(Party Served)                    (Position)

absence of any superior officer as defined in Florida Statute, Section 48.081 when defendant's corporation does not keep
a registered agent present as required by F.S., Section 48.091.

☒ OTHER SERVICE: Refer to legal authority if known and fully describe method of service __BY SERVING__
__BENJAMINE REID, ESQ., (PAUL NETTLETON, HIS PARTNER ACCEPTED SERVICE.)__

_____

☐ NO SERVICE: For the reason that diligent search and inquiry failed to locate said:

_____ in Dade County, Florida.

I ACKNOWLEDGE that I am a Certified Process Server in the Circuit in which this defendant was served, and that
I have no interest in the above action.

| PROCESS SERVER (Signature): | I.D. NO. |
|---|---|

The foregoing instrument was acknowledged before me this __14th__ day of __APRIL__ , 19 __97__
by __PETER KURSCHNER__ , CERTIFIED PROCESS SERVER who is **personally known to me** or who has
name and title
produced _____ and who ____DID____ take an oath.
(type of identification)                              did or did not

NOTARY PUBLIC OR PUBLIC OFFICER AND TITLE OR RANK CCN

CC 619814
2/6/2001

NOTARY PUBLIC STATE OF FLORIDA
BONDED THRU GENERAL INS. UND.

FORM 1

**T. C. MANN, INC. Tel. 577-0220**

Johnson s Printing 374-5946

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN
AND FOR DADE COUNTY, FLORIDA
CASE NO. 97-6611 CA 08

EXOTIC BOTANICALS, INC., a
Florida corporation; HODGE
GREENHOUSES, INC., a Florida
Corporation; JOAN D. CONE
d/b/a TREEHOUSE PLANTS, a sole
proprietorship; DONALD WAYNE SIMPSON
d/b/a ORNAMENTAL HORTICULTURE,
a sole proprietorship; and
GATOR GROWERS NURSERY, INC., a
Florida corporation; on behalf of
themselves and all others similarly
situated,

    Plaintiffs,

v.

E.I. DU PONT DE NEMOURS & COMPANY,
Inc., a Delaware corporation;
CRAWFORD & COMPANY, a Georgia
corporation; THOMAS M. BURKE, ESQ.,
individually; TIMOTHY T. OBRIGAWITCH,
individually; EDGAR S. WOOLARD, JR.,
individually; and CABANISS & BURKE, P.A.,
a Florida partnership, f/k/a CABANISS
BURKE & WAGNER, P.A.,

    Defendants.

_____/

### CIVIL ACTION SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of Said State:

**YOU ARE HEREBY COMMANDED** to serve this summons and a copy of the
Complaint in this action on defendant:

    Thomas M. Burke, Esq.
    Maguire, Voorhis & Wells
    25 Orange Avenue
    Orlando, FL 32801

Each defendant is required to respond to the Complaint on
Plaintiff's attorney whose address is: **Harley S. Tropin, Esq.,
Kozyak, Tropin & Throckmorton, P.A., 200 S. Biscayne Blvd., Suite
2800, Miami, Florida 33131** as provided in the Complaint and to file
the original of the defenses with the Clerk of this Court either
before service on Plaintiff's attorney or immediately thereafter.
If a defendant fails to do so, a judgment may be entered against
the defendant for the relief demanded in the Complaint.

DATED ON   **APR 1 0 1997**_____, 1997.

              HARVEY RUVIN,
              As Clerk of said Court

              By:_____
                  As Deputy Clerk

97004184

☐ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR DADE COUNTY, FLORIDA.

| DIVISION | SERVICE OF PROCESS RETURN | CASE NUMBER |
|---|---|---|
| XX CIVIL<br>☐ OTHER | | 97-6611 CA 08 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | CLOCK IN |
|---|---|---|
| EXOTIC BOTANICALS, INC.,<br>ET, AL | E.I. DU PONT DE NEMOUS & CO.<br>INC., ET, AL | |

☒ ORIGINAL SUMMONS ☐ ALIAS SUMMONS ☐ OTHER

Pursuant to the request of __HARLEY S. TROPIN, ESQ.__ , whose office is located at __200 S. BISCAYNE BLVD., #2800, MIAMI__ and pursuant to the authority conferred on me by the blanket order of appointment executed by the Judge having jurisdiction over the above action and the Chief Judge's Administrative Order No. 93-50 dated October 1, 1993, I, __PETER KURSCHNER__ __510__ , received this process on
_____(Name of Server)_____(I.D. No.)

__4-14-97 at 10:30AM__ and served same on __THOMAS M. BURKE, ESQ.__
(Date)                                         (Name of Defendant)

at __2nd ADD.: 701 BRICKELL AVE., Ste. 1900,__ on __4-14-97__ at __12:15 P.M.__
__MIAMI, FL__ (Address)                          (Date)              (Time)

☐ INDIVIDUAL SERVICE: By serving the within named person a copy of the writ, and a copy of the complaint, petition or initial pleading.

☐ SUBSTITUTE SERVICE: By serving a copy of this writ, and a copy of the complaint, petition or initial pleading at the defendants usual place of abode on a person permanently residing therein, to wit, _____
(Name)

_____ , who is 15 years of age or older and informing the person of the contents.

☐ CORPORATE SERVICE: By serving a copy of this writ and a copy of the plaintiff's initial pleading to
_____ as _____ or any employee of defendant corporation in the
(Party Served)                 (Position)

absence of any superior officer as defined in Florida Statute, Section 48.081 when defendant's corporation does not keep a registered agent present as required by F.S., Section 48.091.

☒ OTHER SERVICE: Refer to legal authority if known and fully describe method of service __BY SERVING__
__DOUGLAS O'KEEFE, ESQ., THOMAS M. BURKE'S ATTY. AT RUDEN MCCLOSKY, SMITH,__
__SCHUSTER & RUSSELL, P.A. PER HARLEY S. TROPIN INSTRUCTIONS.__
__SUMMONS AND COMPLAINT LEFT TO SABRINA SOTO, RECEPTIONIST.__

☐ NO SERVICE: For the reason that diligent search and inquiry failed to locate said:

_____ in Dade County, Florida.

I ACKNOWLEDGE that I am a Certified Process Server in the Circuit in which this defendant was served, and that I have no interest in the above action.

PROCESS SERVER (Signature): _____     I.D. NO. __510__

The foregoing instrument was acknowledged before me this __14th__ day of __APRIL__ , 19__97__
by __PETER KURSCHNER__ , CERTIFIED PROCESS SERVER who is personally known to me or who has
name and title
produced _____ and who _____DID_____ take an oath.
(type of identification)                                     did or did not

| NOTARY PUBLIC OR PUBLIC OFFICER AND TITLE OR RANK<br>OFFICIAL NOTARY SEAL<br>Marilynn Mees | CC 619814<br>2/6/2001 | NOTARY PUBLIC STATE OF FLORIDA<br>BONDED THRU GENERAL INS., UND |
|---|---|---|

FORM 1

**T. C. MANN, INC. Tel. 577-0220**

Johnson's Printing 374-5946

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN
AND FOR DADE COUNTY, FLORIDA

CASE NO. 97-6611 CA 23

EXOTIC BOTANICALS, INC., a
Florida corporation; HODGE
GREENHOUSES, INC., a Florida
corporation; JOAN D. CONE
d/b/a TREEHOUSE PLANTS, a sole
proprietorship; DONALD WAYNE SIMPSON
d/b/a ORNAMENTAL HORTICULTURE,
a sole proprietorship; and
GATOR GROWERS NURSERY, INC., a
Florida corporation; on behalf of
themselves and all others similarly
situated,

       CLASS REPRESENTATION

    Plaintiffs,

v.

E.I. DU PONT DE NEMOURS & COMPANY,
Inc., a Delaware corporation;
CRAWFORD & COMPANY, a Georgia
corporation; THOMAS M. BURKE, ESQ.,
individually; TIMOTHY T. OBRIGAWITCH,
individually; EDGAR S. WOOLARD, JR.,
individually; and CABANISS & BURKE, P.A.,
a Florida partnership, f/k/a CABANISS
BURKE & WAGNER, P.A.,

    Defendants.

_____/

### FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
### TO DEFENDANT DUPONT

Plaintiffs, Exotic Botanicals, Inc.; Hodge Greenhouses, Inc.;

Joan D. Cone d/b/a Treehouse Plants; Gator Growers Nursery, Inc.;

and Donald Wayne Simpson d/b/a Ornamental Horticulture, on their

own behalf and on behalf of all class members similarly situated,

hereby propounds this First Request for Production upon Defendant

E.I. du Pont de Nemours & Company, Inc., ("DuPont"), to be answered

under oath within (30) thirty days, in accordance with the Florida

Rules of Civil Procedure.

**Attorneys for the Class Members**

KOZYAK TROPIN & THROCKMORTON, P.A.

_____
Harley S. Tropin, Esq.
Florida Bar Number 241253
William Xanttopoulos, Esq.
Florida Bar Number 623598
Adam M. Moskowitz, Esq.
Florida Bar Number 984280
2800 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 372-1800
Telecopy: (305) 372-3508


COOPER & WOLFE, P.A.
Marc Cooper, Esq.
Florida Bar Number 198358
700 Courthouse Tower
44 West Flagler Street
Miami, Florida 33130
Telephone: (305) 371-1597
Telecopy: (305) 374-2460

Co-counsel for the Class Members


## CERTIFICATE OF SERVICE

   **I HEREBY CERTIFY** that a true copy of the foregoing was served this 21st day of April, 1997 by U.S. Mail and hand-delivery upon **Benjamine Reid, Esq.,** Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A. P.O. Box 019101, 4000 International Place, 100 Southeast Second Street, Miami, FL 33131 (representing Defendants DuPont, Crawford and Woolard); **Douglas O'Keefe, Esq.,** Ruden, McClosky, et. al., 701 Brickell Avenue, Suite 1900, Miami, FL 33131 (representing Defendants Burke and Cabaniss & Burke, P.A.), and **Timothy T. Obrigawitch,** 52 Belmont Drive, Hockessin, Delaware 19707.

_____
Adam M. Moskowitz

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN
AND FOR DADE COUNTY, FLORIDA

CASE NO. 97-6611 CA 23

EXOTIC BOTANICALS, INC., a
Florida corporation; HODGE
GREENHOUSES, INC., a Florida
corporation; JOAN D. CONE
d/b/a TREEHOUSE PLANTS, a sole
proprietorship; DONALD WAYNE SIMPSON
d/b/a ORNAMENTAL HORTICULTURE,
a sole proprietorship; and
GATOR GROWERS NURSERY, ·INC., a
Florida corporation; on behalf of
themselves and all others similarly
situated,

     Plaintiffs,

v.

E.I. DU PONT DE NEMOURS & COMPANY,
Inc., a Delaware corporation;
CRAWFORD & COMPANY, a Georgia
corporation; THOMAS M. BURKE, ESQ.,
individually; TIMOTHY T. OBRIGAWITCH,
individually; EDGAR S. WOOLARD, JR.,
individually; and CABANISS & BURKE, P.A.,
a Florida partnership, f/k/a CABANISS
BURKE & WAGNER, P.A.,

     Defendants.

_____/

### PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT
### E.I. DU PONT DE NEMOURS & COMPANY, INC.

Plaintiffs, Exotic Botanicals, Inc.; Hodge Greenhouses, Inc.;

Joan D. Cone d/b/a Treehouse Plants; Gator Growers Nursery, Inc.;

and Donald Wayne Simpson d/b/a Ornamental Horticulture, on their

own behalf and on behalf of all class members similarly situated,

hereby propound their First Set of Interrogatories to Defendant

E.I. du Pont de Nemours & Company, Inc., ("DuPont"), to be answered

under oath within (30) thirty days, in accordance with the Florida

Rules of Civil Procedure.

## DEFINITIONS OF TERMS AND INSTRUCTIONS

1.    "You" and\or "your" refers to DuPont, its agents, employees, and/or representatives and, unless privileged, attorneys and accountants.

2.    "Document" or "documents" shall mean any writing, letter, telegram, memorandum, correspondence, memorandum or note of conference or telephone conversations, report, laboratory notes, laboratory journals, study, list, compilation of data, papers, books, records, contracts, agreements, pictures, photographs, transcripts, tapes, microfilm, microfiche, computer data files, printouts, vouchers, accounting statement, mechanical and electrical recordings, checks, deposit slips, pleadings and all other tangible things upon which any handwriting, typing, printing, drawing, photostatic, or other copy, laser, cd-rom, magnetic or electrical impulses or other form of communication is recorded, stored or produced, including audio and video recordings and computer-stored information, whether or not in printout form. These terms shall also mean copies of documents even though the originals are not in your possession, custody or control; every copy of a document which contains handwritten or other notations or which otherwise does not duplicate the original of any other copy; and all attachments to any document.

3.    "DuPont" refers to E.I. du Pont de Nemours & Company, Inc., its affiliates, agents, employees, independent contractors, consultants, directors, officers, scientists, researchers, salespersons, distributors and/or representatives and, unless privileged, attorneys and accountants.

4.    "Benlate" shall refer to any and all variations and versions of the Benlate product produced, manufactured or distributed by or for DuPont, including, but not limited to: Benlate 50 WP; Benlate 50 DF; Benlate 50 GD; Benlate 50 FS; Benlate 50 PM; Benlate 75 DF; and Benlate PNW.

5.    "Claim" shall include any and all suits filed against DuPont and/or Crawford; any files opened for the matter by DuPont and/or Crawford and any settlement of the matters paid for by DuPont and/or Crawford.

6.    The phrase "test" shall include any and all research projects, studies, experiments, investigations, trials, analysis, examinations and/or scientific inquiries.

7.    The phrases "relate to" and "relating to" shall mean to contain, evidence, comment on, respond to, show, describe, analyze, reflect, summarize, constitute or have any topical and/or factual relation to the matter described.

8.   The words "and" and "or" shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of these requests and documents that might be deemed outside their scope by another construction.

9.   Whenever and wherever appropriate, the singular form of a word should also be interpreted in the plural.

10.  1,3-dibutyl urea will be referred to as "DBU".

11.  The terms "identify" or "identity" when used in reference to (a) a natural individual, means to state his or her full name and residential and business addresses, and phone number and provide a summary of the individual's knowledge; (b) a corporation, means to state its full corporate name and any names under which it does business, State of incorporation, the address of its principal place of business and the address of all of its offices in Florida; (c) a business or trust, means to state the full name or style under which the business is conducted, its business address or addresses, the types of business in which it is engaged, the geographic areas in which it conducts its business and the identity of the person or persons who own, operate and control the business; (d) a document, means to state the number of pages and the nature of the document (e.g., letter or memorandum), its title, date, the name or names of its author(s) and recipient(s) and its present location and custodian(s).

12.  If all the information furnished and answered to all or part of an Interrogatory is not within the personal knowledge of the affiant, identify each person to whom all or part of the information furnished is a matter of personal knowledge and each person who communicated to the affiant any part of the information furnished.

13.  In the event any Interrogatory calls for identification of a document, information or an event you contend is privileged, attorneys' work product or trial preparation materials, in whole or in part, the information should be given or the document or event identified to the fullest extent possible consistent with such claim of privilege.  If privilege is claimed as to a document, at least the following information should be furnished: the nature, date, subject matter, and author of the document, as well as the names and job titles of all persons to whom the document was directed, addressed or received, and the paragraph of this discovery request to which the document responds. You are further required to set forth as to any document, information or event for which privilege, attorneys' work product or trial preparation materials is claimed: the nature of the privilege claimed, the grounds relied upon for the claim of privilege (with specificity), the person who claims the privilege and whether there has been any waiver of the privilege.  If there has been a waiver, provide a detailed description of the circumstances surrounding the waiver.

## **INTERROGATORIES**

1.    Identify the quantity and net sales of Benlate 50 DF, in Florida, for each year inclusive of 1987 through 1992.

2.    In regards to the Benlate 50 DF field trials conducted by DuPont in Florida and Hawaii in 1991 and 1992 (the "Field Test"), please identify: (a) all non-DuPont statisticians that reviewed the Field Test protocols prior to conducting the referenced tests; (b) all non-DuPont persons that made applications of chemicals during the Field Tests; and (c) all non-DuPont persons that reviewed the treatments in the Field Tests (excluding any and all members of DuPont's "External Advisory Panel").

3.    Identify all tests (including the date(s), location(s), and result(s)), conducted by DuPont with Benlate 75 DF (in response to this question, please do not list any tests where Benlate 75 DF was not applied).

4.    DuPont document numbered BEX 0220157, which is a letter from P.R. Kolb dated December 19, 1985 and titled "Benlate DF Meeting 12/13/85", states that "[m]arketing needs 1,000 - 2,500 M lbs. for field testing in commercial equipment. Some material must be available by April 1."   In regards to this document, please identify: (a) whether the 1,000 - 2,500 M lbs of Benlate 50 DF were provided to DuPont's marketing department, as indicated in the document; (b) if such testing was conducted, please identify the location and date of the referenced tests; and (c) identify the date and location of any and all greenhouse testing performed specifically with Benlate 50 DF, prior to the products sale to the public.

5.    Identify all persons that attended the meeting between members   of   Ag   Products   and   DuPont's   Central   Research   and Development Department, on April 6, 1992 (which included DuPont's Ray Geddens, Frank DeGennaro, Michael Duffy, Thomas Ray, and Jay Julis) as referenced in DuPont document BSH 0190093.

6.    Was Edgar Woolard informed (prior to December 1995) by any DuPont employee, agent and/or representative, as to any events conducted by DuPont in Costa Rica from July 1992 until December 1992.

7.    Identify all Benlate claims that were authorized to be settled by: (a) John Krol, and/or (b) Edgar Woolard.

8.    Identify all TCALs established by DuPont for the presence of sulfonylureas in Benlate 50 DF (including the date and amount of such TCAL).

9.    Identify all persons that reported damage after applying Benlate 50 DF and/or Benlate 50 WP, to ornamental plants in Australia and/or New Zealand.

10.   Identify all depositions and/or trial testimony during litigation relating to Benlate, where testimony was provided by Timothy Obrigawitch and/or Bruce Hadley and where one of the following individuals were in attendance: (a) Thomas Burke; (b) Frank Shepherd; and/or (c) Patrick Lee.

11.   Were any samples (of any kind, including but not limited to wipe samples, etc.) taken from DuPont's Belle facility (whether within the building and/or from the immediate surrounding vicinity) and tested for the presence of benomyl and/or any sulfonylurea; if yes, please identify the date, location and results of each tests.

12.   Identify any and all tests that DuPont conducted in Costa Rica in 1992, at the Monte Vista site, where Benlate 50 DF and/or Benlate 50 WP was applied.

13.   Identify any and all individuals with any knowledge concerning any activities which took place in Costa Rica for or on behalf of DuPont, on September 16 and 17, 1992, including any and all of DuPont's inside and outside attorneys (including but not limited to Frank Shepherd, Bruce Hadley, Patrick Lee, J.F. Schmutz; D.L. Marvel; J.R. Bowman, etc.).

14.   Identify all individuals that attended the November 4, 1985 DuPont meeting entitled "Development Commercialization of Benlate DF."

15.   Stephen Denis in his May 19, 1992 letter to A. Jay Julis states, in part, that "I do not recall any specific phytotoxicity testing at Stine Research Farms for Benlate DF."  Identify any and all phytotoxicity testing performed at the Stine Research Farms on specifically Benlate 50 DF prior to the products sale to the public, (include the date and person(s) involved with each such test(s)).

16.   Identify all ornamental growers in Florida (with name, address and telephone number) that reported any and all plant injury after applications of Benlate 50 DF and/or Benlate 50 WP.

17.   DuPont document numbered BFL 0720142-145 is a memorandum from Larry Gillham dated July 25, 1991.   In the his memorandum, Gillham states:

(a) "[t]here were also some semi-comparisons where Benlate was used and not used and a difference in growth and etc. could be seen." Identify the location of these "semi-comparisons" and the nursery location;

(b) "On one occasion planted cucumber's in soil removed from growers pots where had previous problems and did see a reaction in the form of reduced growth, unpward [sic] leaf cupping, yellowing and marginal necrosis."   Identify the location and date of this cucumber test and the current location of the documents relating to this test;

(c) "also have a grower study which showed symptoms 9 months after treatment (new growth starting)." Identify the name and location of this grower; and

(d)   "we have seen sypmtomology with few number of applications."   Identify the location of these observations referenced in this statement.

18.   DuPont document numbered LCOR00528 is an October 16, 1991 memorandum from Morris Bailey to Larry Yawn.   The memorandum states, in part, "[w]e are investigating recropping complaints directly and at least for now do not expect Crawford to get involved unless specifically requested by DuPont." Identify all of these recropping complaints as referenced in this document.

19.   Identify all tests (including the date(s), location(s), and current location of all documents relating to such activities), conducted by DuPont to establish any and all TCALs for Benlate 50 DF.

20.   Identify each country in Central America, South America and the Middle East, where Benlate 50 DF was exported and the amounts of Benlate 50 DF exported.

21.   DuPont document BNT 0520006 is a memorandum from Robert Reiser to Dennis Keeler dated June 18, 1992.  In the memorandum Reiser states, in part, that "[t]he sample you delivered ... showed damage in Fla. tests.... Our data suggested a high dibutyl urea (DBU) level, and the sample was submitted for a quantitative DBU analysis.   The level was determined to be 1.9%.   Per Jay Julis, this level of DBU will cause injury with 2 or more drench applications at label rate.... Dave Osbun's tests showed that DF is more hygroscopic than WP, and that significantly more DBU is formed in DF than WP when both are stored in closed containers at high temperature.... 20% of the opened box samples returned by growers had 1% or higher DBU level (per Jay Julis)."  (a) Please explain the procedures and techniques utilized with the referenced "quantitative DBU analysis"; (b) Please identify the basis for Julis' conclusion that "this level of DBU will cause injury with 2 or more drench applications at label rate"; (c) Identify the number of boxes of Benlate 50 DF returned by growers which were tested for levels of DBU and identify the results of all such testing.

22.   Identify the full name, job title, current locations, for the following individuals (and indicate if any such person(s) are currently employed by DuPont):

```
a.   J.F. Schmutz        b.   D.L. Marvel
c.   J.R. Bowman         d.   D.C. Holm
e.   W. Mademann         f.   A.C. Camp
```

_____
Signature

STATE OF             )
                       )  SS:
COUNTY OF          )

      The foregoing instrument was acknowledged before me this _____

day of _____, 1997 by _____, as the

_____ of _____, who is personally known to

me or who has produced a _____ Driver's License as

identification and who took an oath.

_____     (signature   of   person   taking
                             acknowledgment)

_____     (name of officer taking acknowledgment,
                             typed, printed or stamped)

Notary Public _____     (title or rank)

_____

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN
AND FOR DADE COUNTY, FLORIDA

CASE NO. 97-6611 CA 23

EXOTIC BOTANICALS, INC., a
Florida corporation; HODGE
GREENHOUSES, INC., a Florida
corporation; JOAN D. CONE                    CLASS REPRESENTATION
d/b/a TREEHOUSE PLANTS, a sole
proprietorship; DONALD WAYNE SIMPSON
d/b/a ORNAMENTAL HORTICULTURE,
a sole proprietorship; and
GATOR GROWERS NURSERY, INC., a
Florida corporation; on behalf of
themselves and all others similarly
situated,

    Plaintiffs,

v.

E.I. DU PONT DE NEMOURS & COMPANY,
Inc., a Delaware corporation;
CRAWFORD & COMPANY, a Georgia
corporation; THOMAS M. BURKE, ESQ.,
individually; TIMOTHY T. OBRIGAWITCH,
individually; EDGAR S. WOOLARD, JR.,
individually; and CABANISS & BURKE, P.A.,
a Florida partnership, f/k/a CABANISS
BURKE & WAGNER, P.A.,

    Defendants.
_____/

## FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
## TO DEFENDANT DUPONT

    Plaintiffs, Exotic Botanicals, Inc.; Hodge Greenhouses, Inc.;

Joan D. Cone d/b/a Treehouse Plants; Gator Growers Nursery, Inc.;

and Donald Wayne Simpson d/b/a Ornamental Horticulture, on their

own behalf and on behalf of all class members similarly situated,

hereby propounds this First Request for Production upon Defendant

E.I. du Pont de Nemours & Company, Inc., ("DuPont"), to be answered

under oath within (30) thirty days, in accordance with the Florida

Rules of Civil Procedure.

## INSTRUCTIONS

1. As provided for by the Florida Rules of Civil Procedure:

a. The below enumerated requested documents are to be produced in Dade County, Florida within thirty (30) days from the date of service hereof.

2. Where a claim of privilege is asserted in objecting to any document demand, or subpart thereof, and a document is not provided on the basis of such assertion, for each document not provided state the following:

a. Whether the attorney-client privilege, the work-product doctrine, or another form of privilege provides the basis for withholding the document;

b. the type of document being withheld (letter, memo, etc.);

c. the date of the document;

d. the name of the author and all recipients;

e. the relationship of the parties privy to the communication;

f. if applicable, the bates stamp number;

g. the nature of the legal advice sought or rendered;

h. the current location of the document;

i. the circumstances indicating the confidential nature of the communication; and if applicable

j. the litigation for which the document was prepared.

3.    A word in the singular tense may be read in its plural tense if such is appropriate in the context in which it is used, and vice versa, and the use of one gender shall include the other.

4.    Indicate the request number(s) to which the documents produced are responsive.

5.    Unless otherwise indicated below, the relevant time period for this discovery request, shall be between January, 1970, and the present time.

6.    You are to produce all documents in your possession, custody or control, including, without limitation, all documents that are in the files (whether personal, business or any other files), possession, custody or control of your attorneys, beneficiaries, advisors, accountants, consultants, employers, agents, employees or representatives, or any other person or entity from whom you have the right to secure or compel the production of the requested documents.  If, for any reason, you are unable to produce in full any document or the document is otherwise damaged, produce such document to the fullest extent possible and then identify the document and specify the reasons for your inability to produce the document in full.

7.    Documents shall be produced as they are kept in the usual course of business or as organized and labeled to correspond to the categories set forth hereinbelow.  File folders, labels and indices identifying documents requested herein shall be produced intact with such documents.  Documents attached to each other shall not be separated.

## DEFINITIONS OF TERMS

1.    "You" and/or "your" refers to DuPont, its agents, employees, servants or representatives and, unless privileged, attorneys and accountants.

2.    "Document" or "documents" shall mean any writing, letter, telegram, memorandum, correspondence, memorandum or note of conference or telephone conversations, report, laboratory notes, laboratory journals, study, list, compilation of data, papers, books, records, contracts, agreements, pictures, photographs, transcripts, tapes, microfilm, microfiche, computer data files, printouts, vouchers, accounting statement, engineering diagrams, mechanical and electrical recordings, checks, deposit slips, pleadings and all other tangible things upon which any handwriting, typing, printing, drawing, representation, photostatic, or other copy, laser, cd-rom, magnetic or electrical impulses or other form of communication is recorded, stored or produced, including audio and video recordings and computer-stored information, whether or not in printout form.  These terms shall also mean copies of documents even though the originals are not in your possession, custody or control; every copy of a document which contains handwritten or other notations or which otherwise does not duplicate the original of any other copy; and all attachments to any document.

3.    "DuPont" refers to E.I. du Pont de Nemours & Company, Inc., its affiliates, agents, employees, independent contractors, consultants, directors, officers, scientists, researchers, salespersons, distributors or representatives and, unless

privileged, attorneys and accountants.

4.    "Crawford" refers to Crawford & Company, its affiliates, agents, employees, independent contractors, consultants, directors, officers, scientists, researchers, salespersons, distributors or representatives and, unless privileged, attorneys and accountants.

5.    "Benlate" shall refer to any and all variations and versions of the Benlate product produced, manufactured and/or distributed by or for DuPont, including, but not limited to: Benlate 50 WP; Benlate 50 DF; Benlate 75 DF; Benlate 50 PM; Benlate 50 FS; Benlate 50 GD; and Benlate PNW.

6.    The phrases "relate to" and "relating to" shall mean to contain, evidence, comment on, respond to, show, describe, analyze, reflect, summarize, constitute or have any topical and/or factual relation to the matter described.

7.    The words "and" and "or" shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of these requests the or any documents that might be deemed outside their scope by another construction.

8.    The phrase "test" shall include any and all research projects, studies, experiments, investigations, trials, analysis, examinations and/or scientific inquiries.

## DOCUMENTS REQUESTED

1.    Produce a copy of the following DuPont tests:

(a)   The "Orchid Spray Intercept" test by R. Guinivan as mentioned on DuPont document numbered BSH 0211014;

(b)   The "UK Processing Study" by J. Wheeler, L. Shalaby, M.E. McNally and C. Powley, as mentioned in the "DPX H6573 Quarterly Report" on DuPont document numbered BSH 0221488;

(c)   The "Brazilian Soil Studies" as mentioned by Konrad Kmetz in his notes of the "Fungicide Development Committee Meeting" of April 8, 1988, on DuPont document numbered BSH 0211564; and

(d)   The "Soil Spray Interception Study" as mentioned under the heading "Projects Being Managed by Environmental Studies for Support of DPX-H6573 Registration" by Konrad Kmetz in his notes of the October 9, 1989 "Fungicide Development Committee Meeting", and listed on DuPont document numbered BSH 0211279.

2.    Produce any and all documents (including but not limited to the initial protocols, raw data, preliminary surveys, purchase receipts, etc.) relating to the following DuPont tests:

(a)   The "Orchid Spray Intercept" test by R. Guinivan as mentioned on DuPont document numbered BSH 0211014;

(b)   The "UK Processing Study" by J. Wheeler, L. Shalaby, M.E. McNally and C. Powley, as mentioned in the "DPX H6573 Quaterly Report" on DuPont document numbered BSH 0221488;

(c)   The "Brazilian Soil Studies" as mentioned by Konrad Kmetz in his notes of the "Fungicide Development Committee Meeting" of April 8, 1988, on DuPont document numbered BSH 0211564; and

(d)   The "Soil Spray Interception Study" as mentioned under the heading "Projects Being Managed by Environmental Studies for Support of DPX-H6573 Registration" by Konrad Kmetz in his notes of the October 9, 1989 "Fungicide Development Committee Meeting", and listed on DuPont document numbered BSH 0211279.

3.    Produce correct and complete copies of all supporting receipts and invoices, including bills and other supporting documentation, for the employee expense reports and third party invoices, or requests for reimbursement for travel in Costa Rica in July through December 1992 for: Robert Ackerson, Erick Seay, Timothy Obrigawitch, Jill Obrigawitch, Gerald Stephenson, Jim Dallas, Marc Ruggiero, Ray Geddens, Mel Garber, Bruce Hadley, Frank Shepherd, George Frank, Morris Bailey, John Golden and Leon Vargas.

4.    Any and all documents relating to any plants stored, grown, held, tested, rooted and/or analyzed, by DuPont and/or any of its consultants, in Costa Rica at the Monte Vista site, during the time frame of August 1992 through February 1993, including but not limited to, any and all notes, E-mails, memoranda and/or correspondences, etc.

5.    Any and all documents which relate to payments made to Leon Vargas from the law firm of Popham, Haik for any and all work performed at the Monte Vista site in Costa Rica, including but not limited to, the original $500.00 check written by the law firm of Popham, Haik to Leon Vargas (including the complete check stub).

6.    Produce the letters that were sent from L.M. Gardner to L.F. Taylor on or about December 20, 1980, and from P.R. Kolb sent to G.W. Schwing on or about July 25, 1985, as referenced in Warren Yap's draft interrogatory response in the Clyde Richardson case (DuPont document numbered BEX 0250252), where Yap stated, in part, that "the product had failed most of our product specifications. This data was shown in Table II of the letter from L.M. Gardner to L.F. Taylor on 12/20/80."

7.    Any and all documents relating to the Benlate litigation in Belgium in the 1980's, including but not limited to, any and all documents generated by, copied to and/or sent to DuPont scientist Charles Delp.

8.    Any and all documents relating to tests conducted by DuPont where Benlate 75 DF was applied.

9.    All documents, including any and all raw data, which provide the basis for Jay Julis' statement regarding flusilazole in Benlate, when he stated that it (flusilazole) had "some problems if it is used as a soil drench," described in Alice Trivellas' August 30, 1990 memorandum to Ron Hamlen (DuPont document numbered BWM 0020156).

10.    DuPont document numbered BEX 0220124-27 is an April 17, 1986 memorandum from G.W. Schwing to Claude Corty and states, in part, under the heading "Benlate DF" that "dry compacted Benlate is two months past goal due to physical and chemical stability problems and an easy solution is not in sight."  Please produce all documents which form the basis for Schwing's statement as to the "physical and chemical stability problems" with Benlate DF.

11.    DuPont document numbered BEX 0220124-27 is an April 17, 1986 memorandum from G.W. Schwing to Claude Corty and states under the heading "Benlate DF", in part, that "[t]he problem is that benomyl fails to disperse after the compacted formulation is aged for three weeks in a 45 C over ... Problem seems to be related to benomyl particle growth in the compacted product, and small particle size of benomyl (approximately 2 microns) and moisture sensitivity of benomyl.  We are aging some of Earl's samples in 243 Building to represent warehouse storage."  Produce any and all documents: (a) which Schwing relied upon to form his statements (including any and all raw data from such experiments); and (b) any and all documents relating to the referenced "aging" tests in the 243 Building.

12.    Claude Corty's affidavit dated October 14, 1982, filed to extend the term for DuPont's patent of Benlate in South Africa, states, in part, that "it was found that the formulation's stability was adversely affected by the presence of any impurities either in the benomyl compound itself or in the ingredients with which it was to be formulated.    This instability of the formulation, often accompanied by a decrease in biological activity, was found to occur independently of moisture content" and "a need to maintain an exceptionally high level of purity in the preparation and formulation of benomyl was appreciated."  Produce any and all documents Corty relied upon in making these statements regarding Benlate.

13.    Produce complete and correct copies of the minutes (as well as all attachments) for the following DuPont Board of Director meetings: (a) January 29, 1992; (b) February 26, 1992; (c) April 29, 1992; (d) June 24, 1992; (e) October 24, 1992; and (f) April 23, 1993.

14.    Produce any and all documents, relating to Benlate, that were distributed, generated and/or reviewed, at the following DuPont Board of Director meetings: (a) January 29, 1992; (b) February 26, 1992; (c) April 29, 1992; (d) June 24, 1992; (e) October 28, 1992; and (f) April 28, 1993.

15.   Any and all documents that were provided to DuPont's Board of Directors relating to Benlate, including but not limited to:

(a)  the letter dated October 14, 1992 (with all attachments) sent by Edgar Woolard to all members of DuPont's Board of Directors regarding the Native Hammock v. DuPont case; and

(b)  the letter dated June 16, 193 (with all attachments) sent by Edgar Woolard to all members of DuPont's Board of Directors stating, in part, that after extensive testing, DuPont was convinced that Benlate was not the cause of the reported crop damage.

16.   Any and all documents (including all raw data) relating to the sulfonylurea testing performed by Alta Analytical Laboratory, Inc. in 1993 on the following three Alta identified soil samples of Benlate claimants: (a) Alta ID 12582; (b) Alta ID 12768; and (c) Alta ID 12771.

17.   Any and all documents (including all raw data) resulting from Alta Analytical Laboratory, Inc.'s test of 14 soil samples sent to Alta by Eugene Moody and collected by Dr. Phil Banks in the investigation of the Benlate claim of Indigo Marsh Nursery.

18.   In his letter dated September 9, 1991 to Craig Monroe, A. Jay Julis makes certain statements regarding complaints from users of Benlate 50 DF.  Please produce any and all documents which serve as the basis for his following statements: (a) "Benlate has a real growth regulatory effect"; (b) "Over formulated Benlate DF", "No labelled margin of safety from the growth regulator effects in labeled drench applications so an excessively over formulated or reformulated Benlate DF material means plant damage."; and (c) "Old '87-'89 Benlate DF stored improperly generates high levels of a breakdown product called DBU.  This can cause burn in drench application at levels low as 3%.  We had samples come in with levels at 10+ %."

19.   DuPont document BNT 0520006 is a memorandum from Robert Reiser to Dennis Keeler dated June 18, 1992.   In the memorandum Reiser states, in part, that "[t]he sample you delivered ... showed damage in Fla. tests.... Our data suggested a high dibutyl urea (DBU) level, and the sample was submitted for a quantitative DBU analysis.   The level was determined to be 1.9%.   Per Jay Julis, this level of DBU will cause injury with 2 or more drench applications at label rate.... Dave Osbun's tests showed that DF is more hygroscopic than WP, and that significantly more DBU is formed in DF than WP when both are stored in closed containers at high temperature.... 20% of the opened box samples returned by growers had 1% or higher DBU level (per Jay Julis)."   (a) Produce all documents which evidence the damage caused by the referenced sample (identified as the "Roberts 1991 Program Benlate DF") in the "Fla. tests"; (b) Produce all the referenced "data" that "suggested a high dibutyl urea (DBU) level"; (c) Produce all documents relating to the referenced "quantitative DBU analysis" of the Benlate 50 DF sample; (d) Produce all documents from Dave Osbun's tests which, in part, showed that "significantly more DBU is formed in DF than WP when both are stored in closed containers at high temperature"; and (d) Produce all documents relating to the testing of the referenced "opened box samples" by DuPont for DBU levels.

20.   Produce any and all documents specifically relating to DuPont's testing of wipe samples from its Belle plant facility for the detection of sulfonylureas.

21.   In Robert Reiser's letter to John Nickle dated August 14, 1991, Reiser states that Chuck Powley previously analyzed a Platte DF sample that was aged 2 weeks at 40C and found the DBU level increased .17% to 1.7%.   Produce any and all documents relating to Powley's test.

22.  Produce a copy of Chuck Powley's lab notebooks numbered: (a) 9642 (1984-85); (b) E-45350 (1986-1988); and (c) E-45349 (Powley 1986).

23.  Produce a complete and correct copy of the following DuPont studies: (a) the September 1987 study by A.J. Julis entitled "Tip Burn Evaluation"; (b) the August 1987 study by M. J. Henry entitled "Flusilazole Mode of Action"; and (c) the September 1987 study by R.J. Howard entitled "Cytology Study".

24.  Produce a copy of any and all sworn interrogatory responses provided by DuPont in: (a) the lawsuit brought by Terra against DuPont relating to Benlate claims; and (b) any case brought by an insurance company against DuPont in regards to the payment of Benlate claims.

25.  Please send a correct copy of the following DuPont documents, which are all currently located at DuPont's warehouse of documents in Newark, Delaware:

| | | | |
|---|---|---|---|
| BLG 0100010 | BLG 0100016 | BLG 0100019 | BPM 0143167 |
| BPM 0070933 | BPM 0050025 | BHS 0140142 | BHS 0140326 |
| BLG 0920029 | BLG 0920054 | BLG 0920059 | BLG 0960024 |
| BLG 0960314 | BEX 0190001 | BEL 0410059 | BEX 1850068 |
| BEX 0220124 | BWM 0030374 | BTO 0010018 | BEX 0290261 |
| BVE 0850001 | BEX 2110003 | BFN 0310434 | BFN 0310020 |
| BHS 0082972 | BEX 0160053 | | |

| | | | |
|---|---|---|---|
| BFN 0310438-0439 | BHS 0040023-0023 | | BHS 0082970-2971 |
| BJW 0061727-1738 | BPM 0063660-3660 | | |
| BFN 0300043-0045 | BTO 0010054-0057 | | BII 0003898-3899 |
| BTO 0010425-0427 | BTO 0010059-0097 | | |
| BII 0003136-3137 | BLP 0071179-0099 | | BLG 0910150-0168 |
| BLG 0910170-0185 | BLG 0910187-0196 | | BLG 0920024-0028 |
| BLG 0960073-0078 | BLG 0960271-0273 | | BEX 1850219-0221 |
| BWM 0070025-0075 | BEL 0230485-0486 | | BSH 0071107-1108 |
| BWM 0292750-2754 | BWM 0693763-3764 | | BWM 0731587-1591 |
| BWM 0731932-1933 | BFD 0030131-0134 | | BFZ 0220020-0046 |
| BFZ 0220056-0075 | BSH 0211567-1570 | | BWM 0662061-2077 |
| BWV 0132463-2501 | BEX 2040017-0020 | | BNT 0070665-0666 |
| BPM 0020195-0198 | BLG 0100023-0026 | | |

Attorneys for the Class Members

KOZYAK TROPIN & THROCKMORTON, P.A.

_____

Harley S. Tropin, Esq.
Florida Bar Number 241253
William Xanttopoulos, Esq.
Florida Bar Number 623598
Adam M. Moskowitz, Esq.
Florida Bar Number 984280
2800 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 372-1800
Telecopy: (305) 372-3508 -

COOPER & WOLFE, P.A.
Marc Cooper, Esq.
Florida Bar Number 198358
700 Courthouse Tower
44 West Flagler Street
Miami, Florida 33130
Telephone: (305) 371-1597
Telecopy: (305) 374-2460

Co-counsel for the Class Members

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was served this 21st day of April, 1997 by U.S. Mail and hand-delivery upon **Benjamine Reid, Esq.,** Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A. P.O. Box 019101, 4000 International Place, 100 Southeast Second Street, Miami, FL 33131 (representing Defendants DuPont, Crawford and Woolard); **Douglas O'Keefe, Esq.,** Ruden, McClosky, et. al., 701 Brickell Avenue, Suite 1900, Miami, FL 33131 (representing Defendants Burke and Cabaniss & Burke, P.A.), and **Timothy T. Obrigawitch,** 52 Belmont Drive, Hockessin, Delaware 19707.

_____

Adam M. Moskowitz

2635/102/93933.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

EXOTIC BOTANICALS, INC., a Florida
corporation; HODGE GREENHOUSES,
INC., a Florida corporation; JOAN D.
CONE, INC., d/b/a TREEHOUSE
PLANTS, a sole proprietorship;
DONALD WAYNE SIMPSON d/b/a
ORNAMENTAL HORTICULTURE, a
sole proprietorship; and GATOR
GROWERS NURSERY, INC., a Florida
corporation; on behalf of themselves
and all other similarly situated,

     Plaintiffs.

vs.

E.I. DU PONT DE NEMOURS &
COMPANY, INC., a Delaware
corporation; CRAWFORD &
COMPANY, a Georgia corporation;
THOMAS M. BURKE, ESQ.,
individually; TIMOTHY T.
OBRIGAWITCH, individually; EDGAR
S. WOOLARD, JR., individually; and
CABANNIS & BURKE, P.A., a Florida
partnership, f/k/a CABANISS BURKE &
WAGNER, P.A.,

     Defendants.

CASE NO.:

MAGISTRATE:

**DEFENDANTS', THOMAS M. BURKE
ESQ., AND CABANISS & BURKE,
P.A.'s NOTICE OF CONSENT TO AND
JOINDER IN DEFENDANTS, E.I.
DUPONT DE NEMOURS & COMPANY,
INC.'s ET AL. NOTICE OF REMOVAL**

_____/

    Defendants, THOMAS M. BURKE, ESQ., and CABANISS & BURKE, P.A., f/k/a

CABANISS BURKE & WAGNER, P.A., hereby consent to and join in the removal of the above

styled cause to the United States District Court, Southern District of Florida, Miami Division.  This



EXHIBIT

"B"

1

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

notice has been filed by Defendants within thirty (30) days of the date it was first ascertained this cause is removable.

Wherefore, Defendants, THOMAS M. BURKE, ESQ., and CABANISS & BURKE, P.A., f/k/a CABANISS BURKE & WAGNER, P.A., respectfully requests this court assume jurisdiction.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail to: **R. Benjamin Reid, Esq.**, CARLTON, FIELDS, WARD, EMMANUEL, SMITH & CUTLER, P.A, Attorneys for DUPONT, CRAWFORD, OBRIGAWITCH and WOOLARD, NationsBank Tower at International Place, Suite 4000, 100 Southeast Second Street, Miami, Florida 33131; **Harley S. Tropin, Esq.** KOZYAK TROPIN & THROCKMORTON, P.A., Attorney for Plaintiffs, 2800 First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131; and **Mark Cooper, Esq.**, COOPER & WOLFE, P.A., Co-Counsel for Plaintiffs, 700 Courthouse Tower, 44 West Flagler Street, Miami, Florida 33130, this _____*25*<sup>th</sup>_____ day of April, 1997.

<div style="margin-left:40%;">

Respectfully submitted,

RUDEN, McCLOSKY, SMITH
SCHUSTER & RUSSELL, P.A.
Attorneys for Defendants,
THOMAS M. BURKE, ESQ., and
CABANISS & BURKE, P.A.
701 Brickell Avenue
Suite 1900
Miami, Florida 33131
(305) 789-2700
Fax: (305) 789-2793

By:_____
    Calvin E. David
    Florida Bar No.: 110871
    Douglas L. O'Keefe
    Florida Bar No.: 21253

</div>

2

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
DADE COUNTY, FLORIDA

CASE NO.: 97-6611 CA 23

EXOTIC BOTANICALS, INC., a Florida
corporation; HODGE GREENHOUSES,
INC., a Florida corporation; JOAN D.
CONE, INC. d/b/a TREEHOUSE
PLANTS, a sole proprietorship;
DONALD WAYNE SIMPSON d/b/a
ORNAMENTAL HORTICULTURE, a
sole proprietorship; and GATOR
GROWERS NURSERY, INC., a Florida
corporation; on behalf of themselves
and all others similarly situated,

     Plaintiffs,

E.I. DU PONT DE NEMOURS &
COMPANY, INC., a Delaware
corporation; CRAWFORD &
COMPANY, a Georgia corporation;
THOMAS M. BURKE, ESQ.,
individually; TIMOTHY T.
OBRIGAWITCH, individually; EDGAR
S. WOOLARD, JR., individually; and
CABANISS & BURKE, P.A., a Florida
partnership, f/k/a CABANISS BURKE &
WAGNER, P.A.,

     Defendants.

_____   /

## DEFENDANTS' NOTICE OF FILING NOTICE OF REMOVAL

Defendants, E.I. DuPONT DE NEMOURS & COMPANY ("DuPont"), CRAWFORD

& COMPANY, INC. ("Crawford"), EDGAR S. WOOLARD, JR., and TIMOTHY T.

OBRIGAWITCH, pursuant to 28 U.S.C. § 1446(d), hereby give notice to the Clerk of the Court

of the Eleventh Judicial Circuit, in and for Dade County, Florida, that on the 25th day of April,



EXHIBIT
"C"

1997, Defendants removed this action to the United States District Court for the Southern District of Florida, pursuant to 28 U.S.C. §§ 1331, 1332, 1337, 1441 and 1446.

Further, this Court is required to take no further action and to stay all proceedings before this Court, pursuant to 28 U.S.C. § 1446(d), unless and until further order is forthcoming from the United States District Court for the Southern District of Florida, remanding this action to the Circuit Court. Absent entry of a Remand Order issued by the United States District Court for the Southern District of Florida, the Circuit Court of the Eleventh Judicial Circuit, in and for Dade County, Florida, is divested of jurisdiction over this cause and is requested to stay all actions and undertake no further proceedings. Attached hereto as Exhibit "A" and incorporated herein by reference is a copy of the Notice of Removal filed with the United States District Court for the Southern District of Florida, by and on behalf of the named Defendants.

Respectfully submitted,

CARLTON, FIELDS, WARD,
EMMANUEL, SMITH & CUTLER, P.A.
100 S.E. Second Street, Suite 4000
Miami, FL  33131
Counsel for E.I. du Pont de Nemours
& Co., Crawford & Co., Edgar S.
Woolard, Jr., and Timothy T.
Obrigawitch
Phone: (305) 530-0050
Fax: (305) 530-0055

By:

BENJAMINE REID
FLORIDA BAR NO. 183522
PAUL L. NETTLETON
FLORIDA BAR NO. 396583

2

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished

via U.S. Mail this 25th day of April, 1997 to  HARLEY S. TROPIN, ESQUIRE, KOZYAK

TROPIN & THROCKMORTON, P.A., Attorneys for Plaintiffs, 2800 First Union Financial

Center, 200 South Biscayne Boulevard, Miami, Florida  33131;  MARK COOPER, ESQUIRE,

COOPER & WOLFE, P.A., Co-counsel for Plaintiffs, 700 Courthouse Tower, 44 West Flager

Street, Miami, Florida  33130;  and DOUGLAS L. O'KEEFE, ESQUIRE, RUDEN,

McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A., Attorneys for Defendants, Thomas M.

Burke, Esq. and Cabaniss & Burke, P.A., 701 Brickell Avenue, Suite 1900, Miami, Florida

33131.

> CARLTON, FIELDS, WARD,
> EMMANUEL, SMITH & CUTLER, P.A.
> 100 S.E. Second Street, Suite 4000
> Miami, FL  33131
> Counsel for E.I. du Pont de Nemours
> & Co., Crawford & Co., Edgar S.
> Woolard, Jr., and Timothy T.
> Obrigawitch
> Phone: (305) 530-0050
> Fax: (305) 530-0055
>
> By: _____
>     BENJAMINE REID
>     FLORIDA BAR NO. 183522
>     PAUL L. NETTLETON
>     FLORIDA BAR NO. 396583

136513

3

# CIVIL COVER SHEET

**97-1264**
**CIV-LENARD**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**MAGISTRATE**
**JOHNSON**

## I (a) PLAINTIFFS

EXOTIC BOTANICALS, INC., a Florida corporation; et al.  (See attached)

## DEFENDANTS

E.I. du Pont de Nemours & Company, Inc., a Delaware corporation, et al.  (See attached for complete style)

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF __Dade__
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

FILED by ___ D.C.
INTAKE
APR 25 1997
CARLOS JUENKE
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

See attached

ATTORNEYS (IF KNOWN)

See attached

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:
(DADE) MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN × IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN × IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

RICO alleging violations of 18 U.S.C. sections 1341, 1343, 1622, and products liability.  Diversity under 28 U.S.C. section 1332.

IVa. 3+ years days estimated (for both sides) to try entire case. (if class certified)

## V. NATURE OF SUIT (PLACE AN × IN ONE BOX ONLY)

### A CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability

### A REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### A TORTS
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**PERSONAL INJURY**
☐ 362 Personal Injury — Med Malpractice
☐ 365 Personal Injury — Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### A CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights

### B PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence Habeas Corpus
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights

### B FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

### A LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt Relations
☐ 730 Labor/Mgmt Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

### A BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### A PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### B SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### A FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS — Third Party 26 USC 7609

### A OTHER STATUTES
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc
☐ 460 Deportation
☒ 470 Racketeer Influenced and Corrupt Organizations
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions

## VI. ORIGIN (PLACE AN × IN ONE BOX ONLY)

☐ 1 Original Proceeding
☒ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Refiled
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A ☒ CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ $1million+

Check YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____    DOCKET NUMBER _____

DATE  4-25-97

SIGNATURE OF ATTORNEY OF RECORD  PAUL L. NETTLETON

FOR OFFICE USE ONLY:  Receipt No. 75883   Amount: $150.00

UNITED STATES DISTRICT COURT
S/F  I-2

Date Paid: 4/25/97

## CIVIL COVER SHEET ATTACHMENT

1(a).   STYLE:

EXOTIC BOTANICALS, INC., a Florida )
corporation;  HODGE GREENHOUSES, )
INC., a Florida corporation;  JOAN D. )
CONE, INC. d/b/a TREEHOUSE )
PLANTS, a sole proprietorship; )
DONALD WAYNE SIMPSON d/b/a )
ORNAMENTAL HORTICULTURE,  a )
sole proprietorship;  and GATOR )
GROWERS NURSERY, INC., a Florida )
corporation;  on behalf of themselves )
and all others similarly situated, )
)
     Plaintiffs, )
)
E.I. DU PONT DE NEMOURS & )
COMPANY, INC., a Delaware )
corporation;  CRAWFORD & )
COMPANY, a Georgia corporation; )
THOMAS M. BURKE, ESQ., )
individually;TIMOTHY T. )
OBRIGAWITCH, individually;  EDGAR )
S. WOOLARD, JR., individually;  and )
CABANISS & BURKE, P.A., a Florida )
partnership, f/k/a CABANISS BURKE & )
WAGNER, P.A., )
)
     Defendants. )
_____ )

1(c)   Attorneys

HARLEY S. TROPIN, ESQUIRE
KOZYAK TROPIN & THROCKMORTON, P.A.
Attorneys for Plaintiffs
2800 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Phone (305) 372-1800

MARK COOPER, ESQUIRE
COOPER & WOLFE, P.A.
Co-counsel for Plaintiffs
700 Courthouse Tower
44 West Flager Street
Miami, Florida  33130
Phone (305) 371-1597

CALVIN F. DAVID, ESQUIRE
DOUGLAS L. O'KEEFE, ESQUIRE
RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.
Attorneys for Defendants, Thomas M. Burke, Esq. and Cabaniss & Burke, P.A.
701 Brickell Avenue, Suite 1900
Miami, Florida  33131
Phone: (305) 789-2700

BENJAMINE REID, ESQUIRE
PAUL L. NETTLETON, ESQUIRE
CARLTON, FIELDS, WARD,
EMMANUEL, SMITH & CUTLER, P.A.
100 S.E. Second Street, Suite 4000
Miami, FL  33131
Counsel for E.I. du Pont de Nemours
& Co., Crawford & Co., Edgar S. Woolard, Jr.
and Timothy T. Obrigawitch
Phone: (305) 530-0050
Fax: (305) 530-0055

1136610.1